**ORAL ARGUMENT NOT YET SCHEDULED**
No. 26-5028

# In the United States Court of Appeals for the District of Columbia Circuit

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellant*,

v.

META PLATFORMS, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Columbia

**BRIEF OF THE AMERICAN ANTITRUST INSTITUTE AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT AND VACATUR**

Randy M. Stutz
Kathleen W. Bradish
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue NW
Suite 1000
Washington, DC 20036
(202) 304-0195

Brendan Benedict
Michael D. Altebrando
BENEDICT LAW GROUP PLLC
322 G Street NE
Washington, DC 20002
(212) 287-9501
*brendan@benedictlawgroup.com*

*Counsel for Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record submits this Certificate as to Parties, Rulings, and Related Cases:

### A. Parties and *Amici*

Except for the following *amici* and any other *amici* who have not yet entered an appearance in this case, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the FTC's brief:

1. American Antitrust Institute
2. State of Texas
3. State of Alaska
4. State of Arkansas
5. State of Colorado
6. District of Columbia
7. State of Delaware
8. State of Florida
9. State of Idaho
10. State of Indiana
11. State of Iowa
12. State of Kansas
13. State of Kentucky

14. State of Louisiana
15. State of Maryland
16. State of Missouri
17. State of Montana
18. State of Nebraska
19. State of Nevada
20. State of New Jersey
21. State of North Dakota
22. State of Ohio
23. State of Oklahoma
24. State of Oregon
25. State of Pennsylvania
26. State of South Carolina
27. State of South Dakota
28. State of Tennessee
29. State of Utah
30. State of West Virginia

## B. Rulings under Review

References to the rulings at issue appear in the FTC's brief.

### C. Related Cases

The case has not previously been on review before this Court or any other court (except the district court) and the undersigned is unaware of any related cases pending in this Court or any other court.

May 29, 2026

Respectfully submitted,

/s/ *Brendan Benedict*
Brendan Benedict
BENEDICT LAW GROUP PLLC
322 G Street NE
Washington, DC 20002
(212) 287-9501
*brendan@benedictlawgroup.com*

*Counsel for amicus curiae*

## CORPORATE DISCLOSURE STATEMENT

The American Antitrust Institute is a nonprofit organization that has issued no stock or stake to the public, and has no parent companies, subsidiaries, or affiliates that issued any stock or stake to the public.

## STATEMENT REGARDING CONSENT TO FILE AND JUSTIFICATION FOR SEPARATE BRIEFING

All parties consented to the timely and rule-compliant filing of this brief. Pursuant to D.C. Circuit Rule 29(d), I certify that this separate *amicus* brief is necessary because it provides unique insights regarding the application of antitrust and competition principles from the perspective of a non-profit consumer antitrust organization and because to my knowledge no other *amici* address these principles in this way. Additionally, I am unaware that any other *amicus* has briefed the issues of market shares, inferences from economic profits, or the narrowest market principle.

May 29, 2026

Respectfully submitted,

/s/ *Brendan Benedict*
Brendan Benedict
BENEDICT LAW GROUP PLLC
322 G Street NE
Washington, DC 20002
(212) 287-9501
*brendan@benedictlawgroup.com*

*Counsel for amicus curiae*

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............. i

CORPORATE DISCLOSURE STATEMENT ..................................................... iv

STATEMENT REGARDING CONSENT TO FILE AND JUSTIFICATION FOR SEPARATE BRIEFING ........................................................................................ v

TABLE OF CONTENTS ........................................................................... vi

TABLE OF AUTHORITIES ........................................................................ vii

GLOSSARY ............................................................................................ xi

STATUTES AND REGULATIONS .............................................................. xii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ........................................... 1

SUMMARY OF ARGUMENT ......................................................................... 2

STANDARD OF REVIEW ............................................................................ 5

ARGUMENT ............................................................................................ 6

I. The District Court Misapplied Fundamental Market Definition Principles... 6

   A. The District Court Erred in Failing to Analyze Reasonable Interchangeability for the Same Purposes. ........................................ 11

   B. The District Court Erred in Applying the HMT Using Evidence of Diversion from Infinite and Temporary Price Increases. ................... 15

   C. The District Court Did Not Distinguish Between Overlapping Markets or Define the Narrowest Market. ...................................................... 17

   D. The District Court Failed to Account for Evidence That TikTok and YouTube Do Not Constrain Meta's Profits. ...................................... 21

II. The District Court Independently Erred in its Market Share-Based Analysis of Monopoly Power. ........................................................................ 22

CONCLUSION ........................................................................................ 26

## TABLE OF AUTHORITIES

### Cases

*Bailey v. Allgas, Inc.*,
284 F.3d 1237 (11th Cir. 2002) ........................................................................24

*Broadway Delivery Corp. v. UPS, Inc.*,
651 F.2d 122 (2d Cir. 1981)..............................................................................23

*Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co.*,
885 F.2d 683 (10th Cir. 1989)............................................................................25

*Eastman Kodak Co. v. Image Tech. Servs.*,
504 U.S. 451 (1992) ..........................................................................................19

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024) *and* 144 S. Ct. 682 (2024) ................................................................................................. 9

*Epic Games, Inc. v. Google LLC (In re Google Play Store Antitrust Litig.)*,
147 F.4th 917 (9th Cir. 2025), *cert. pet. dismissed per stipulation*, 146 S. Ct. 1051 (2026) .........................................................................................................10

