ORAL ARGUMENT NOT YET SCHEDULED
No. 26-5028

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellant*,

v.

META PLATFORMS, INC.,
*Defendant-Appellee.*

On Appeal from the United States District Court for the District of Columbia
No. 20-cv-3590
Hon. James E. Boasberg

# BRIEF FOR AMICI CURIAE PROFESSORS OF ECONOMICS IN SUPPORT OF REVERSAL

ETHAN E. LITWIN
SHINDER CANTOR LERNER LLP
14 Penn Plaza, Suite 1900
New York, NY 10122
(646) 960-8610
ethan@scl-llp.com

PATRICK M. KENNEDY
CONSTANTINE CANNON LLP
1001 Pennsylvania Avenue, NW
Suite 1300N
Washington, DC 20004
(202) 204-3500
pkennedy@constantinecannon.com

ANKUR KAPOOR
CONSTANTINE CANNON LLP
230 Park Avenue, 17th Floor
New York, NY 10169
(212) 350-2700
akapoor@constantinecannon.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ........ 1

SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 5

I. ECONOMIC PRINCIPLES OF MARKET DEFINITION ........ 5

A. Market definition determines the ability of firms to exercise market power by identifying an area of effective competition. ........ 5

B. Market definition must focus on the set of products *where* the challenged conduct occurs. ........ 7

C. The Cellophane Fallacy is a known error that results when attempting to define the relevant market with a SSNIP without reference to the anticompetitive allegations or *when* the challenged conduct occurred. 9

II. THE DISTRICT COURT'S ERRORS IN APPLYING THE ECONOMIC PRINCIPLES OF MARKET DEFINITION ........ 12

A. The district court did not conduct market definition in the area where the challenged conduct occurred—and thereby overlooked an area of effective competition. ........ 12

B. The district court compounded the first error by expanding the market based on substitution evidence drawn entirely from a post-conduct, supra-competitive equilibrium—thereby committing the Cellophane Fallacy. ........ 15

C. The district court erred in assessing substitution evidence when applying the Hypothetical-Monopolist Test. ........ 17

III. IF NOT REVERSED, THE DISTRICT COURT'S DECISION WILL UNDERMINE DETERRENCE OF ANTICOMPETITIVE CONDUCT ........ 20

# TABLE OF AUTHORITIES

**Cases**

*Brown Shoe Co., Inc. v. United States*,
370 U.S. 294 (1962) 8

*FTC v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986) 6

*NCAA v. Bd. of Regents of the Univ. of, Okla.*,
468 U.S. 85 (1984) 5

*United States v. E.I. du Pont de Nemours and Co.*,
351 U.S. 377 (1956) passim

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) 13, 18

**Other Authorities**

Joseph Farrell & Carl Shapiro, "Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition,"
10 *B.E. J. Theoretical Econ. Pol'ys and Persps.,* issue I art. 9 (2010) ........... 8, 14

Joseph Farrell & Carl Shapiro, "Recapture, Pass-Through, and Market Definition,"
76 *Antitrust* L.J. 585 (2010) ....................................................................18

John B. Kirkwood, "Market Power and Antitrust Enforcement,"
98 *B.U. L. Rev.* 1169 (2018) ....................................................................6

Donald Turner, "Antitrust Policy and the Cellophane Case,"
70 *Harv. L. Rev*. 281 (1956) ....................................................................11

Steven C. Salop, "First Principles Approach to Antitrust, Kodak, and Antitrust at the Millenium,"
68 *Antitrust L.J.* 187 (2000) ....................................................................5, 6, 11

Carl Shapiro, "Mergers with Differentiated Products,"
10 *Antitrust* 23 (1996) ....................................................................18

Lawrence J. White, "The Dead Hand of *Cellophane* and the Federal Google and Facebook Antitrust Cases: Market Delineation Will Be Crucial," 67 *Antitrust Bull.* 113 (2022) ....................10, 11

U.S. Dep't of Justice and Fed. Trade Comm'n Merger Guidelines (Dec. 18, 2023)....................7, 8

## INTEREST OF AMICI CURIAE

The undersigned amici curiae are professors of economics who are interested in antitrust law being construed and enforced in accord with economic principles. (A list of the signatories is attached as Addendum A.)[1] As antitrust law has long recognized, enforcement informed by economics increases consumer welfare and fosters innovation.