*FTC v. Arch Coal, Inc.*,
329 F. Supp. 2d 109 (D.D.C. 2004), *appeal voluntarily dismissed*, Nos. 04-5291, 04-7120, 2004 U.S. App. LX 19405 (D.C. Cir. Sept. 15, 2004) ............. 11, 12, 19

*FTC v. Edwards Lifesciences Corp.*,
Civ.-A.-No.-25-2569(RC), 2026 LX 80846 (D.D.C. Jan. 9, 2026)...............11, 15

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) .......................................................................... 8

*FTC v. Hackensack Meridian Health, Inc.*,
30 F.4th 160 (3d Cir. 2022)................................................................................ 8

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) .......................................................................................... 6

*FTC v. Meta Platforms, Inc.*,
811 F. Supp. 3d 67 (D.D.C. 2025)............ 7, 12, 15, 16, 17, 18, 20, 22, 23, 24, 25

*FTC v. Penn State Hershey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016)........................................................................ 5

*FTC v. Staples*,
970 F. Supp. 1066 (D.D.C. 1997) ..............................................................10, 11

*FTC v. Sysco Corp.*,
113 F. Supp. 3d 1 (D.D.C. 2015) ...............................................................11, 19

*FTC v. Whole Foods Mkt., Inc.*,
548 F.3d 1028 (D.C. Cir. 2008).....................................................................1, 16

*Hayden Publ'g Co. v. Cox Broad. Corp.*,
730 F.2d 64 (2d Cir. 1984)..........................................................................24

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ......................................................................25

*In re Lorazepam & Clorazepate Antitrust Litig.*,
MDL No. 1290, 2005 U.S. Dist. LX 51209 (D.D.C. Mar. 29, 2005)..................25

*NCAA v. Alston*,
594 U.S. 69 (2021) ....................................................................................... 7

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) ......................................................................................6, 18

*Reazin v. Blue Cross & Blue Shield, of Kan., Inc.*,
899 F.2d 951 (10th Cir. 1990)...............................................................9, 24, 25

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995).........................................................................24

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
96 F.4th 327 (2d Cir. 2024)......................................................................... 8

*Teradata Corp. v. SAP SE*,
124 F.4th 555 (9th Cir. 2024), *cert. denied*, 146 S. Ct. 118 (2025)...................6, 8

*Times–Picayune Publ'g Co. v. United States*,
345 U.S. 594 (1953). .......... 14

*United States v. Aetna Inc.*,
240 F. Supp. 3d 1 (D.D.C. 2017) .......... 19

*United States v. Aluminum Co. of Am.*,
148 F.2d 416 (2d Cir. 1945) .......... 23

*United States v. Anthem, Inc.*,
855 F.3d 345 (D.C. Cir. 2017) .......... 1, 5

*United States v. E. I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) .......... 8, 12, 15

*United States v. Eastman Kodak Co.*,
63 F.3d 95 (2d Cir. 1995) .......... 7

*United States v. Google LLC*,
747 F. Supp. 3d 1 (D.D.C. 2024),
*appeal pending*, No. 26-5023 (D.C. Cir.) .......... 11, 12, 15, 24

*United States v. H&R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011) .......... 19

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam) .......... 6, 8, 10

*Vasquez v. Ind. Univ. Health, Inc.*,
40 F.4th 582 (7th Cir. 2022) .......... 10

*Worldwide Basketball & Sport Tours, Inc. v. NCAA*,
388 F.3d 955 (6th Cir. 2004) .......... 5

**Books, Articles, and Reports**

Herbert Hovenkamp, *Antitrust and eMarkets*,
36 Stan. L. & Pol'y Rev. 147 (2025) .......... 13, 14

Thomas G. Krattenmaker, Robert H. Lande & Steven C. Salop, *Monopoly Power and Market Power in Antitrust Law*, 76 Geo. L.J. 241 (1987) .......... 9

Hon. Richard A. Posner, *Antitrust Law* (2d ed. 2001) ........................................... 7

Steven C. Salop, *The First Principles Approach to Antitrust,* Kodak*, and Antitrust at the Millennium*, 68 Antitrust L.J. 187 (2000) ................................................ 6

U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* (Aug. 9, 2010) ........20

U.S. Dep't of Justice & FTC, *Merger Guidelines* (Dec. 18, 2023) ....................8, 10

Gregory J. Werden, *Market Delineation Under the Merger Guidelines: Monopoly Cases & Alternative Approaches*, 16 Rev. Indus. Org. 211 (2000) ...................... 9

**Other Authorities**

Thomas J. Klotz, *Monopoly Power: Use, Proof and Relationship to Anticompetitive Effects in Section 2 Cases* (FTC Staff Working Paper, Dec. 1, 2008), https://tinyurl.com/ycya9z64 ..................................................................... 9

Steven C. Salop, *A Modern Economic Approach to Antitrust Law* (Feb. 2, 2026) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5379164 ..........................22

Steven C. Salop, *Potential Competition and Antitrust Analysis: Monopoly Profits Exceed Duopoly Profits* (Apr. 28, 2021) (OECD panel paper), *available at*: https://tinyurl.com/4v6rr2z5 .........................................................................18

## GLOSSARY

AAI American Antitrust Institute

FTC Federal Trade Commission

HMT Hypothetical Monopolist Test

PSN Personal Social Networking

SSNIP Small but Significant, Non-Transitory Increase in Price

## STATUTES AND REGULATIONS

All applicable statutes, rules, etc., are contained in the FTC's brief.