We submit this brief because the district court's economic analyses are flawed and, if affirmed, would undermine antitrust enforcement against dominant firms in digital markets and depart from settled principles of industrial organization. Specifically, we identify fundamental economic errors in the district court's reasoning and explain why those errors are inconsistent with the principles that economists regularly apply to market definition and the assessment of monopoly power.

## SUMMARY OF ARGUMENT

This appeal presents fundamental questions of economic methodology in antitrust enforcement. The district court held that Meta lacks monopoly power because Facebook and Instagram faced competition by 2025 from TikTok and

[1] The parties to this appeal have consented to this amicus brief. No party's counsel has authored this brief in whole or in part; no party's counsel has contributed money intended to fund preparing or submitting the brief; and no person other than the amici curiae or their counsel has contributed money that was intended to fund preparing or submitting the brief. The signatories' institutional affiliations are provided for information only; the institutions have not authorized or endorsed this brief. Amici have no financial interest in the outcome of this litigation.

YouTube for short-form video. That ruling rests on a series of interlocking economic errors centered around the court's erroneous application of the Hypothetical-Monopolist Test ("HMT").

The HMT looks at whether a hypothetical monopolist of a group of products can impose a small but significant and non-transitory increase in price above the competitive level ("SSNIP") or a small but significant and non-transitory decrease in quality below the competitive level ("SSNDQ") without buyers substituting to other products such that the SSNIP or SSNDQ would be unprofitable. If the hypothetical monopolist of a group of products can profitably impose (and maximize profits with) a SSNIP or SSNDQ, then that group of products comprises a relevant product market for antitrust analysis.

A key caveat is that the SSNIP or SSNDQ must begin at the competitive level, not a monopolized level. The HMT was developed for the analysis of proposed mergers in competitive markets, because it is premised on prices and quality being at competitive levels. Its standard approach does not apply directly in a monopoly-maintenance case where prevailing prices and quality may already be at monopoly levels. The HMT cannot be used in the same way as in the analysis of a proposed merger in a competitive market or as in an attempt to monopolize—situations where monopoly has not yet been achieved.

The district court below applied the HMT in a mechanical way without regard to this being a case of monopoly maintenance. The court's failure to carefully adjust the HMT for use in this case led to its several errors. Taken together, they would render Section 2 incapable of reaching anticompetitive conduct, particularly in digital markets.

First, the district court searched for *the unique* market in which *Meta* currently operates, rather than identifying a relevant product market in which competition had been reduced and monopoly power maintained by the challenged conduct. Meta is a multi-product firm. The relevant market is not the broadest set of digital platforms with which Meta now happens to overlap in some line of business. Facebook's prior acquisitions of Instagram (2012) and WhatsApp (2014), which the FTC alleges to be anticompetitive, targeted competition in personal social networking ("PSN") and did not target other areas where Meta now competes. In widening its view to encompass all of Meta's offerings, the district court overlooked the existence of a PSN market supported by the court's factual findings.

Second, the district court committed the classic Cellophane Fallacy by using the HMT and analyzing the substitution resulting from a small but significant increase in price—not from a competitive price, but from a price after Meta's initial position and challenged conduct allegedly allowed it to maintain monopoly

power. Because a monopolist sets its prices to maximize profits, further price increases above the monopoly level cause substitution away from the monopolist's products so as to make the price increase unprofitable. But that does not mean that the firm lacks monopoly power. It just means that its monopoly power is not infinite.