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The American Antitrust Institute ("AAI") is an independent nonprofit organization devoted to promoting competition that protects consumers, businesses, and society. It serves the public through research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy. AAI enjoys the input of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders.

AAI has filed numerous *amicus* briefs advocating for the proper legal and economic analysis of relevant antitrust markets in this Court and around the country. *See, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023); *United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017); *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008). It has an interest in ensuring that markets are defined properly so as not to obscure anticompetitive effects that harm consumers.

---

[1] No counsel for any party authored this brief in whole or part, and no person apart from *amicus* or its outside counsel contributed money intended to fund the brief's preparation and submission. AAI's General Counsel previously worked in the FTC's Office of the General Counsel, and he was timely screened from the AAI's participation here. AAI President Randy Stutz and Senior Counsel David Fisher were previously at the FTC during the pendency of this case but did not participate in this case while there.

## SUMMARY OF ARGUMENT

The FTC sued to challenge Meta's acquisitions of Instagram and WhatsApp as acts of monopoly maintenance in the market for personal social networking services (the "PSN" market), which centers on the use-case for broadcast sharing with friends and family. The evidence at trial included an email in which founder Mark Zuckerberg agreed that the purpose of the Instagram acquisition was to "neutralize a potential competitor." FTC Br. 8. That evidence bears directly on Meta's monopoly power. A firm without monopoly power has no economic incentive to spend billions of dollars acquiring nascent rivals because eliminating just one or two potential entrants would not confer meaningful protection from competition in the market as a whole. That Meta did so is evidence of an existing power that the acquisition was designed to preserve.

But when it defined the relevant market, the district court took as given the world in which Meta's monopolization scheme had already succeeded rather than start from a competitive baseline. As a result, each of its findings was infected by a variation of the same economic and legal error: using evidence of time shifts away from the PSN market *after* monopolization to define an overbroad market that would be meaningful in assessing competition *before* monopolization. Separate and apart from another critical error—applying Section 13(b) of the FTC Act at the time of trial instead of the time of suit—the district court treated today's purported

divergence as evidence of yesterday's substitution. Its erroneous analysis should be vacated.

I. The district court's timing error led it to misapply foundational principles of market definition in four related but distinct ways. *First*, it erred in discounting functional interchangeability in its analysis of reasonable interchangeability for the same purposes, the touchstone of market definition. Without evidence of why consumers shifted time across apps, the district court had no more reason to conclude that TikTok and YouTube compete with Meta's apps in the PSN market than it had to conclude that Meta's apps compete with TikTok and YouTube for short-form video consumption.

*Second*, it erred in analyzing the cross-elasticity of demand to draw the market's boundaries. While the hypothetical monopolist test ("HMT") focuses on small and durable price increases of 5%, the district court considered purported divergence in response to temporary price increases from 12% to infinity to draw the market's boundaries. This necessarily defined an overbroad market.

*Third*, faced with these evidentiary problems, the district court erred by failing to recognize that Meta on the one hand and TikTok and YouTube on the other may compete in markets that are broader than or overlapping with the PSN market the FTC alleged. In its application of the HMT, the district court failed to cite, let alone apply, the narrowest market principle, which holds that markets

should be defined from the inside out. Here, that would have meant starting with a hypothetical market comprised of Facebook and Instagram and then adding other apps until a small but significant and non-transitory increase in price or decrease in quality (“SSNIP”) would be profitable. Instead, the district court defined the market from the outside in, starting with Snapchat and reasoning backwards to conclude that TikTok and YouTube should be included, too. That was a fundamental market definition error: defining a market based on firms, not products.

*Fourth*, the district court drew the wrong inference from the evidence of Meta’s sustained economic profits, believing that Meta’s persistent profits despite TikTok’s entry and YouTube’s audience expansion was exculpatory. The proper inference from that evidence was the opposite: that those platforms do not constrain Meta’s profits from the PSN market and therefore do not participate in it.

II. After misapplying market definition principles, the district court erred further in finding that the FTC did not prove monopoly power based on the market shares it established, even with TikTok as part of the PSN market. There is no 65% market share threshold for finding monopoly power, and the better reasoned authorities find that a monopoly power inference requires above a 50% share of the market, a threshold the FTC’s evidence surpassed.

The Court should vacate the judgment and remand for the district court to analyze the relevant market and Meta's monopoly power based on correct principles.

## STANDARD OF REVIEW

"[W]hile a district court's conclusion concerning what constitutes the relevant market is subject to the clearly erroneous standard of review, the district court's formulation of the market tests may be freely reviewed on appeal as a matter of law." *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 960 (6th Cir. 2004) (citation modified); *see also United States v. Anthem, Inc.*, 855 F.3d 345, 368 (D.C. Cir. 2017) (noting that, "importantly," defendant had not "allege[d] any error of law" in market definition on appeal). *De novo* review can apply as much to "economic theory as" it does to "legal analysis." *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 336–37 (3d Cir. 2016) (reviewing "application of the hypothetical monopolist test" *de novo* and then reversing). Thus, "where a district court applies an incomplete economic analysis or an erroneous economic theory to those facts that make up the relevant . . . market, it has committed legal error subject to plenary review." *Id.*