One way the court could have avoided the Cellophane Fallacy in the context of the HMT would have been to use a more competitive baseline price of the product below the prevailing level, not the prevailing monopoly price. In this regard, there was evidence that an ad-free experience produced only a 7 percent increase in time spent on Facebook. This inelastic substitution to Facebook in response to a lower price indicates that forgoing that price decrease was profitable, which is not inconsistent with the view that Meta had monopoly power in the PSN market. The court, however, erroneously treated that as evidence *against* monopoly power.

If left uncorrected, the district court's errors will reduce deterrence of anticompetitive conduct, particularly in digital markets. Because digital platforms are relatively more able to move into adjacent markets, the court's decision provides them with a roadmap to escape liability under Section 2 of the Sherman Act: monopolize a core market; move into an adjacent market; and then argue, based on the district court's decision, that there is only one market in which there is

no monopoly power. A monopolist also could try to delay litigation long enough for markets to evolve until its monopoly power is possibly dissipated or more easily disputed, meanwhile collecting additional monopoly profits. Such an outcome cannot be reconciled with robust enforcement of the Sherman Act. This Court should reverse.

## ARGUMENT

### I. ECONOMIC PRINCIPLES OF MARKET DEFINITION

#### A. Market definition determines the ability of firms to exercise market power by identifying an area of effective competition.

Market power is defined, both as a matter of economics and of antitrust law, as "the ability to raise prices above those that would be charged in a competitive market." *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984) (citations omitted); Steven C. Salop, "The First Principles Approach to Antitrust, Kodak, and Antitrust at the Millenium," 68 *Antitrust L.J.* 187, 189-90 (2000) ("Salop, *First Principles*"). "In standard microeconomic models, market power and monopoly power are synonyms. Market (or monopoly) power is the ability of a firm to maximize profits by charging a price in excess of its marginal cost. A 'monopolist' may be viewed as a firm with a high degree of market power." Salop, *First Principles*, 68 *Antitrust L.J.* at 189-90 (footnote omitted).

Market power "is central to antitrust because it distinguishes firms that can harm competition and consumers from those that cannot. A firm with market

power can deviate from the competitive result and force consumers to pay higher prices." John B. Kirkwood, *Market Power and Antitrust Enforcement*, 98 B.U. L. Rev. 1169, 1173 (2018). The role of market definition in a Sherman Act Section 2 case is to determine whether the defendant's conduct can lead to the achievement, enhancement, or maintenance of monopoly power. Market definition is thus a means to an end, not an end in itself to define a single "market." Salop, *First Principles*, 68 *Antitrust L.J.* at 188 ("Although market power and market definition have a role in antitrust analysis, their proper roles are as parts of and in reference to the primary evaluation of the alleged anticompetitive conduct and its likely market effects."); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition").

Market definition is guided by the central question it seeks to answer: can the defendant raise or maintain prices above the competitive level after engaging in the alleged anticompetitive conduct? Market power and market definition, therefore, should not be analyzed in a vacuum or in a threshold test divorced from the conduct and allegations about its effects. Salop, *First Principles*, 68 *Antitrust L.J.* at 188. Instead, market power should be measured as the power profitably to raise or maintain price above the competitive price, which is the price that would

prevail in the absence of the alleged anticompetitive restraint. Market definition and anticompetitive effects are thus inextricably linked.

### B. Market definition must focus on the set of products *where* the challenged conduct occurs.

Because the ultimate purpose of market definition is to illuminate the competitive effects of the specific conduct under scrutiny, market definition must focus on the set of products for which competition has allegedly been undermined by the defendant's conduct. For example, if the challenged conduct had been that du Pont created a system that allocated international markets with other cellophane producers and thereby maintained its monopoly the U.S. market, the antitrust concern is that the conduct prevented the price of cellophane from falling. The fact that competition from other flexible wrappings would prevent the cellophane price from rising would be irrelevant since the challenged conduct and the achievement of monopoly power had already occurred.