# ARGUMENT

## I. The District Court Misapplied Fundamental Market Definition Principles.

Market definition helps identify "the area of effective competition"—that is, the breadth of products within a geographic location that serve as a meaningful competitive constraint on the defendant's products. *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (citation modified); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 57 (D.C. Cir. 2001) (en banc) (per curiam) ("Structural market power analyses are meant to determine whether potential substitutes constrain a firm's ability to raise prices above the competitive level . . ."). "[T]he purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition," and they "are but a surrogate for detrimental effects." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) (citation modified). As a result, "market definition must be relevant to the theory of harm at issue . . . ." *Teradata Corp. v. SAP SE*, 124 F.4th 555, 570 (9th Cir. 2024) (citation modified), *cert. denied*, 146 S. Ct. 118 (2025); *see also* Steven C. Salop, *The First Principles Approach to Antitrust,* Kodak*, and Antitrust at the Millennium*, 68 Antitrust L.J. 187, 188 (2000) (arguing that markets should be defined "in reference to the primary evaluation of the alleged anticompetitive conduct and its likely market effects"). Accordingly,

market definition cannot be the first item of a "rote checklist" under the rule of reason. *NCAA v. Alston*, 594 U.S. 69, 97 (2021).

Under these principles, market definition analysis should shed light on whether the acquisitions of Instagram and WhatsApp helped Meta maintain a monopoly. Defining the market based on today's evidence, years after the acquisitions, risks mistaking evidence of purported diversion away from monopoly prices or levels of quality and toward distant substitutes as evidence of genuine competition. After all, even "poor substitutes . . . constrain monopoly pricing" because "[a] sufficiently large price increase will make poor substitutes at the competitive price look good to consumers . . . ." Hon. Richard A. Posner, *Antitrust Law* 149 (2d ed. 2001) (Kindle pagination). If an antitrust market is "so broadly defined as to include poor substitutes," then that "will understate" monopoly power. *Id.* Crediting substitution away from a monopoly price or level of quality and thereby defining the market too broadly is an economic error known as the "Cellophane Fallacy," as the district court acknowledged. *See FTC v. Meta Platforms, Inc.*, 811 F. Supp. 3d 67, 107 (D.D.C. 2025); *see also United States v. Eastman Kodak Co.*, 63 F.3d 95, 103 (2d Cir. 1995); FTC Br. 58–62.

Competitive effects analysis in a monopoly maintenance case, then, must account for the competitive baseline in a hypothetical world without the

monopolizing conduct, against which the effects of the conduct can be assessed.[2] One common method that courts and economists use to determine this competitive baseline is to define a relevant market using the HMT. *See FTC v. H.J. Heinz Co.*, 246 F.3d 708, 718 (D.C. Cir. 2001); *see also, e.g.*, *Teradata*, 124 F.4th at 565–66; *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024); *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 169 (3d Cir. 2022). In all cases, the relevant product market "must include all products 'reasonably interchangeable by consumers *for the same purposes*.'" *Microsoft*, 253 F.3d at 52 (emphasis added) (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).

The HMT helps a court determine which products are reasonably interchangeable and thus constrain the monopolist's pricing and quality. The HMT defines a relevant market as one in which a hypothetical monopolist of the product(s) at issue could impose a small but significant and non-transitory increase in price (SSNIP)—or decrease in quality, *see* U.S. Dep't of Justice & FTC, *Merger Guidelines* 42 (Dec. 18, 2023)—without losing so many customers that the price

[2] Even so, imperfections and uncertainty in the hypothetical world cannot take on so much importance that "liability turn[s] on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct," as that "would only encourage monopolists to take more and earlier anticompetitive action." *Microsoft*, 253 F.3d at 79.

increase or quality decrease is unprofitable. In a monopoly maintenance case, the alleged harm is premised on an existing monopoly having already imposed monopoly prices or levels of quality, such that the relevant question is whether the challenged conduct prevented a decrease in prices or increase in quality. The benchmark for the SSNIP test is thus the price or level of quality that "would prevail but for the challenged conduct"—here, absent the challenged acquisitions.[3]

Because consumers may substitute away from products in a monopolized market to products they would not consider substitutes in a competitive market, it is important not to include these products in the relevant market. "Otherwise, a court may risk a false negative: *over*-defining a market and finding no market power where, in fact, it does exist." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 n.7 (9th Cir. 2023) (emphasis in original), *cert. denied*, 144 S. Ct. 681 (2024) *and* 144 S. Ct. 682 (2024).[4] A proper application of the HMT "does not always lead

---

[3] Thomas J. Klotz, *Monopoly Power: Use, Proof and Relationship to Anticompetitive Effects in Section 2 Cases* 14 n.57 (FTC Staff Working Paper, Dec. 1, 2008), https://tinyurl.com/ycya9z64 (quoting Gregory J. Werden, *Market Delineation Under the Merger Guidelines: Monopoly Cases & Alternative Approaches*, 16 Rev. Indus. Org. 211, 215 (2000)).