When the concern is that permitting the challenged conduct will lead to higher prices in the future, as with a merger, the Hypothetical-Monopolist Test (HMT) frames the economic inquiry. U.S. Department of Justice and Federal Trade Commission Merger Guidelines § 4.3 (Dec. 18, 2023). For example, consider a proposed merger between two firms that sell Products A and B, in competition with each other and additional firms. The HMT would ask whether buyers who purchase from a hypothetical monopolist of Product A would substitute

to Product B from Product A in response to a small but significant and non-transitory increase in the price ("SSNIP") of Product A above the current competitive level. If many buyers would do so, then the merger could raise competitive concerns. And if simultaneous SSNIPs of both products would be profit-maximizing despite substitution to other products sold by other firms, then those two firms by themselves would constitute a relevant market.[2]

The HMT thus provides a quantitative economic test for determining whether two or more products are "reasonably interchangeable" in the sense of constraining profit-maximizing price increases, and it captures the idea that products in the same market must be economic substitutes as well as functional substitutes. *See Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); Op., at 37 (quoting *United States v. E.I. du Pont de Nemours and Co.*, 351 U.S. 377, 395 (1956)) ("A product market is the set of all

---

[2] The Merger Guidelines confirm that the HMT does not require a SSNIP across all products in the proposed relevant market; rather, a SSNIP imposed on a single product can satisfy the test if that product alone would generate sufficient profits at the new price. U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines § 4.1.2 (2023). The standard treatment of asymmetric pricing within a candidate market is well-established in the industrial-organization literature. *See* Joseph Farrell & Carl Shapiro, "Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition," 10 *B.E. J. Theoretical Econ. Pol'ys and Persps.*, issue I art. 9, at 28 (2010).

alternatives that are 'reasonably interchangeable by consumers for the same purposes.'").

It is also common for multiple market definitions to satisfy the HMT. For example: both a light-beer and an all-beer market definition might satisfy the HMT, if light beers constrain one another's prices or quality and the prices of light beers also constrain and are constrained by the prices of all beers. The key issue is whether the proposed market is analytically sound and supported by the economic evidence, and the existence of one relevant market does not rule out the existence of others.

In markets with prices of zero—as here and for many digital platforms— the concept of a 5 percent (or other small percentage) price increase in implementing the SSNIP test makes no sense, because any price increase is an infinite percentage. Therefore, in zero-price markets the test can be to evaluate substitution in response to a small but significant and non-transitory decrease in quality ("SSNDQ").

### C. The Cellophane Fallacy is a known error that results when attempting to define the relevant market with a SSNIP without reference to the anticompetitive allegations or *when* the challenged conduct occurred.

The very premise of a Section 2 monopoly-maintenance claim is that the challenged conduct preserves a monopoly already achieved. The competitive baseline price that the HMT presupposes is absent in such a case. Thus, the

standard HMT involving a SSNIP above the prevailing (monopoly) level cannot be used to evaluate conduct in a market that has already been monopolized. Lawrence J. White, "The Dead Hand of *Cellophane* and the Federal Google and Facebook Antitrust Cases: Market Delineation Will Be Crucial," 67 *Antitrust Bull.* 113 (2022). The test cannot detect the very condition Section 2 exists to reach.[3]

Applying the SSNIP to a monopoly price commits the Cellophane Fallacy. In *United States v. E.I. du Pont de Nemours and Co.*, 351 U.S. 377, 395 (1956), the cellophane case, the United States challenged various du Pont business practices under section 2 of the Sherman Act. As the three dissenting justices explained (in a 4-3 decision with two justices taking no part), du Pont's conduct was specifically directed to, and successful in, excluding competition for cellophane and elevating its price. 351 U.S. at 418-20 (Warren, C.J., dissenting). The record further established that cellophane's price was two to seven times that of other flexible packaging materials and that other materials' prices did not respond to cellophane's. *Id.* at 416-17.

The majority defined the market to include all flexible packaging materials, and therefore affirmed the trial court's judgment for du Pont, on the basis that cellophane's qualities were present in other materials to varying degrees. 351 U.S.