[4] "[M]arket power and monopoly power are qualitatively identical concepts . . ." Thomas G. Krattenmaker, Robert H. Lande & Steven C. Salop, *Monopoly Power and Market Power in Antitrust Law*, 76 Geo. L.J. 241, 246 (1987). They differ only as a matter of degree. *See Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 967 (10th Cir. 1990) ("Market and monopoly power only differ in degree—monopoly power is commonly thought of as 'substantial' market power."

to a single relevant market," and the FTC could win an injunction by showing that Meta's acquisition harmed competition "in any one or more relevant markets." *Merger Guidelines* 40 (2023); *see also, e.g.*, *Epic Games, Inc. v. Google LLC (In re Google Play Store Antitrust Litig.)*, 147 F.4th 917, 937 (9th Cir. 2025) ("[J]ust because parties compete in one market does not mean, as a matter of law, that there cannot be a narrower or overlapping market in which the parties do not compete." (citation modified)), *cert. pet. dismissed per stipulation*, 146 S. Ct. 1051 (2026); *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 587 (7th Cir. 2022) (explaining that "the bounds of a relevant market for the purposes of a case need not be coextensive with the total market" (citation modified)); *FTC v. Staples*, 970 F. Supp. 1066, 1075 (D.D.C. 1997) ("[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes.").

By placing dispositive weight on Meta's experiments of time spent on Facebook and Instagram on the one hand and TikTok and YouTube on the other, the district court made this error at the outset, taking today's evidence of purported diversion—which could be a flight toward poor substitutes and away from a monopolist—to draw the market's boundaries. *See* FTC Br. 54–62. This erroneous

---

(citation modified)); *Microsoft*, 253 F.3d at 51 ("[A] firm is a monopolist if it can profitably raise prices substantially above the competitive level.").

approach to market definition created four related but independent mistakes, each a reversible error of its own.

### A. The District Court Erred in Failing to Analyze Reasonable Interchangeability for the Same Purposes.

*First*, in placing dispositive weight on Meta's evidence of changes in time spent between Facebook and Instagram on the one hand and YouTube and TikTok on the other, the district court glossed over whether consumers used their time on all four platforms for the same purposes, specifically "friends-and-family sharing," which the FTC alleged to be a defining feature of the relevant PSN product market that Meta monopolized. *See* FTC Br. II.B.2.

When considering which products are "reasonable substitutes" in defining the relevant product market, courts in this Circuit have looked at "two factors: functional interchangeability and cross-elasticity of demand." *United States v. Google LLC* ("*Google Search*"), 747 F. Supp. 3d 1, 108 (D.D.C. 2024), *appeal pending*, No. 26-5023 (D.C. Cir.); *see also FTC v. Edwards Lifesciences Corp.*, Civ.-A.-No.-25-2569(RC), 2026 LX 80846, at *43–44 (D.D.C. Jan. 9, 2026); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 25 (D.D.C. 2015); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 119–120 (D.D.C. 2004), *appeal voluntarily dismissed*, Nos. 04-5291, 04-7120, 2004 U.S. App. LX 19405 (D.C. Cir. Sept. 15, 2004); *Staples*, 970 F. Supp. at 1074–75. This follows naturally from the Supreme Court's statement that "[d]etermination of the competitive market for commodities depends on how

different from one another are the offered commodities in character or use, [and] how far buyers will go to substitute one commodity for another." *du Pont*, 351 U.S. at 393.

As to the first factor, "[f]unctionally interchangeable products are those that consumers view as substitutes for each other." *Google Search*, 747 F. Supp. 3d at 108. "So long as consumers can substitute the use of one for the other, then the products in question will be deemed functionally interchangeable." *Id.* (citation modified); *see also Arch Coal*, 329 F. Supp. 2d at 119 ("Courts compare the use or function of defendant's product with other products . . .").

Here, the district court gave short shrift to functional interchangeability. While it conceded that "qualitative differences between products can serve as useful evidentiary proxies for direct proof of substitutability," it called consumer response to a price increase "the touchstone of market definition." *Meta*, 811 F. Supp. 3d at 97 (citation modified). While correctly noting that the HMT "depends on which alternatives consumers would turn to and how readily they would do so," the court thought it inappropriate to consider "how different the products seem to a judge" acting as factfinder in a bench trial. *Id.* at 96.

To be sure, district courts sometimes place *too much* emphasis on functional interchangeability. Historically, notable market definition errors courts have made stemmed from relying on functional interchangeability exclusively, thereby failing

to weigh evidence of actual substitution in response to a SSNIP and replicating the Cellophane Fallacy. *See* Herbert Hovenkamp, *Antitrust and eMarkets*, 36 Stan. L. & Pol'y Rev. 147, 153 (2025) ("The *Brown Shoe* decision was incorrect to state a 'reasonable interchangeability' test without including an important limitation: whether the substitution of one alternative is sufficiently robust to hold the other alternative to a competitive price?"). The FTC ably explains why crediting Meta's experiments replicated that error here. *See* FTC Br. § II.C.

But the district court also erred at the first step in a way that independently caused error at the second: it bypassed findings on functional interchangeability and assumed that consumers were turning to TikTok and YouTube as substitutes for whatever they were doing on Facebook and Instagram—rather than as substitutes for short-form video specifically or any number of other services offered by Meta's apps, and rather than exiting the PSN market altogether. *See* FTC Br. § II.B.2. There was no basis for that logical leap. Meta's own expert economists admitted that their substitution experiments did not consider interchangeability for the same purpose or use. (*See* 5/21 (Carlton) 186:4–186:9 ("Q. In rendering your relevant market opinions in this matter, you did not attempt to assess the purposes for which consumers use different apps. Correct? A. That's fair. I looked at the actual evidence of substitution."); 5/19 (List) 179:8–179:19 ("Q. So you're not making any assertion that people are switching between applications for any particular

purpose; correct? A. I'm asserting that they switch in now a very predictable way, but I can't tell you why they switch beyond . . . . [the] stimuli . . .").)