[3] Applying a SSNIP above the prevailing price similarly will give an erroneous signal in the case of exclusionary conduct by a monopolist intended to prevent future entry or competition that otherwise would lead prices to fall. Salop, *supra*.

at 397-400. The Court purported to assess substitution from cellophane to other materials. *Id.* at 400. However, it did so at cellophane's prevailing price, which was the monopoly price because the anticompetitive conduct had already occurred. Because even a monopolist will lose sales and profits if it raises prices above the profit-maximizing monopoly price, analyzing substitution at the prevailing and supra-competitive cellophane prices erroneously included materials that did not constrain cellophane's monopoly. The Court's error has become known as "the Cellophane Fallacy." *See* Donald Turner, "Antitrust Policy and the Cellophane Case," 70 *Harv. L. Rev.* 281 (1956).

More generally, where the anticompetitive conduct has already succeeded, using the HMT (SSNIP test) at prevailing, monopoly prices to show substitution and expand the market is erroneous and commits the Cellophane Fallacy, because those prevailing prices reflect the monopoly the defendant has already acquired. Salop, *First Principles*, 68 *Antitrust L.J.* at 197; White, *supra*.

The risk of committing the Cellophane Fallacy is heightened in digital markets characterized by low marginal costs and network effects, conditions which make digital markets susceptible to rapid increases in scale and "tipping" to a single dominant firm. In such markets, observed substitution patterns after the challenged conduct may already reflect a market structure shaped by the achievement, maintenance, and exercise of monopoly power.

## II. THE DISTRICT COURT'S ERRORS IN APPLYING THE ECONOMIC PRINCIPLES OF MARKET DEFINITION

The district court misapplied the economics of market definition, both spatially and temporally. First, spatially, the court did not conduct market definition in the area where the challenged conduct occurred—personal social networking (PSN)—and thereby overlooked an area of effective competition. Second, temporally, the court looked to substitution evidence after the challenged conduct had already occurred and possibly maintained Facebook's monopoly power in the PSN market. By using the standard HMT that assumes a competitive baseline price and evaluating substitution in response to an increase in price above the monopoly level or a decrease in quality below the monopoly level, the court committed the Cellophane Fallacy and expanded the market to include products that do not restrain Meta's monopoly prices or quality.

### A. The district court did not conduct market definition in the area where the challenged conduct occurred—and thereby overlooked an area of effective competition.

The court erred by searching for a *unique market definition* in which *Meta*—a multi-product firm—competes rather than properly analyzing the product market that best assesses the risk of anticompetitive effects of the challenged conduct. The challenged conduct is the acquisition of a PSN app (Instagram) and a threatened entrant into PSN services (WhatsApp) by the owner of the most prominent PSN service in the country and the world (Facebook). Rather than starting with

substitution among PSN competitors, the court "zoomed out" and looked at all the ways in which Facebook and Instagram competed with other digital platforms with respect to all their products. For example, Facebook, Instagram, YouTube, and to a lesser degree TikTok all provide news and other non-social video content. But news and video entertainment are neither functional nor economic substitutes for social networking. They are separate products. And the fact that those digital platforms may compete in multiple product markets does not rule out the existence of a PSN app market.

A firm may face genuine competition for certain products but not others. A firm can thus possess market power in the firm's core line of business while facing competition in other areas. For example, Microsoft competes in the market for web browsers while having market power in the market for PC operating systems. *See United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001). In a monopolized market, it is erroneous to treat competition in peripheral or adjacent product markets as defeating monopoly power over a core product where consumers lack close substitutes for the core offering. Thus, this Court in *Microsoft* did not include Netscape and Windows in the same product market. *See id.* at 54 ("Because market definition is meant to identify products 'reasonably interchangeable by consumers,' *du Pont*, 351 U.S. at 395, and because middleware

is not now interchangeable with Windows, the District Court had good reason for excluding middleware from the relevant market.”).