Ultimately, the mistake of crediting purported divergence evidence unconnected from the consumer's purpose in changing apps resembles a fundamental error of antitrust analysis: defining markets based on firms instead of products. *See* Hovenkamp, *supra*, at 152 ("[T]he market power requirement attaches to *products*, not to firms." (emphasis in original)). The district court treated all time users spent on YouTube, TikTok, Instagram, and Facebook interchangeably, regardless of what consumers were doing there. As it recognized at summary judgment, a market for time and attention has no limiting principle. (*See* ECF No. 384 at 35.) All products and services compete for time and attention from consumers. The same logic applies equally to money: in an irrelevant sense, all goods and services compete for a consumer's dollars, too. But that does not suggest all products in the economy are in the same relevant antitrust market. Crediting "competition" among products that are not functionally interchangeable leads to absurd results, making any two goods substitutes on the theory that the time or money spent on one could be spent on the other. A market with such an "infinite range" is faulty as a matter of law. *Times–Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953).

### B. The District Court Erred in Applying the HMT Using Evidence of Time-Shifts Following Infinite and Temporary Price Increases.

*Second*, the district court erred in analyzing "consumers' sensitivity to an increase in price." *Google Search*, 747 F. Supp. 3d at 108; *see du Pont*, 351 U.S. at 400 ("An element for consideration as to cross-elasticity of demand between products is the responsiveness of the sales of one product to price changes of the other."). When applying the HMT, courts ask whether consumers would substitute the purchase of one product for another when faced with a SSNIP. *See, e.g.*, *Edwards Lifesciences*, 2026 LX 80846, at *56. A price increase commonly used in the HMT is 5%, as the district court acknowledged. *Meta*, 811 F. Supp. 3d at 96. But the district court credited Meta's evidence suggesting consumers switched their time between Facebook and Instagram on the one hand and TikTok and YouTube on the other when faced with a price increase between 12% and infinity. That was wrong as a matter of law. Each of Meta's five experiments was based on a price increase greater than a SSNIP, so none was probative of whether Meta faced competitive discipline from TikTok or YouTube in the PSN market.

*The Payment Experiment*. In one experiment, Meta's expert John List paid users in a treatment group "$4 for each hour that they cut from their Facebook or Instagram use" and tracked their app usage. *Id.* at 100. The Court called this "the single best evidence of what consumers consider alternatives to Meta's apps . . . " *Id.* at 101. But on cross, professor List admitted that, using a $4 prevailing hourly

wage as a stand-in for time spent on Facebook and Instagram (which consumers are not charged a fee to use) amounted to measuring consumer behavior when faced with a 12% price increase, not a 5% increase. (5/19 (List) 193:17–195:12.) Similarly, this was not a non-transitory increase, but one that lasted just four weeks. *See Meta*, 811 F. Supp. 3d at 100. "A price increase ordinarily must last for the foreseeable future, considered by some to be more than a year, to qualify as nontransitory." *FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1058 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (citation modified). Both of these departures from a SSNIP tend to define a market too broadly.

*India's Ban on TikTok*. Perhaps recognizing that Meta's other experiments showed time shifts in response to "short-term outages," the district court next considered professor List's "synthetic" analysis of time spent on Facebook in India after India banned TikTok. *Meta*, 811 F. Supp. 3d at 101–103. This, too, defied the SSNIP test. As professor List admitted, India's ban of TikTok was an "infinite price increase." (5/19 (List) 236:19–237:3.) On cross, he admitted that this experiment was not an application of the HMT. (*Id.* 236:13–236:18.)

*2021 Meta Outage*, *U.S. TikTok Shutdown, and 2018 YouTube Outage*. *See Meta*, 811 F. Supp. 3d at 101, 103–04. These three experiments studied transitory events in which Meta's apps, TikTok, or YouTube were briefly unavailable. These experiments combined the flaws of the others: they were both temporary and

infinite price increases. Evidence of consumer behavior during service outages is no more probative of PSN-market substitution than evidence that consumers read books during power outages would be probative of whether a streaming service faces competition from print publishers. Outage data cannot reveal what consumers regard as functional substitutes.

The district court conceded that "none of this empirical evidence is a SSNIP test" for these reasons, but it characterized the FTC's objections as quibbling. *Meta*, 811 F. Supp. 3d at 106. Yet the court gave apparently dispositive weight to this legally non-probative evidence.

### C. The District Court Did Not Distinguish Between Overlapping Markets or Define the Narrowest Market.

To guard against a false negative from the above purported diversion evidence, particularly given its limitations in answering the HMT's key SSNIP question, the district court should have recognized that Meta's apps and TikTok and YouTube may be competing in some product markets—say, for short-form video—but not in the PSN market that may enable Meta, through the sale of advertising, to reap monopoly profits. In a monopoly maintenance case, the existence of entry does not rebut a showing of monopoly power because less extreme but still attractive monopoly maintenance strategies are consistent with some degree of fringe entry and expansion. *See* Steven C. Salop, *Potential Competition and Antitrust Analysis: Monopoly Profits Exceed Duopoly Profits* ¶ 17

(Apr. 28, 2021) (OECD panel paper), *available at*: https://tinyurl.com/4v6rr2z5 ("The fact that entry by an efficient entrant can occur does not mean that it would be sufficient to prevent the exercise of market power" because the monopolist "might simply accommodate the limited entry rather than cut its price to maintain a higher market share."). A monopolist that has achieved dominance through acquisition is in precisely this position. It can permit limited entry by apps competing for short-form video consumption while still maintaining below-competitive app quality (or supracompetitive ad load) in the PSN market. That TikTok and YouTube were able to grow in an adjacent product space says nothing about whether Meta's acquisitions foreclosed competition in the narrower PSN market. The district court's conclusion to the contrary—based in part on conclusions that TikTok's entry disproved monopoly power in the PSN market, *see Meta*, 811 F. Supp. 3d at 98–99—was error.