The district court itself muses that a PSN app market existed at the time of the acquisitions and at least through the 2020 complaint filing. Op., at 1, 40–41. And direct evidence also appears to support a PSN app market in 2025. Facebook and Instagram are close alternatives to each other in serving core demand for PSN. *See, e.g.*, Op., at 45-46 (List study results). A merger of producers of two close substitutes would generate substantial anticompetitive price/quality effects. *See* Joseph Farrell & Carl Shapiro, “Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition,” 10 *B.E. J. Theoretical Econ. Pol’ys and Persps.*, issue I art. 9 (2010).

Moreover, the district court finds that consumer demand for connecting with friends remains present and “important.” Op., at 9. PSN apps serve that demand; TikTok and YouTube do not. Op., at 7 (“[TikTok’s] breakthrough innovation and central feature opened a new path that traditional social networks had not yet explored: an AI algorithm that shows users content based not on their friends, but on their interests.”) As the court acknowledged, TikTok’s main social feature “has not achieved great success.” Op., at 65. Unlike Facebook, Instagram, and Snapchat, which are built around a social graph that allows users to share with an audience limited to their personal connections, TikTok and YouTube are built

around content graphs that surface algorithmically recommended material from accounts the user does not follow. Those differing architectures produce differentiated consumer demand and therefore should not be considered economic substitutes for PSN.

Meta's use of its control of Facebook and Instagram to raise ad load also shows that a market for PSN satisfied the HMT (at the time of the merger) in the real world, because the higher ad load was a profitable, sustained quality reduction without losing users to TikTok or YouTube. *See* Op., at 80 ("Once the [Facebook] mobile app had won a foothold, Meta squeezed it for all it was worth."; noting how the Facebook app's ad load tripled from 2014 to 2022).

### B. The district court compounded the first error by expanding the market based on substitution evidence drawn entirely from a post-conduct, supra-competitive equilibrium—thereby committing the Cellophane Fallacy.

In a monopoly-maintenance matter, interpretation of substitution evidence must adhere to the context. The district court relied on substitution evidence beginning in 2018, Op., at 52-53 (2018 YouTube outage), but it never determined whether those prices were competitive. To the contrary, the court "assume[d] that the quality-adjusted price of Meta's apps several years ago represented the competitive price." Op., at 29. By assuming the prevailing market equilibrium was competitive without reference to the conduct or earlier effects, the court walked headfirst into the Cellophane Fallacy. Where a monopolist has already

exercised monopoly power, observed substitution at the elevated equilibrium overstates the constraint that alternatives would impose on a competitive firm.

The List experiment on which the court relies for market definition led to the court's Cellophane Fallacy error. The List experiment—conducted long after the allegedly monopolizing mergers and thus at risk of the Cellophane Fallacy—paid people to use Facebook less, causing them to substitute away from Facebook. Op., at 45. The highest diversion rate from Facebook in the experiment was to web browsers, *id.*, which are clearly outside any of the claimed relevant markets. That is consistent with the prevailing price and quality being at the monopoly level and the Cellophane Fallacy being present.

There was also evidence that users given an ad-free experience spent only 7 percent more time on Facebook. If reducing ad load (an effective price) caused only a very small increase in usage, then reducing that price is likely to be unprofitable. Less elastic demand in response to price decreases is not inconsistent with monopoly power. Taken together, the evidence of less elastic demand in response to price decreases plus evidence of elastic demand in response to price increases supports the conclusion that Meta was pricing at the profit-maximizing monopoly level. Yet the court erroneously treated that evidence as showing lack of monopoly power.

### C. The district court erred in assessing substitution evidence when applying the Hypothetical-Monopolist Test.

As a threshold matter, the district court's substitution evidence from the present day post-dates Facebook's acquisition of Instagram and the subsequent profitable ad-load increases/SSNDQ. The proper use of the HMT requires examining substitution from a competitive baseline. That error is particularly acute here. Facebook and Instagram were the only two large PSN apps at the time of the acquisition and the acquisition eliminated their direct competition. Substitution evidence drawn from the post-acquisition equilibrium therefore cannot, as a matter of economic logic, identify the constraints that competition between an independent Facebook and Instagram would have imposed on a competitive firm. The court's substitution evidence is derived from a likely monopolized market and therefore commits the Cellophane Fallacy.