Nor did the district court explicitly find that friends-and-family sharing and short-form video consumption should be grouped into the same product market. The district court did not cite the test that it "should combine different products or services into a single market when that combination reflects commercial realities"—let alone apply it to reach that conclusion. *Am. Express*, 585 U.S. at 544 (citation modified). That omission was appropriate: short-form videos and friends-and-family broadcast sharing are better understood not as substitutes but as

complements, which do not belong in the same product market. *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 463, 477 (1992). So the court should have considered short-form video consumption as outside the PSN market.

One way that courts in this Circuit identify the relevant market for purposes of assessing potential antitrust violations is by following the "narrowest market principle." *See, e.g.*, *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 40 (D.D.C. 2017) ("[T]he government may evaluate a merger in any relevant market satisfying the hypothetical monopolist test, and will usually do so in the smallest market that qualifies." (citation modified)); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 59 (D.D.C. 2011) ("[T]he relevant product market should ordinarily be defined as the smallest product market that will satisfy the hypothetical monopolist test."); *Sysco*, 113 F. Supp. at 26–27 (similar). In *Arch Coal*, Judge Bates explained how to conduct the HMT with this principle in mind:

> The analysis begins by examining the most narrowly-defined product or group of products sold by the [defendant] to ascertain if the evidence and data support the conclusion that this product or group of products constitutes a relevant market. If not, the analysis shifts to the next broadest product grouping to test whether that is a relevant market. This process continues until a relevant market is identified.

329 F. Supp. 2d at 120.

Guided by the narrowest market principle, the HMT works from the inside out. Here, it would start by asking if a hypothetical monopolist of Meta's products

would find a SSNIP profitable. If the answer is no, the next closest substitute products from other firms would be added to the market one by one until a hypothetical monopolist of those products would find the SSNIP profitable.

Although the district court acknowledged that a product market should encompass "the smallest grouping of products on which a hypothetical monopolist could profitably impose a SSNIP," it instead applied the HMT from the outside in. *Meta*, 811 F. Supp. 3d at 109. The district court began with the FTC's concession that the product market ought to include the friends-and-family sharing functions of Snapchat and MeWe. *See id.* at 121. It then reasoned backwards from the inclusion of those apps to deduce that TikTok and YouTube should be included as well. *Id.*

The superseded edition of the *Merger Guidelines* endorsed this approach in part, explaining that "if the market includes a second product, the Agencies will normally also include a third product if that third product is a closer substitute for the first product than is the second product." U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* 9 (Aug. 9, 2010). But that third product is a closer substitute only "if, in response to a SSNIP on the first product, greater revenues are diverted to the third product than to the second product." *Id.* But as explained above, the district court did not consider diversion in response to a SSNIP. And it failed to consider whether the PSN market is one market nested within several

overlapping ones that include Facebook and Instagram's products and services or if it is the narrowest candidate market that satisfies the HMT. It instead chose a single "time and attention" market that suited its intuitions. That was error.

### D. The District Court Failed to Account for Evidence That TikTok and YouTube Do Not Constrain Meta's Profits.

Finally, while the district court rejected the FTC's evidence of Meta's sustained economic profits as direct evidence of monopoly power, it still should have recognized that those profits were strong evidence that TikTok and YouTube were not genuine competitors with Facebook and Instagram, at least in the friends-and-family use case that the FTC contended defined the PSN market.

One reliable indicator of whether rival firms are constraining a defendant's pricing is sustained economic profit—profit in excess of the competitive return on invested capital. Unlike accounting profit, economic profit accounts for the opportunity cost of capital, such that a firm subject to effective competition will tend toward zero economic profit over time as rivals compete away supracompetitive returns. A firm that sustains economic profits over a significant period, and particularly one whose profits grow notwithstanding apparent competitive entry, is one whose rivals are not serving as an effective competitive constraint. That inference is directly relevant to market definition: a putative rival's product that does not discipline the defendant's profits is not a genuine competitive substitute and should be excluded from the relevant market. *See* Steven C. Salop, *A*

*Modern Economic Approach to Antitrust Law* 1-29–1-30, 4-36 (Feb. 2, 2026) (unpublished manuscript).[5]

The district court drew the wrong market-definitional inference from this evidence. It reasoned that because "Meta's business has shifted away from friend sharing and toward unconnected video, it should be losing its monopoly profits," but "the opposite has happened: as Meta's apps have become closer substitutes for TikTok and YouTube, the company's projected rate of return has only increased." *Meta*, 811 F. Supp. 3d at 90. That observation supports the conclusion that TikTok and YouTube do not belong in the PSN market—not the conclusion that the PSN market is underinclusive. If TikTok and YouTube were genuine PSN substitutes, consumer time diverted to those apps would discipline Meta's profits, and those profits would be declining rather than growing. That Meta's profits are not decreasing is evidence that any diversion occurring does not constrain Meta's market power. The district court's incorporation of the opposite inference into its market definition analysis was therefore error.