The district court's application of the HMT would have been defective even if the market were competitive. First, the court never asked the ultimate HMT question: Could a hypothetical monopolist over PSN apps *profitably* impose SSNDQ on users of Facebook and/or Instagram if it controlled all PSN apps?[4] In this test, the "magnitude" of substitution must be paired with the assessment of the margins to determine the profitability of the SSNDQ. Joseph Farrell & Carl

[4] See note 2, *supra*.

Shapiro, "Recapture, Pass-Through, and Market Definition," 76 *Antitrust L.J.* 585 (2010); Carl Shapiro, "Mergers with Differentiated Products," 10 *Antitrust* 23 (1996). The court did not engage in that inquiry.

The court acknowledged "that seeing a photo from a friend and watching a video of a stranger are different." Op., at 61. Yet the court dismissed that difference, stating, "Yet like many differentiated products — Chinese and Mexican restaurants, Sprite and Coca-Cola, glass containers and metal cans — they compete." *Id.* But in fact, differentiated products may define narrow markets as in the beer example above. While a proposed market comprised of all the restaurants in town may satisfy the HMT, so might a market comprised solely of Chinese restaurants. In differentiated-product markets, all sorts of products compete at the margin. The economic question is whether the diversion is sufficient, together with firms' price-cost margins and recapture, to defeat or support the candidate market. The court did not do that.

The court also relied on the almost complete overlap among users of Facebook, Instagram, TikTok, and YouTube. Op., at 75-76; *id.* at 82 ("people often use all five apps [including Snapchat]"). However, that fact by itself does not support the purported broad market. Simultaneous consumption of multiple products can involve distinct uses or complementarity. A consumer might sometimes have lunch at fast food restaurants and other times have lunch or dinner

at fancy tablecloth restaurants. But markets limited to each of these restaurant types might well satisfy the HMT.

Similarly, the List experiment on which the court relied misapplied the HMT by failing to analyze (1) small but significant and (2) non-transitory increases in price (SSNIP) or decreases in quality (SSNDQ). Outages and bans of Facebook and Instagram are not small; they are equivalent to infinite price increases. The List experiment and Meta's internal studies also all measured responses to transitory changes. The court itself acknowledged: "True, none of this empirical evidence is a SSNIP test. Bans and outages do not impose small but significant price increases; they get rid of a product entirely. The outages and pricing experiment were transitory." Op., at 55.

Responses to large price increases (or outages) may not be the same as responses to a SSNIP. When consumers have been buying (or spending time consuming) a product and it becomes temporarily unavailable, they will reallocate that time and money on other products. But that substitution may teach nothing about the closeness of substitution, that is, whether their presence can meaningfully constrain the monopolist's behavior in the original product market. If there is an electricity outage caused by a summer thunderstorm, a consumer may go to an air-conditioned movie theater to stay cool until it is to be restored, or stay home and burn candles. But neither movie theaters nor candle manufacturers are in the

market for electricity, nor do they constrain the price that could be charged by an unregulated monopoly utility.

The List experiment thus cannot be used to reject a PSN market definition. The List experiment may be informative about how users reallocate time during a temporary Facebook deprivation, but it is not a valid implementation of the HMT. It does not test a small, significant, and non-transitory increase in price (SSNIP) or reduction in quality (SSNDQ) from the competitive baseline; it does not estimate whether a hypothetical monopolist over PSN services could profitably worsen terms; and it treats short-run time substitution across heterogeneous online activities as if that were evidence of economic substitutability within a relevant product market.