## II. The District Court Independently Erred in its Market Share-Based Analysis of Monopoly Power.

The district court's overbroad product market led it to incorrectly conclude that Meta lacked monopoly power. *See* FTC Br. 62–63. And the district court's

[5] *Available at*: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5379164.

monopoly power finding was error for the added reason that the district court required a showing of an artificially high market share to infer monopoly power within that market. While acknowledging that "[t]here is no threshold that a firm must cross to hold a monopoly," *Meta*, 811 F. Supp. 3d at 121, it nevertheless erected one, stating that "[n]othing, in short, suggests that a market share of 54%" or even 60% "produces monopoly power," *id.* at 122. It reached this result in part because it found that "[t]he canonical statement on the relationship between market shares and monopoly remains Judge Learned Hand's opinion in *Alcoa*," which suggested "it is doubtful" that market shares of 60% or 64% could show monopoly power. *Id.* (quoting *United States v. Aluminum Co. of Am.* ("*Alcoa*"), 148 F.2d 416, 424 (2d Cir. 1945)).

The district court was wrong. *Alcoa*'s brightline rule is no longer good law in the Second Circuit, let alone in this one. The Second Circuit later cabined that statement, explaining that Judge Hand "expressed a doubt, not a rule of preclusion." *Broadway Delivery Corp. v. UPS, Inc.*, 651 F.2d 122, 127 (2d Cir. 1981). It explained the utility of market shares, with the jury as factfinder in mind, as follows:

> Sometimes, but not inevitably, it will be useful to suggest that a market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power.

*Id.* at 129; *see also Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984) ("[A] party may have monopoly power in a particular market, even though its market share is less than 50%."); *Google Search*, 747 F. Supp. 3d at 134 (applying *Broadway Delivery* test).

Although the circuits are divided on a minimum market share for inferring monopoly power, several agree that it must be above 50%. *See, e.g.*, *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) ("A market share at or less than 50% is inadequate as a matter of law to constitute monopoly power."); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (noting that "a market share of less than 50 percent is presumptively insufficient to establish market power" for "claims of *actual* monopolization"); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1443 (6th Cir. 1990) (average market shares over seven years of 58% to 63% sufficient to find monopoly power); *Reazin v. Blue Cross & Blue Shield, of Kan., Inc.*, 899 F.2d 951, 969–70 (10th Cir. 1990) (affirming jury's finding of monopoly power where evidence indicated that market shares were between 45% and 62% because somewhat lower shares give "at most a presumption of a lack of monopoly or market power" but do not preclude monopoly power "as a matter of law").[6] Even counting TikTok in the market, the

[6] The district court's collection of authorities supporting a higher market share threshold ignores one side of the circuit split. *See Meta*, 811 F. Supp. 3d at 122.

FTC's evidence of Meta's market shares cleared that minimum 50% threshold. *See Meta*, 811 F. Supp. 3d at 121 (acknowledging that FTC's expert calculated Meta market shares between 54% and 62% in a market including TikTok and giving "less weight" to third-party data showing market shares of 42% and 56%).

Similarly, the district court's reliance on the proposition that a 65% market share makes out a prima facie case misses the mark. *See id.* at 122 (quoting *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power.")). That case and others like it "hold that a market share of 50% or less alone does not establish a prima facie case of monopoly power, not that such a share precludes a finding of market power if other factors, such as significant barriers to entry, are present." *In re Lorazepam & Clorazepate Antitrust Litig.*, MDL No. 1290, 2005 U.S. Dist. LX 51209, at *47 (D.D.C. Mar. 29, 2005). Because it rejected an inference of monopoly power on the basis of market shares alone, the district court did not proceed to issue formal findings on barriers to entry after trial, as it did at summary judgment, (*see* ECF No. 384 at 47–51). The proper application of the test for monopoly power would have permitted the FTC to meet

---

And while the district court cited *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F.2d 683 (10th Cir. 1989) in support of a higher market share threshold, the Tenth Circuit stated a year later that it "do[es] not view *Colorado Interstate Gas* as establishing a firm market share percentage required before a finding of monopoly power can ever be sustained." *Reazin*, 899 F.2d at 967–68.

its burden of proof with the market shares it did introduce along with evidence of barriers to entry. Remand must follow for the district court to conduct this analysis with the evidence at trial.

## CONCLUSION

For all these reasons, the Court should vacate the judgment and remand with instructions to reanalyze market definition and monopoly power under the correct legal and economic standards.

May 29, 2026

Respectfully submitted,

/s/ Brendan Benedict
Brendan Benedict
Michael D. Altebrando
BENEDICT LAW GROUP PLLC
322 G Street NE
Washington, DC 20002
(212) 287-9501
*brendan@benedictlawgroup.com*

Randy M. Stutz
Kathleen W. Bradish
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue NW
Suite 1000
Washington, DC 20036
(202) 304-0195

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(A)(5) because, including the Appendix but excluding the parts of the document exempted by FRAP 32(f) and Circuit Rule 32(e), this document contains 6,203 words. This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in proportionally spaced serif typeface (14-point Century Schoolbook and Times New Roman) using Microsoft Word for Office 365.

*/s/ Brendan Benedict*
Brendan Benedict

## CERTIFICATE OF SERVICE

I certify that on May 29, 2026, I served this brief on all parties or their counsel of record through the CM/ECF system.

*/s/ Brendan Benedict*
Brendan Benedict