## III. IF NOT REVERSED, THE DISTRICT COURT'S DECISION WILL UNDERMINE DETERRENCE OF ANTICOMPETITIVE CONDUCT

By failing to address the area of effective competition and Meta's conduct in that market, the district court overlooked Meta's monopoly power and how its acquisition of Instagram maintained or enhanced its monopoly power as of the time of the FTC's complaint in 2020. Despite its musing that "PSN apps may have been a market unto themselves when the FTC filed this case in 2020," Op., at 40-41, which would imply that Meta had monopoly power, the district court never analyzed liability. Instead, the court focused on evidence regarding whether Meta had monopoly power in 2025 and whether that evidence supported an injunction or

divestiture. While the state of competition in 2025 is certainly relevant to crafting forward-looking injunctive relief, the court's conflating liability and remedy makes no economic sense. It merely caused the court to ignore Meta's liability for the challenged anticompetitive conduct at the time of the complaint.

The district court's failure to address liability has market consequences. First, it would dramatically reduce deterrence. It would give the monopolist the incentive to enter adjacent markets where it lacked monopoly power in the hope that the court would focus on whether it monopolized the larger set of markets, not on its power in the monopolized market. It could also give monopolists an even greater incentive to delay litigation challenging their conduct in anticipation that their monopoly power might be reduced, dissipated, or more easily disputed by the time of the trial, in which case they might escape liability even if the conduct were anticompetitive when the conduct occurred and the complaint was filed. The end result would be excessive "false negatives" and underdeterrence.

Second, the same blind spot also obscured possible continuing harm in this case. Even if Meta were no longer a monopolist in 2025, it likely retained residual market power in the PSN market that led to competitive harm. The court did not even consider whether a remedy short of divestiture was required for any such residual market power.

Third, a public finding of liability informs right and wrong and sets a precedent for future monopolists to follow. Over a century of antitrust jurisprudence has informed the marketplace what business practices are procompetitive and what business practices are anticompetitive. Determinations of antitrust liability thus promote efficient markets in addition to providing deterrence and redressing past competitive harms.

Dated: May 29, 2026

Respectfully submitted,

/s/*Patrick M. Kennedy*

ETHAN E. LITWIN
SHINDER CANTOR LERNER LLP
14 Penn Plaza, Suite 1900
New York, NY 10122
(646) 960-8610
ethan@scl-llp.com

PATRICK M. KENNEDY
CONSTANTINE CANNON LLP
1001 Pennsylvania Avenue, NW
Suite 1300N
Washington, DC 20004
(202) 204-3500
pkennedy@constantinecannon.com

ANKUR KAPOOR
CONSTANTINE CANNON LLP
230 Park Avenue, 17th Floor
New York, NY 10169
(212) 350-2700
akapoor@constantinecannon.com

*Counsel for Amici Curiae*

**ADDENDUM A**

Steven C. Salop
Professor of Economics & Law Emeritus
Georgetown University Law Center

Allan Collard-Wexler
Professor of Economics
Duke University

Florian Ederer
Allen and Kelli Questrom Professor in Markets, Public Policy & Law
Boston University Questrom School of Business

Martin Gaynor
Lester A. Hamburg University Professor of Economics and Public Policy Emeritus
Heinz College
Carnegie Mellon University

Nancy L. Rose
Charles P. Kindleberger Professor of Applied Economics
Massachusetts Institute of Technology Department of Economics
Visiting Scholar, Mossavar-Rahmani Center, Harvard Kennedy School

Lawrence J. White
Robert Kavesh Professor of Economics
New York University Leonard N. Stern School of Business

## CERTIFICATE OF COMPLIANCE

1. This document complies with the length limit of Federal Rule of Appellate Procedure 29(a)(5) and the type-volume limitation of Rules 32(g)(1) and 32(a)(7)(B) because, excluding the parts of the document exempted by Rule 32(f), the brief contains 4,976 words.

2. This document complies with the requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

May 29, 2026

*/s/ Patrick M. Kennedy*
Patrick M Kennedy

Attorney for Amici Curiae