No. 26-5028

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellant*,

v.

META PLATFORMS, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Columbia
No. 20-cv-3590
Hon. James E. Boasberg

# OPENING BRIEF OF THE FEDERAL TRADE COMMISSION

DANIEL GUARNERA
*Director*

TAYLOR C. HOOGENDOORN
KELSE MOEN
*Deputy Directors*

KRISHA CERILLI
NATHAN BRENNER
PATRICIA GALVAN
JUSTIN LORBER
JENNIFER TARR
*Attorneys*

BUREAU OF COMPETITION

LUCAS CROSLOW
*General Counsel*

H. THOMAS BYRON III
ALEX POTAPOV
*Deputy General Counsels*

BENJAMIN F. AIKEN
MARIEL GOETZ
*Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 569-7769
baiken@ftc.gov

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to Circuit Rule 28(a), the Federal Trade Commission certifies as follows:

**A. Parties and Amici.** The parties to the case in the district court were Plaintiff-Appellant the Federal Trade Commission and Defendant-Appellee Meta Platforms, Inc. The same parties appear in this Court. The New York Times Company intervened below on a discrete issue unrelated to this appeal. That company is not a party to this appeal.

**B. Rulings Under Review.** The ruling under review is the district court's (Boasberg, J.) Memorandum Opinion and Order of November 18, 2025 following a bench trial, PJA.086-87, 792, and the judgment entered that same day, PJA.882. The opinion is reported at 811 F. Supp. 3d 67 (D.D.C. 2025). The opinion is also available on Westlaw at 2025 WL 3458822 and on Lexis at 2025 LX 565085.

**C. Related Cases.** The case has not previously been on review before this Court or any other court (except the district court) and the FTC is not aware of any related cases pending in this Court or any other court.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ..... i

TABLE OF AUTHORITIES ..... iv

GLOSSARY ..... viii

INTRODUCTION ..... 1

JURISDICTION ..... 5

QUESTIONS PRESENTED ..... 5

STATUTES AND REGULATIONS ..... 5

STATEMENT OF THE CASE ..... 6

Meta Acquires and Maintains a Monopoly in the Market for Personal Social Networking.0F ..... 6

The FTC Sues Meta for Unlawfully Monopolizing the Market for Personal Social Networking. ..... 9

Meta Develops Short Form Video Offering. ..... 9

The District Court Denies Meta's Summary Judgment Motion, Conducts a Trial, and Rules in Meta's Favor Based on Recent Market Conditions. ..... 12

SUMMARY OF ARGUMENT ..... 15

STANDARD OF REVIEW ..... 18

ARGUMENT ..... 19

I. Section 13(b) of the FTC Act Does Not Require The Commission to Show a Current or Imminent Antitrust Violation at the Time of the Court's Decision. ..... 19

A. Section 13(b)(1) creates a pleading requirement that applies at the time of the complaint. ........ 20

B. Section 13(b)(1) does not apply to standalone permanent injunction cases. ........ 29

C. Remand is required. ........ 34

II. The Commission Demonstrated That Meta Held Monopoly Power in the Market For PSN Services. ........ 36

A. The FTC showed that PSN services are a relevant product market. ........ 37

B. The district court improperly viewed substitution with TikTok and YouTube for video content as proof that the PSN market does not exist. ........ 42

1. A market including TikTok and YouTube can coexist with the PSN market. ........ 42

2. Evidence of substitution with TikTok and YouTube does not refute a distinct friends-and-family market. ........ 46

C. The district court erred by treating existing conditions as competitive. ........ 53

1. The court used the wrong baseline for its hypothetical monopolist test. ........ 53

2. The district court committed the *Cellophane* fallacy. ........ 57

D. The district court erroneously rejected the FTC's direct evidence of Meta's monopoly power. ........ 62

CONCLUSION ........ 68

## TABLE OF AUTHORITIES

### CASES

*Alaska v. United States*, 545 U.S. 75 (2005) .................................... 32, 33

*AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021) ........................................................................................ 24, 33

*Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 926 (N.D. Cal. 2009) ..................................................................... 64

*Bailey v. Allgas, Inc.*, 284 F.3d 1237 (11th Cir. 2002) ............................................................................... 63, 64

*Beatrice Foods v. FTC*, 540 F.2d 303 (7th Cir. 1976) ............................................................................... 43, 48

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995) ................................ 64

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........................................................................................ 37

*Cass Student Advert. v. Nat'l Educ. Advert. Serv., Inc.*, 516 F.2d 1092 (7th Cir. 1975) ......................................... 62

*Eastman Kodak Co. v. Image Tech. Serv. Inc.*, 504 U.S. 451 (1991) ...................................................... 56, 58, 60

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ........................................................................................ 34

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) .................................................................................. 58

*Epic Games, Inc. v. Google LLC*, 147 F.4th 917 (9th Cir. 2025) .............................................................................. 44

*ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547 (8th Cir. 1991) .............................................................................. 25

*FTC v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020) ................................... 20

*FTC v. Advocate Health Care Network*, 841 F.3d 460 (7th Cir. 2016) ......................................................... 45, 61

*FTC v. AMG Cap. Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018) .................................................................................. 24

*FTC v. AMG Cap. Mgmt., LLC*, 998 F.3d 897 (9th Cir. 2021) .......... 24

*FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019) .......... 24

*FTC v. Evans Products Co.*, 775 F.2d 1084 (9th Cir. 1985) .......... 23

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) .......... 30

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) .......... 61

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984) .......... 34

*Greyhound Comput. Corp. v. IBM Corp.*, 559 F.2d 488 (9th Cir. 1977) .......... 44, 48

*In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231 (9th Cir. 1976) .......... 26

*Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242 (1959) .......... 47

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) .......... 48

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) .......... 21

*Pullman-Standard v. Swint*, 456 U.S. 273 (1982) .......... 19, 35

*Republic of Iraq v. Beaty*, 556 U.S. 848 (2009) .......... 32

*United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1 (D.D.C. 2022) .......... 45

*United States v. Conn. Nat'l Bank*, 418 U.S. 656 (1974) .......... 47

*United States v. Continental Can*, 379 U.S. 441 (1964) .......... 36, 43, 45, 46, 47

*United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) .......... 58

*United States v. Eastman Kodak Co.*, 63 F.3d 95 (2d Cir. 1995) .......... 58

*United States v. Google LLC*, 778 F. Supp. 3d 797 (E.D. Va. 2025) .......... 50

*United States v. Google*, 747 F. Supp. 3d 1 (D.D.C. 2024) .......... 48, 65

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) .......... 21, 36, 47, 64

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001). .......... 18, 27, 36, 47, 51, 62, 65, 67

*United States v. Morton*, 467 U.S. 822 (1984) .......... 23

*United States v. Oregon State Med. Soc.*, 343 U.S. 326 (1952) .......... 25

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) .......... 44

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953) .......... 25

*Wilk v. Am. Med. Ass'n*, 895 F.2d 352 (7th Cir. 1990) .......... 25

**STATUTES AND RULES**

15 U.S.C. § 45 .......... 31

15 U.S.C. § 53 .......... 2, 5, 20, 23, 30, 31, 32, 34

Fed. R. Civ. P. 3 .......... 20

Fed. R. Civ. P. 37(c)(1) .......... 28

**OTHER AUTHORITIES**

U.S. Dep't of Justice & FTC, *Merger Guidelines* (2023) .......... 54

IIB Phillip E. Areeda *et al.*, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2021) .......... 55, 58, 63

Final Judgment, *U.S. v. Aluminum Co. of America*, N.D.N.Y. (July 6, 1950), http://justice.gov/atr/page/file/1166976/dl .......... 26

Investopedia, *Understanding Economic vs. Accounting Profit: Key Differences Explained* (Nov. 14, 2025), https://tinyurl.com/mryac7mj .......... 63

# GLOSSARY

Commission – Federal Trade Commission

FTC – Federal Trade Commission

FTC Act – Federal Trade Commission Act, 15 U.S.C. § 41, *et seq*.

PSN – Personal social networking

PJA – Public Joint Appendix

SJA – Sealed Joint Appendix

Section 2 – 15 U.S.C. § 2

Section 13(b) –15 U.S.C. § 53(b)

## INTRODUCTION

After its founding, Facebook quickly (and famously) seized a monopoly in the market for personal social networking—that is, sharing content with friends and family. In 2020, the FTC brought this action, alleging that Meta—Facebook's owner—unlawfully maintained that monopoly by purchasing Instagram and WhatsApp, thereby eliminating them as competitive threats. As a result, the personal social networking market remained monopolized, with Meta properties Facebook and Instagram as the giants in the field and only Snapchat as a meaningful—but much smaller—competitor. Five years of litigation ensued, culminating in a six-week trial.

The district court acknowledged that Meta may well have enjoyed monopoly power when the complaint was brought. It nevertheless rejected the FTC's claim based on the following syllogism: First, the court held that Section 13(b) of the FTC Act, the statute that empowered the FTC to bring this case, required the FTC to prove that Meta had a monopoly at the time of the court's decision. Second, the court held that at the time of its decision in 2025, Meta no longer held a monopoly due to the rise of apps like TikTok that largely serve short

videos selected by an AI algorithm. Both premises of the syllogism are wrong.

Start with the major premise—that the FTC was obligated to prove a 2025 monopoly. The court's cursory analysis focused on Section 13(b) of the FTC Act, which authorizes the Commission to "bring suit" in certain cases "[w]henever" it "has reason to believe" that the defendant "is violating, or is about to violate" any law the Commission enforces. 15 U.S.C. § 53(b), (b)(1). By its plain terms, this is a pleading requirement that applies at the time of the complaint. Nothing in the statutory text requires the Commission to make any substantive showing as of the time of decision.

The district court's atextual interpretation of Section 13(b) is entirely novel, and would improperly deprive courts of the power to remedy past unlawful action even if it threatens to recur or continues to cause grievous harm. The court was surely correct in insisting, with Heraclitus, "that no man can ever step into the same river twice." PJA.792. But as far as Section 13(b) is concerned, what matters is the state of the river at the time of the complaint.

That simple observation resolves the appeal. As a result, this Court need not consider the broader question of whether Section 13(b)(1) applies here at all. The answer is no. This case was brought under the second proviso of Section 13(b), which empowers the Commission to seek permanent injunctive relief in federal court. Section 13(b)(1) is located in a different part of Section 13(b) and does not apply to second-proviso cases.

The district court was similarly mistaken as to its minor premise: that Meta's personal social networking monopoly had somehow dissipated between 2020 and 2025. TikTok's growth during that time is irrelevant because TikTok does not meaningfully serve the demand for friends-and-family sharing, and Meta comfortably maintained its vise grip on that market. The district court's contrary conclusion rested on a series of errors.

To begin, the district court failed to grasp the fundamental point that a single company can operate in multiple markets. If a monopolistic grocery store adds a pet food section, that may bring it into competition with PetSmart as to pet food, but its grocery monopoly would be undisturbed. Just the same, even as Meta brought itself into

competition with TikTok by adding its own algorithmic short form video product, it retained its monopoly on personal social networking.

The same basic mistake caused the district court to overrely on evidence of switching between Facebook, Instagram, TikTok, and other apps when one of them was briefly unavailable. Again, if the supermarket were temporarily closed, some customers would buy pet food at PetSmart, but this would have no bearing on the supermarket's monopoly in groceries. What the court should have asked—but never did—is whether TikTok or other purported competitors' apps are used for friends-and-family sharing. The answer to that is plainly no.

Finally, the district court's market definition analysis was plagued with the false assumption that current market conditions are competitive. In other words, the court assumed its conclusion. This caused it to perform a "hypothetical monopolist test" that used an already monopolized market as a baseline, and also to commit the infamous *Cellophane* fallacy: relying on substitution evidence that reflects a monopoly to purportedly disprove the monopoly's existence.

In sum, the district court erred by requiring the FTC to demonstrate a 2025 monopoly, and erred again in its analysis of the 2025 market. This Court should reverse and remand.

## JURISDICTION

The FTC brought this case under 15 U.S.C. § 53(b). The district court had jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1345. The court entered final judgment disposing of all parties' claims on November 18, 2025. PJA.086. The Commission filed a notice of appeal on January 20, 2026. PJA.883. This court has jurisdiction under 28 U.S.C. § 1291.

## QUESTIONS PRESENTED

**1.** Whether the district court erred in holding that Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), obligated the Commission to demonstrate that Meta possessed a monopoly as of the time of the court's decision.

**2.** Whether the district court erred in holding that Meta lacked monopoly power in a relevant market.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in a Statutory Addendum at the end of this brief.

## STATEMENT OF THE CASE

### Meta Acquires and Maintains a Monopoly in the Market for Personal Social Networking.[1]

Mark Zuckerberg started Facebook from his Harvard dorm room in 2004, and the product soon took the world by storm. PJA.796. Facebook allowed users to connect with "the people they care about," and it quickly overtook and then vanquished MySpace. PJA.891, 983-84; PJA.981.

Facebook evolved over the ensuing decades. In its earliest days, Facebook was a web-based product that allowed users to find their friends and view their posts and profiles. PJA.796. Over time, the site added features like picture (and eventually video) sharing and direct messaging, and it grew from thousands of users to billions. PJA.796. Facebook also began to offer other features, less related to sharing personal content: Users can now, for example, buy and sell products in a marketplace, or—as discussed more below—view videos from creators

[1] Facebook the company changed its name to Meta in 2021, but for simplicity, this brief will refer to the company (which now owns Facebook, Instagram, WhatsApp, and more) as Meta regardless of the timeline; Facebook will refer to the individual app.

with whom users have no personal connection. PJA.796, 818. And most users now access Facebook on their mobile phones. PJA.1028.

Throughout Facebook's evolution, its core product retained nearly unchallenged dominance. Google tried to enter the personal social networking ("PSN") market with Google+, which Meta saw as "the first time" there was "real competition" to Facebook that gave "consumers … real choice." PJA.902, 1019-1024 (Sandberg). Social networks, however, rely on network effects for success, and Google+ lacked the "critical mass" of users that Facebook already held. PJA.948-49, 1025-28. Google+ accordingly failed to gain traction and eventually shut down. PJA.1172.

Facebook's most significant threat came from Instagram, which built a personal social network around the ability to upload, edit, and share photos. PJA.797. Much like Facebook, Instagram allowed users to connect with friends and family; users could scroll through photos from accounts they followed. PJA.797. Users could also like and comment on those photos, creating a conversation with their network. PJA.797.

Instagram was a serious competitor to Facebook. It "was growing so much faster" than Facebook that Meta determined it "had to buy

[Instagram] for $1 billion" and did so in 2012. PJA.955, 997-1000. Meta's motive for the transaction was clear: Zuckerberg wanted to "neutralize a potential competitor." PJA.900-01. Otherwise, he feared, Instagram might "grow to a large scale" that "could be very disruptive to" Meta's lucrative, unchallenged monopoly over personal social networking. PJA.899.

Meta followed a similar pattern in 2014 when—after failing to acquire Snapchat, PJA.1001 (Zuckerberg)—it stamped out a nascent competitive threat from WhatsApp, a popular internet-based messaging app. Worried that WhatsApp would start a social network, PJA.898—which Meta saw as "the biggest threat we've ever faced," PJA.931—Zuckerberg raced to purchase the app for $19 billion, without any standard valuation or plans to monetize it. PJA.1066, 1073-74. Meta thus eliminated "a threat to [its] core businesses." PJA.898.

Thanks in large part to these acquisitions, Meta remained the behemoth in the PSN market, maintaining market shares well over 60% throughout the relevant period. PJA.1165-67, 920-26. As a result, Meta has reaped windfall profits for years. PJA.1066-71.

**The FTC Sues Meta for Unlawfully Monopolizing the Market for Personal Social Networking.**

The FTC sued Meta in December 2020, alleging that Meta violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by unlawfully maintaining a monopoly in the market for personal social networking services. *See* PJA.89. After the district court dismissed the initial complaint and the FTC amended, PJA.199, the court denied Meta's motion to dismiss, PJA.335. The court concluded that the FTC had adequately alleged that Meta "exercises monopoly power in the market for PSN services" and that it "willfully maintained that power through anticompetitive conduct—specifically, the acquisitions of Instagram and WhatsApp." PJA.336.

The court bifurcated the proceedings into liability and remedies phases. PJA.384. The parties then proceeded to discovery on liability, with fact discovery running through mid-2023 and expert discovery lasting into 2024. PJA.383.

**Meta Develops Short Form Video Offering.**

Meanwhile, outside of the trial, Meta became increasingly focused on TikTok, which first arrived in the United States in 2018. PJA.798. TikTok did not challenge Meta in the market for personal social

networking. Its "breakthrough innovation and central feature … that traditional social networks had not yet explored" was "an AI algorithm that shows users content based not on their friends, but on their interests." PJA.798. Nearly all TikTok users thus use the platform to watch AI-recommended videos from accounts users do not follow, not videos shared by friends. PJA.798. This is known as "unconnected content." PJA.800. More than 170 million Americans now use TikTok each month. PJA.798.

Other companies sought to compete with TikTok. For example, in 2021, YouTube debuted YouTube Shorts, PJA.845, "short videos that are virtually identical to a TikTok video," PJA.799.

Meta took notice of this exploding market. In 2020-21, Meta added its own unconnected-content video product called "Reels" on both Instagram (2020) and Facebook (2021). PJA.796, 804. Like TikTok and YouTube Shorts, Reels offers short videos posted by people the user does not know, recommended by an AI algorithm. PJA.796. Reels were an afterthought when this case began—they are not even mentioned in the complaint or Meta's motions to dismiss—but they evolved into a larger part of Meta's overall business. In part because videos take

longer to watch than pictures or updates take to view, PJA.875, users now spend 51% of their time on Instagram and 41% of their time on Facebook viewing Reels, PJA.965-66.

At the same time, "connecting with friends remains an important part of" Facebook and Instagram. PJA.800. Zuckerberg testified that "connecting with friends and family is one of the … core purposes that the Facebook application provides today" and that the same was true of Instagram. PJA.987-88, 993; PJA.1015-16. Both apps continue to emphasize that function. Their sign-up pages still encourage users "to see photos and videos from your friends," PJA.885 (Instagram), 1057, and "connect with friends, family, and people you know," PJA.893 (Facebook), 994, while making no mention of unconnected content. And users continue to demand those services, spending billions of minutes per month interacting with content from their friends on Facebook and Instagram as of January 2025. PJA.1226.

Americans' options for personal social networking, however, are sharply limited. Two Meta apps, Facebook and Instagram, offer those services. PJA.796-97. So does Snapchat, SJA.303-06, but it is the only meaningful non-Meta competitor for personal social networking services

in the United States today. *See, e.g.,* PJA.856 (explaining that TikTok's main social feature "has not achieved great success").

**The District Court Denies Meta's Summary Judgment Motion, Conducts a Trial, and Rules in Meta's Favor Based on Recent Market Conditions.**

Back to the litigation, which was occurring in parallel with these developments. After discovery closed, the parties cross-moved for summary judgment.

By now, Reels had risen from an afterthought to a prominent part of Meta's defense. Meta argued that it did not have monopoly power in any relevant market because it was a smaller player in the enormous market for users' "time and attention," which included TikTok and YouTube, among others. PJA.415, 419. The court recognized, however, that "it is beyond cavil that companies can operate in multiple and concentric relevant markets" and rejected this argument. PJA.574-75 (SJ Op.) (quotations omitted). The case therefore headed to trial on liability.

At trial, Meta continued its focus on a broad market for user time and attention—emphasizing competition for unconnected content and relying largely on evidence about conditions in 2025. Throughout trial,

over the FTC's objections, Meta introduced *post-discovery* evidence to argue that no PSN-services market existed in 2025 and that Meta no longer possessed monopoly power in a relevant market. PJA.668. Indeed, Meta elicited testimony from its own executives focusing on supposed data from recent months, well after the close of discovery. PJA.674. The FTC promptly moved to exclude this evidence, PJA.633, but the district court denied that motion, PJA.654. When Meta continued to introduce similar late-breaking evidence at trial, the FTC renewed its objection in a bench brief. PJA.668. Relevant here, the FTC argued that Section 13(b) of the FTC Act creates, at most, a pleading standard that requires the FTC to allege in its complaint that the defendant "is violating, or is about to violate" the law. PJA.682-85. The district court overruled the objection, concluding that the active voice in the statute required the FTC to demonstrate a *current* monopoly, years after the complaint. PJA.665-67.

Following a six-week trial, the district court entered judgment for Meta nearly six months later. The court reiterated that Section 13(b) required the FTC to show that Meta maintained a monopoly at the time of the court's final decision. PJA.813-14 ("[T]he agency must prove that

Meta is violating the law *now*."); PJA.814 ("The FTC can therefore seek to enjoin only conduct that currently violates the law ….").

Next, the court held that Meta did not have monopoly power in any relevant market at the time of the decision. The court concluded that the FTC had not shown that personal social networking was a distinct market. PJA.793. In the court's view, Meta's apps competed in a broader market—which the court never identified or defined—that included TikTok and YouTube. PJA.873. The court's cursory analysis of Section 13(b) turned out to be the fulcrum point of the decision. The court recognized that "PSN apps may have been a market unto themselves when the FTC filed this case in 2020" but concluded that this was "no longer the case." PJA.831-832. And the court repeatedly cited post-discovery evidence to support its decision. *See, e.g.*, PJA.805, 845 (relying on 2025 evidence, not produced during discovery, concerning time spent on Facebook and Instagram); PJA.820 (same, concerning ad load).

Because the court thought that only the 2025 market mattered, it neither evaluated whether Meta's conduct was anticompetitive nor

determined whether Meta had monopoly power at any earlier time. The court therefore entered judgment for Meta. This appeal followed.

## SUMMARY OF ARGUMENT

The court below erred in two fundamental and independent ways, each of which warrants reversal.

**I.** First, the court badly misread Section 13(b), the statute that authorizes the Commission to bring suit to enforce a wide range of substantive statutes. The court concluded that the FTC had to show that Meta was violating the law (here, Section 2 of the Sherman Act) at the time the court reached its decision in 2025. But the court disregarded the plain language of that part of Section 13(b), which provides that the FTC "may bring suit" "[w]henever" it has reason to believe that the defendant "is violating, or is about to violate" a law the Commission enforces. That language dictates only when the Commission may sue.

No other court has held, as the district court did here, that Section 13(b) requires the Commission to prove a violation at the time the court reaches a decision on the merits, following discovery and trial. The district court's reading conflicts with standard principles of civil

procedure, conflates remedial questions with merits issues, and would lead to illogical and damaging consequences (like depriving courts of the ability to remedy past violations that threaten to recur or continue to cause harm).

More fundamentally, Section 13(b)(1) does not apply to cases like this one, where the Commission seeks a permanent injunction. The statute addresses two distinct categories of cases. In the first, the Commission seeks a preliminary injunction pending its own administrative adjudication of the merits. In the second, the Commission seeks a permanent injunction directly in federal court—as it did here. Section 13(b)(1) applies only to the first category.

**II.** The district court also misapplied fundamental antitrust law principles by failing to recognize the validity of the PSN market, whether in 2020 or 2025. The PSN market—for friends-and-family sharing—is dominated by Meta's two apps: Facebook and Instagram. The FTC showed that the PSN market is a proper product market under two established methods of defining a market: the *Brown Shoe* factors and the hypothetical monopolist test. The district court rejected

that market based on conceptual errors that infected its analysis under both methods.

First, the district court relied on evidence that users sometimes substitute time on Meta's apps with time on TikTok or YouTube. In doing so, the court made two basic analytic errors: It failed to recognize that a single company can compete in multiple markets, and it failed to consider whether TikTok and YouTube are used for friends-and-family sharing (they are not). Had the court applied the correct legal principles, it would have recognized that the PSN market is valid and excludes TikTok and YouTube.

Second, the court engaged in circular reasoning by assuming that the current market is competitive. This false assumption fatally infected the court's application of the hypothetical monopolist test, which asks whether a firm controlling all products in the market could profitably raise prices (or here, degrade quality) a small amount compared to a competitive market. The test's baseline should have been a hypothetical competitive market in which Instagram remained independent and competed with Facebook. The court instead asked whether *Meta as it currently exists*—i.e., owning both Facebook and

Instagram—could profitably decrease quality even more than it already has. That is the wrong question because it uses a monopolized market, not a competitive one, as the baseline. That same problem led the court to fall prey to the well-known *Cellophane* fallacy: treating substitution that *results* from a monopoly as evidence that no monopoly exists.

Finally, the court improperly dismissed the direct evidence of Meta's monopoly, including: (1) Meta's persistently high economic profits and (2) its ability to profitably degrade the quality of its products (effectively making them more expensive) by increasing advertising loads and engaging in harmful privacy and data-protection practices. That direct evidence is alone sufficient to demonstrate a monopoly; at a minimum it further illustrates why the court erred by assuming a competitive market.

This Court should reverse and remand.

## STANDARD OF REVIEW

This Court "review[s] legal questions *de novo*" and findings of fact for "clear[] error[]." *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001). Where a district court's "findings are infirm because of an erroneous view of the law, a remand is the proper course unless the

record permits only one resolution of the factual issue." *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982).

## ARGUMENT

### I. Section 13(b) of the FTC Act Does Not Require The Commission to Show a Current or Imminent Antitrust Violation at the Time of the Court's Decision.

The court fundamentally misinterpreted Section 13(b) of the FTC Act. This critical mistake came at the outset and infected the entire decision.

By its plain terms, Section 13(b)(1) dictates when the Commission "may bring suit." *Infra* § I.A. It did not require the FTC to show that Meta was violating the Sherman Act at the time of the court's decision on the merits. The district court's unprecedented conclusion that "the agency must prove that Meta is violating the law *now*," PJA.813-14, years after the complaint, contradicts the statute's plain text and finds no support in the court's scant legal analysis. This Court can resolve the appeal on this basis alone and remand for the district court to issue a new decision under the correct statutory standard.

In any event, the provisions of Section 13(b) governing a suit where the FTC seeks a preliminary injunction do not apply here. *Infra* § I.B. This broader question about the statute's structure has never

been conclusively resolved, and this Court need not do so here unless it disagrees that Section 13(b)(1) creates only a pleading requirement. But if it does reach the issue, this Court should hold that Section 13(b)(1) does not apply to freestanding permanent injunction suits like this one.

### A. Section 13(b)(1) creates a pleading requirement that applies at the time of the complaint.

**1.** The terms of Section 13(b)(1) do not govern a district court's assessment of the merits following trial. Instead, the statute provides that "[w]henever the Commission has reason to believe—(1) that any person … is violating, or is about to violate, any provision of law enforced by the [FTC] … the Commission … may bring suit … to enjoin any such act or practice." 15 U.S.C. § 53(b). The Third Circuit has explained that in prescribing when the FTC "may bring suit," Section 13(b)(1) creates a "pleading requirement—which is applied right out of the gate." *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 158 (3d Cir. 2019); *see also FTC v. AbbVie Inc.*, 976 F.3d 327, 381 (3d Cir. 2020) ("Section 13(b) … requires a plaintiff *to plead* the defendant 'is violating' or is 'about to violate' the antitrust laws.…") (emphasis added)). As in any other case, the Commission files a complaint and the case proceeds based on the alleged violation. *Cf.* Fed. R. Civ. P. 3.

Section 13(b)(1) says nothing about the governing legal standard. The substantive law in any Section 13(b) case—i.e., the law that provides the elements the Commission must prove to show the defendant acted illegally—is whichever statute the Commission contends the defendant violated. Here, the Commission alleged that Meta violated Section 2 of the Sherman Act, 15 U.S.C. § 2, and so had to prove that Meta held monopoly power in a market and acquired or maintained that power through anticompetitive conduct. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). The relevant market in a Section 2 case is the market at the time of the alleged anticompetitive conduct. *See, e.g., id.* at 567-68, 571 (discussing defendant's market share in 1961, and noting allegedly anticompetitive conduct continued through that year). Section 2 thus often requires courts "to look back in time to the marketplace as it once was and perhaps might have been, not as it now is." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1071 (10th Cir. 2013) (Gorsuch, J.).

Thus, when the Commission brings a case under Section 13(b) alleging a violation of the Sherman Act, the former imposes a pleading requirement, and the latter instructs courts to look at the market at the

time of the allegedly anticompetitive conduct. Neither statute instructs courts to consider the market at the time of the final decision on the merits. This straightforward and well-understood statutory construction resolves this appeal. The district court acknowledged that the Commission's proposed market "may have been a market … when the FTC filed this case in 2020." PJA.831-32. Remand is required for the district court to address that question instead of whether the FTC proved a market in 2025. *See infra* 34-35.

**2.** In a single paragraph of analysis, the district court concluded that Section 13(b)(1) required the Commission to demonstrate current or imminent monopolization at the time of the court's final decision. *See* PJA.814; *see also, e.g.*, PJA.815 ("[T]he FTC must prove that Meta has monopoly power *now*.").[2] This was error for multiple reasons.

---

[2] Given that six months passed between trial and decision, the FTC assumes that "now" (or "currently violates," PJA.814) means the time of the decision. This in turn could lead to the untenable possibility of a court considering *post-trial*, pre-final-decision evidence. If the court was instead referring to the time of trial (which the opinion neither says nor suggests), that would introduce its own problems. A trial is not a fixed point in time (this one lasted six weeks), and given the court's view that the statute is "always forward facing," PJA.814, it would be arbitrary to end the inquiry at trial. Regardless, the statute contemplates only when the FTC may sue; it mentions neither trial nor final decision.

Most fundamentally, the court failed to reckon adequately with the statutory text. As noted, Congress provided that when a party "is violating, or is about to violate" the law, the Commission "may bring suit" to enjoin that conduct. 15 U.S.C. § 53(b). The district court quoted this language but focused entirely on the first phrase while ignoring the second. PJA.814. In doing so, the court committed the cardinal sin of construing a statutory phrase "in isolation" rather than "read[ing] [the] statute[] as a whole." *United States v. Morton*, 467 U.S. 822, 828 (1984). The statute as a whole shows that Congress was setting preconditions on when the Commission may bring certain cases, not altering the merits standard under other statutes.

**3.** No other court has adopted the district court's novel, atextual construction. The few cases the district court cited, PJA.814, are inapposite. *FTC v. Evans Products Co.* considered whether Section 13(b) "encompass[ed] violations that completely ceased *before the FTC brought suit* and have not been shown likely to recur." 775 F.2d 1084, 1087 (9th Cir. 1985) (emphasis added). That holding merely echoes the Third Circuit's view that Section 13(b) creates a pleading requirement;

it says nothing to support the district court's time-of-decision interpretation.

Both *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019), and *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021), meanwhile, addressed the totally separate issue of whether Section 13(b) authorizes equitable monetary relief. Neither court held that Section 13(b) imposed anything more than a pleading standard. And the Commission obtained permanent injunctions in both cases. *See Credit Bureau Ctr.*, 937 F.3d at 767-68; *FTC v. AMG Cap. Mgmt., LLC*, 910 F.3d 417, 428 (9th Cir. 2018) (affirming permanent injunction), *rev'd and remanded on other grounds by AMG*, 593 U.S. 67; and *FTC v. AMG Cap. Mgmt., LLC*, 998 F.3d 897 (9th Cir. 2021) (vacating only equitable monetary relief). Neither decision stands for the remarkable proposition that Section 13(b) requires the Commission to demonstrate an ongoing antitrust violation at the time of the final decision.

**4.** The district court also conflated the standard for finding liability with the standard for imposing a remedy. The court's underlying concern seems to have been that injunctive relief for Meta's past misconduct would be improper in light of changed circumstances.

That is a relevant consideration—but it must be addressed at the *remedy* phase rather than the liability phase of the bifurcated proceedings. *Cf. Microsoft*, 253 F.3d at 49.

Traditional principles of equity would govern the remedies phase. And under those principles, even if illegal conduct has ceased, an injunction may still be warranted if there is a "real threat of future violation or a contemporary violation of a nature likely to continue or recur." *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("[T]he court's power to grant injunctive relief survives discontinuance of the illegal conduct."). Here, even if Meta was no longer engaging in any unlawful conduct, the court could have considered in the remedy phase whether the likelihood of recurrence warranted an injunction.

Similarly, the court would consider at the remedy phase whether the "lingering effects" of Meta's anticompetitive conduct warranted injunctive relief. *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 369 (7th Cir. 1990); *see also ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 557 (8th Cir. 1991) (when considering injunctive relief, courts "may consider

both the continuing effects of past illegal conduct … and the possibility of lingering efforts" of that conduct) (cleaned up)); *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 236 (9th Cir. 1976) ("[E]quitable remedies may be granted to eliminate the harmful residual effects of past violations on the competitive system…."). Even if Meta's monopoly power had dissipated, an injunction might still have been necessary to remedy the lingering harm caused by Meta's monopolistic conduct, including the ongoing absence of competition between Facebook and Instagram. *See, e.g.*, Final Judgment, *U.S. v. Aluminum Co. of America*, N.D.N.Y. (July 6, 1950), http://justice.gov/atr/page/file/1166976/dl (ordering injunction and retaining jurisdiction to ensure that "competitive conditions of an effective and lawful nature will prevail" even though monopoly had ended).

The district court never considered any of these possibilities because it imported remedial concerns into its merits decision. Nothing in Section 13(b) suggests that Congress created an exceptional scheme that eliminates these well-established equitable doctrines in the isolated context of Section 13(b) proceedings.

Indeed, when a non-FTC plaintiff—government or private—seeks to enjoin violations of the Sherman Act, courts do not assess the defendant's conduct at the time of the final decision. For instance, in *Microsoft*, this Court recognized that "over six years have passed since Microsoft engaged in the first conduct plaintiffs allege to be anticompetitive" and that "[b]y the time a court can assess liability, firms, products, and the marketplace are likely to have changed dramatically." 253 F.3d at 49. Still, the Court held Microsoft liable—while recognizing the remaining challenge of "crafting injunctive remedies," a process that would benefit from evidence at the remedial stage. *Id.*

**5**. The district court's construction of Section 13(b) would also impose illogical and anomalous limitations on the Commission's enforcement authority.

For one, the court's construction forces the Commission to make an impossible prediction when deciding whether to try to stop unlawful conduct. Under the court's interpretation, the Commission must guess—before deciding whether to file a complaint—whether the defendant's conduct will persist until the merits decision, potentially

many years down the road. The text of Section 13(b) nowhere suggests that Congress intended to demand that the Commission see into the future.

The district court's approach also conflicts with basic notions of civil procedure. Litigation often unfolds over years; evidence is fixed at the close of discovery and trial proceeds based on that record. *See, e.g.*, Fed. R. Civ. P. 37(c)(1) (absent justification, parties may not rely on evidence "at a trial" unless that evidence was produced during discovery). The district court's interpretation transforms post-discovery developments into unvetted cornerstones of a defendant's case. This in turn invites defendants to engage in strategic, mid-litigation conduct designed to manufacture favorable post-discovery evidence, and it deprives plaintiffs of any opportunity to test that evidence through discovery.[3]

These are not theoretical concerns. As the FTC explained, Meta repeatedly relied on evidence at trial that had not been produced during discovery. *See* PJA.677-85 (SJA.121-29). There are indications that

[3] The district court's construction also incentivizes defendants to engage in delay tactics, hoping that the passage of time will help them evade an adverse judgment.

Meta took steps to ensure that this post-discovery evidence was favorable to its defense. *See* PJA.640-43 (SJA.100-03), PJA.649-50. Section 13(b) does not alter the ordinary rules of civil procedure and vitiate the scrutiny that the discovery process is meant to provide.

* * *

The plain text of Section 13(b)(1) imposes a pleading requirement that is assessed at the time of the complaint. This Court can resolve this appeal on this simple basis and remand with instructions for the district court to decide this case under the proper legal standard. *See infra* § I.C (explaining why remand is necessary).

### B. Section 13(b)(1) does not apply to standalone permanent injunction cases.

The district court's decision was also wrong for the independent reason that Section 13(b)(1) does not apply when the Commission brings a standalone case seeking only a permanent injunction. Section 13(b) refers to two distinct types of cases the Commission may bring: (1) an action for a preliminary injunction to maintain the status quo while administrative adjudication proceeds;[4] and (2) an action seeking a

---

[4] The FTC regularly seeks preliminary injunctions under Section 13(b) to temporarily block a proposed merger while the Commission considers

permanent injunction (where there is no administrative adjudication). The plain text of the statute shows that Section 13(b)(1) applies only to the former category, not the latter.

Section 13(b) separately addresses preliminary and permanent injunctions. The first part of Section 13(b), including subsections (b)(1) and (b)(2), as well as the first proviso, describes preconditions and limitations in a case where the FTC seeks a preliminary injunction pending an administrative proceeding. Section 13(b)(1) requires that the defendant "is violating, or is about to violate" a statute the Commission enforces. 15 U.S.C. § 53(b)(1). And Section 13(b)(2) requires that the Commission have reason to believe that enjoining the defendant's conduct pending the issuance of an administrative complaint would be "in the public interest." *Id.* § 53(b)(2). If those two conditions are met, the Commission "may bring suit" and seek temporary relief pending an administrative adjudication. *Id.* § 53(b). Under the first proviso, if the Commission does not file an administrative complaint in 20 days, the preliminary relief must be

---

whether to permanently bar the merger. *See, e.g.*, *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713-14 (D.C. Cir. 2001).

"dissolved." *Id.* Thus, the first part of the statute, from "[w]henever the Commission has reason to believe," through (b)(1) and (b)(2) and the first proviso (beginning "[p]rovided, however"), constitutes the complete statutory scheme describing how the Commission may seek interim relief when it plans to administratively adjudicate a case. Following that adjudication, the Commission may order the defendant to "cease and desist" its violative conduct—that is the only relief the Commission may impose—and the order becomes final unless challenged in court. 15 U.S.C. § 45(b), (c).

Following this comprehensive description of the process for temporary relief comes a simple second proviso. It states in full: "*Provided further*, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b).[5] Most relevant here, the statute does not provide that the Commission may seek permanent relief only when a defendant "is violating, or is about to violate" the law.

Section 13(b) thus describes two types of cases with distinct requirements, and nothing in the text or structure of the statute

[5] The remainder of Section 13(b) addresses venue, joinder, and service.

suggests that the requirements for one type apply to the other. That is not unusual. A proviso need not "refer only to things covered by a preceding clause"; it may also "state a general, independent rule." *Alaska v. United States*, 545 U.S. 75, 106 (2005); *see also, e.g., Republic of Iraq v. Beaty*, 556 U.S. 848, 858 (2009). The permanent injunction proviso in Section 13(b) grants an additional power not contingent on anything preceding it.

The text of the two provisos further underscores that the second creates a distinct power. The first proviso states "[*p*]*rovided*, *however*," thus referring to (and limiting) the preceding authorization, which pertains to preliminary injunctions. 15 U.S.C. § 53(b). The second states "[*p*]*rovided further*," *id.*, which on its face announces a separate, unrelated power. Indeed, *Beaty* also featured an authority announced in a "[p]rovided further" proviso, and the Court concluded that this proviso granted the President "an additional power" that "was not … an exception to, qualification of, or restraint on the principal power." 556 U.S. at 858. So too here. Section 13(b)'s permanent injunction proviso does not create an exception, qualification, or restraint on the distinct authority to seek a preliminary injunction. It instead "state[s] a general,

independent rule" unrelated to "things covered" in the "preceding clause," pertaining to preliminary injunctions. *Alaska*, 545 U.S. at 106. The requirements of Sections 13(b)(1) and (b)(2)—including the "is violating, or is about to violate" requirement—thus do not apply to standalone permanent injunction suits.

Courts have confirmed that the second proviso of Section 13(b) authorizes the Commission to bring standalone cases seeking only a permanent injunction. *See, e.g.*, *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434-35 (11th Cir. 1984); *United States v. JS&A Group., Inc.*, 716 F.2d 451, 456 (7th Cir. 1983); *FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1110-11 (9th Cir. 1982).[6] And it makes sense that Section 13(b) creates different requirements for two separate categories of cases. After all, "preliminary relief and a permanent injunction are entirely different

---

[6] The Supreme Court has also recognized that the statute authorizes two types of cases: "the Commission may use § 13(b) to obtain injunctive relief while administrative proceedings are foreseen or in progress, *or* when it seeks only injunctive relief." *AMG*, 593 U.S. at 78 (emphasis added). *AMG* also contains dicta suggesting that the "is violating, or is about to violate" language applies in a permanent injunction case. *See, e.g., id.* at 70. As explained above, *supra* 24, *AMG* concerned whether Section 13(b) authorized equitable monetary relief, not the question presented here.

animals." *JS&A*, 716 F.2d at 456. In Section 13(b), "Congress clearly intended that each be governed by a separate statutory provision." *Id.*[7]

In this case, where the challenged mergers were consummated years before, the Commission opted against seeking preliminary relief and did not pursue an administrative proceeding. Instead, the Commission sought only a permanent injunction under the second proviso of Section 13(b), which merely requires "proper proof." 15 U.S.C. § 53(b). That meant, at the remedies phase, the Commission had to satisfy the well-known standard for a permanent injunction. *See, e.g.*, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). But it did *not* have to satisfy the Section 13(b) requirements for preliminary injunction suits.

### C. Remand is required.

The district court's misconstruction of Section 13(b) requires reversal and remand. The court's determination that the FTC had to demonstrate that Meta was violating the Sherman Act at the time of

[7] The district court was wrong, therefore, to conflate the two kinds of cases and to treat a preliminary injunction as an intermediate stage that occurs "as a case progresses" toward the permanent injunction stage. PJA.814-15.

the final decision—combined with the court's view that the facts on the ground had fundamentally evolved in the years between complaint and judgment—was the foundation of its decision from start to finish. *See* PJA.792 ("The landscape that existed only five years ago when the [FTC] brought this antitrust suit has changed markedly."); PJA.880 ("Whether or not Meta enjoyed monopoly power in the past, though, the agency must show that it continues to hold such power now."). Indeed, the court expressly acknowledged that the Commission's proposed market "may have" existed "when the FTC filed this case in 2020" but insisted that this "is no longer the case." PJA.831-32; *see also* PJA.792 ("While it once might have made sense to partition apps into separate markets of social networking and social media, that wall has since broken down.").

These statements make clear that the district court's interpretation of Section 13(b) made all the difference. This appeal therefore can end here. This Court should remand and instruct the district court to decide this case under the proper legal standard. *See Pullman-Standard*, 456 U.S. at 292 (requiring remand following error of law).

## II. THE COMMISSION DEMONSTRATED THAT META HELD MONOPOLY POWER IN THE MARKET FOR PSN SERVICES.

In addition to misconstruing Section 13(b), the district also erred in its analysis of the 2025 marketplace. This Court can reverse and remand on either ground, or both.

Under the Sherman Act, unlawful monopolization requires showing (1) monopoly power and (2) acquiring or maintaining that power through anticompetitive conduct. *Grinnell*, 384 U.S. at 570-71. Monopoly power can be shown through direct proof, or by evidence of high market shares protected by barriers to entry in a relevant antitrust market, which includes a geographic market (here, the United States) and a product market.

A product market consists of "all products reasonably interchangeable by consumers for the same purposes." *Microsoft*, 253 F.3d at 52 (cleaned up); *see also, e.g.*, *United States v. Continental Can*, 378 U.S. 441, 476-77 (1964) (relevant market is "area of effective competition"). Two established methods for defining a product market are the hypothetical monopolist test and an evaluation of "practical indicia" such as the factors outlined in *Brown Shoe Co. v. United States*,

370 U.S. 294, 325 (1962). *See, e.g.*, *FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1037-38 (D.C. Cir. 2008).

The FTC showed at trial that personal social networking services constitute a product market under either method, and that TikTok and YouTube do not belong in that market. But the district court rejected the FTC's proposed market and held Meta lacked monopoly power in 2025 in a broader market—resolving the case on *Grinnell*'s first element alone. That ruling suffered from multiple legal errors, each of which requires reversal.

We start with a summary of the market the FTC proved at trial; we then explain each error in turn.

### A. The FTC showed that PSN services are a relevant product market.

The FTC showed that there is persistent, distinct consumer demand for apps used to connect with friends and family—i.e., for PSN services. Facebook and Instagram are the two dominant apps in this area (with a combined market share over [DELETED]), with Snapchat a distant third option. PJA.1166 & SJA.276, SJA.285. The demand for PSN services is huge by any measure: Every day, Americans consume over *ten billion* posts focused on friends and family on Meta's apps;

annually, Meta collects tens of billions of dollars in ad revenue serving this demand. PJA.927, 928; PJA.1163-64 & SJA.274-75, SJA.283-84; PJA.1226. Indeed, more than 80% of Meta's ad revenue on Facebook and Instagram comes from friend-focused areas of the apps. PJA.1163 & SJA.274-75.

Facebook and Instagram have been marketed from the beginning as tools for staying in touch with people you know. Zuckerberg has long described Facebook as "about real connections to actual friends." PJA.892; PJA.984. And Meta executives consistently recognize that interacting with friends and family has been—and remains—Facebook's "core use case." PJA.906; PJA.988-89 (Zuckerberg). Instagram, too, has always had a "core job" of enabling users to connect with friends and family. PJA.1143-44; *see also* PJA.962. This "friend use case" has been vital to Instagram, PJA.929, and has "remain[ed] resilient" over the years, PJA.936.

Indeed, a 2024 Pew Research center study found that more than 90% of Facebook users and more than 80% of Instagram users use those apps to keep up with friends and family. PJA.1061-62. Almost no one uses them only for Reels. PJA.916, 1153, 1157. And virtually every user

of Facebook and Instagram has multiple—typically, many—friend connections on the apps. PJA.917, 1157. Friends-and-family sharing is also a core way people use Snapchat. SJA.304. Trial testimony from Meta and other companies' executives plus reams of internal and third-party documents confirmed these facts. *See, e.g.*, PJA.895, 906, 1012; PJA.1084-85 & PJA.951; SJA.280, 282.

To enable this core use for friends-and-family sharing, Facebook, Instagram, and Snapchat are built around a social graph—a "map" of a user's personal connections that allows the app to show users content about people they know and suggest new connections based on their current friends. PJA.969-71, 986, 991-92, 1139-40, 1141-42, 1145-46; SJA.307-09 & PJA.964. These apps also provide a shared social space where users can share updates with an audience limited to their own connections, and promote a norm of using real-life identities. PJA.972-73, 982-83, 985-86, 1058-59, 1147-48; SJA.307-09 & PJA.964.

Other apps like TikTok and YouTube do not offer this core ability to engage in personal social networking. PJA.1093-96 & PJA.945-46 (SJA.290-91); PJA.1036-38 & PJA.942-43. TikTok and YouTube both lack the all-important social graph that enables a shared social space

for posting personal updates to only friends. *See* PJA.1096-97; PJA.1034. Neither TikTok nor YouTube offer anything comparable, instead focusing on unconnected video entertainment. PJA.1033, 1097-98, 1101-02. But watching a video of strangers lip-syncing is different altogether from discovering a high-school classmate's wedding photos. Other social media apps likewise have different purposes and are not used for friends-and-family sharing: LinkedIn, for example, is used for professional networking, PJA.1094, while X is for "seeing what's happening in the world and talking about it," PJA.1079.

Every industry witness to testify at trial recognized that PSN services like Facebook and Instagram offer a friends-and-family sharing experience that TikTok and YouTube do not offer. A TikTok executive testified that "Facebook and Instagram are focused on users' interactions with existing friends and family," and that TikTok "differs from them in that respect." PJA.1101. [

DELETED

]

Surveys and research conducted by Meta and others confirmed that people use Facebook and Instagram "primarily" to "connect with

people that they already know," while this was not true for apps like TikTok and YouTube. PJA.977-78, SJA.298-99; *see also* PJA.1111-14 & PJA.938; PJA.907, 1085. Indeed, in TikTok research, people reported using Instagram and Facebook "to stay connected with friends, [and] view personal content from friends," but could not do the same on TikTok because they "lacked a network of friends" there. SJA.287-88.

Finally, expert testimony reinforced what the facts showed: strong demand exists for apps used for friends-and-family sharing, and TikTok and YouTube are not alternatives for that. A rigorous survey asked respondents for the most important reason they use different apps; for Facebook, Instagram, and Snapchat, the top answer was "to keep up with my friends' and family's lives in one place." PJA.1131-36. By contrast, the most important reason people used TikTok and YouTube was for "entertainment"—with less than 5% of respondents selecting as the primary reason "to keep up with my friends' and family's lives in one place." PJA.1133-34, 1136.

### B. The district court improperly viewed substitution with TikTok and YouTube for video content as proof that the PSN market does not exist.

The district court held that there was no PSN market, largely based on its misunderstanding of constructed and natural experiments measuring how much time users spent on TikTok or YouTube when Facebook or Instagram temporarily became unavailable or were made less attractive—and vice versa. *See* PJA.832-47; *see also* PJA.863-65, 867. This evidence convinced the court "that TikTok and YouTube compete with Meta's apps," PJA.843, and that therefore "personal social networking is not a separate product market." PJA.867.

That reasoning and conclusion are wrong several times over, and the errors affected the court's analysis under both the hypothetical monopolist test and *Brown Shoe*.

#### 1. A market including TikTok and YouTube can coexist with the PSN market.

The district court set out to determine "*the* market in which Facebook and Instagram compete," PJA.813 (emphasis added), and concluded that "Meta competes in *the* market for social media," PJA.868 (emphasis added). The court based that conclusion largely on evidence of competition between Facebook, Instagram, TikTok, and YouTube to

show users AI-recommended videos that have nothing to do with their family and friends. The court effectively reasoned that because Meta also competed in a broader market including TikTok and YouTube, Meta *therefore did not compete* in a narrower PSN market. *See, e.g.*, PJA.867-68. That logic contravenes settled antitrust doctrine.

**a**. Antitrust law has long recognized that there is no one "true" market in a given case or industry; relevant product markets can overlap or operate in parallel. In *Continental Can*, for example, the Supreme Court expressly acknowledged that "there may be a broader product market" including "other competing containers" (such as plastic, paper, or foil, in addition to cans and glass), but held that this fact "does not necessarily negative the existence" of a narrower market (such as cans and glass containers). 378 U.S. at 457-58. Indeed, evidence that cans and glass containers were an "area of effective competition" supported the narrower market. *Id.*; *see also Beatrice Foods v. FTC*, 540 F.2d 303, 307-09 (7th Cir. 1976). Likewise, Judge Brown recognized in *Whole Foods* that an organic grocery market could "operat[e] in parallel with" a traditional grocery market. 548 F.3d at 1039 (Brown, J.).

As the Ninth Circuit recently explained:

> McDonald's might compete against Chick-fil-A in the fast-food market yet not compete against Chick-fil-A in the hamburger fast-food market (and instead compete with Wendy's, Burger King, Sonic, and In-N-Out Burger). Although Google and Apple compete for mobile-gaming downloads and mobile-gaming in-app transactions, they do not compete in the Android-only app distribution and in-app billing markets, where Google competes against Samsung, Amazon, and others.

*Epic Games, Inc. v. Google LLC*, 147 F.4th 917, 936 (9th Cir. 2025). That Apple and Google competed in one relevant market therefore was "of little consequence" to whether Google also competed in a different market. *Id.* Failing to establish "monopoly power in [one] market is not a legal bar" to finding monopoly power in another market. *Greyhound Comput. Corp. v. IBM Corp.*, 559 F.2d 488, 503 (9th Cir. 1977).

Consistent with these principles, courts evaluate proposed markets in which the allegedly unlawful conduct occurs—they do not undertake a free-floating search for "the" singular relevant market. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 357 (1963) (courts look to where the effect on competition "will be direct and immediate"); *Epic*, 147 F.4th at 936; *FTC v. Advocate Health Care Network*, 841 F.3d 460,

476 (7th Cir. 2016) (reversing for failing to focus on the "'area of *effective* competition'").

**b.** The district court earlier recognized that "companies can operate in multiple and concentric relevant markets." PJA.574-75 (SJ Op.). As the court explained at summary judgment, "evidence of head-to-head competition outside the PSN-services market … does nothing to show that [Meta's] proposed 'time and attention' market is the only relevant antitrust market." PJA.575 (SJ Op.). But in holding after trial that "Meta competes in *the* market for social media," PJA.868, the court lost sight of this core principle.

As a result, the court never properly analyzed whether Meta *also* competed in a narrower PSN market limited to apps used for connecting with friends and family. The court's reasoning suggests at most that there may be another market in which Meta competes; it does not "negative the existence" of a distinct PSN market. *Cont'l Can*, 378 U.S. at 458; *see also United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 28 (D.D.C. 2022) (Pan, J.) ("[Even] if there are broader markets that might be analyzed, the viability of such additional markets does not render the one identified by the government unusable."). The district

court's 25-page disquisition on TikTok and YouTube, PJA.827-52, is thus at best orthogonal to the antitrust inquiry.

### 2. Evidence of substitution with TikTok and YouTube does not refute a distinct friends-and-family market.

The court did not deny that millions of Americans use Meta's apps to connect with friends and family but insisted that evidence of user switching between Meta's apps and TikTok or YouTube defeated a distinct PSN market. *See, e.g.*, PJA.832-47, 857-58, 863-65, 867. That reasoning contravenes precedent holding that separate product markets tied to a product's distinct purpose can exist even though the product may be interchangeable with out-of-market products for a *different* purpose. This additional legal error in defining the market also requires reversal.

**a.** An antitrust market may be limited to products used for a specific purpose. In *Continental Can*, for example, the Supreme Court examined substitution between products "for the same end uses." 378 U.S. at 453; *see also id.* at 457 (defining market to include glass and metal containers for "all end uses for which they compete"). That qualification was important because glass and metal containers could

be used for many purposes, including for packing food, industrial products, beer, and more. Substitution, or the lack of it, for one purpose did not necessarily shed light on substitution for a different purpose. *See id.* at 449-57. Markets thus were defined around specific uses and included reasonable substitutes for each use. *See id.* at 447, 457.

Likewise, the Supreme Court found a relevant market for commercial banking services—excluding savings banks—despite "fierce" competition between commercial and savings banks in a broader market. *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 662-66 (1974). And in *Grinnell*, the Court defined a market for property protection services through a central station even though components of that service—like burglar alarm services—may compete in different markets. 384 U.S. at 571-73; *see also Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 251 (1959) (finding that a "'particular and special demand exists'" for championship boxing contests, and that nonchampionship fights are not "'reasonably interchangeable for the same purpose'"); *Microsoft*, 253 F.3d at 52-53 (excluding products that could not perform core set of operating system functions from market for PC operating systems); *United States v. Google LLC*, 747 F. Supp. 3d

1, 109-16 (D.D.C. 2024) ("*Google Search*") (defining market for "general search services" even though consumers could use specialized websites "for an individual query on a particular subject matter").

Courts of appeals similarly recognize that products having distinct uses can constitute relevant product markets. In *Whole Foods*, for example, Judges Brown and Tatel both recognized that a distinct product market could exist for premium natural and organic supermarkets even though many customers also cross-shopped at traditional supermarkets. *See* 548 F.3d at 1040 (Brown, J.) ("cross-shopping is entirely consistent with the existence of" an organic market); *id.* at 1048-49 (Tatel, J., concurring) (that customers "also shop at conventional stores" did not defeat the organic market). Likewise, the Seventh Circuit affirmed a market limited to paint brushes and rollers, even though a broader market—including aerosol paints and other sprays—may have existed for different end uses. *Beatrice Foods*, 540 F.2d at 307-09; *see also, e.g.*, *McWane, Inc. v. FTC*, 783 F.3d 814, 829-30 (11th Cir. 2015).

**b.** These authorities establish that an antitrust market may be limited to products used for a specific purpose—here, apps used to

connect with friends and family (PSN apps)—when there is meaningful demand for that purpose, even when there is competition with other products for other purposes. The PSN market therefore could be invalid if (1) no meaningful demand exists for friends-and-family sharing; *or* (2) other apps (like TikTok and YouTube) satisfy that demand. But the court made neither finding, and the evidence would not support either conclusion.

**1.** The district court did not (and could not) deny that there is significant demand for apps used for friends-and-family sharing. The court acknowledged that friends-and-family sharing has been a core purpose of Facebook and Instagram for many years, and recognized that "connecting with friends remains an important part of both" Facebook and Instagram. PJA.800. And the court found that "industry experts typically agreed that Facebook and Instagram let users keep up with friends, that TikTok and YouTube are less effective at this, and that this makes them different options." PJA.862. The court's own findings thus strongly support the conclusion that consumers have distinct demand for PSN services. *See supra* § II.A.

**2.** Nor did the court determine that consumers could turn to TikTok and YouTube for friends-and-family sharing.

In fact, the court acknowledged significant evidence to the contrary. The court recognized that many industry experts believed these apps did *not* serve the same friends-and-family purpose as Facebook and Instagram. PJA.862, 865 (concluding that "[t]he balance of the persuasive evidence" shows that "Facebook, Instagram, and Snapchat differ from TikTok and YouTube in important ways"). Moreover, the court acknowledged that "not as many" people use TikTok or YouTube "to connect with people they know," PJA.866, and that those apps "would need lots of people using them socially to create network effects" if they "wanted to replicate a traditional social network," PJA.865-66.

Nonetheless, the court concluded that all these apps belonged in the same product market because they all compete for users' time and attention. PJA.843-45, 852 (SJA.244). That abstract approach to market definition has no sound basis in precedent or economic theory. *Cf. United States v. Google LLC*, 778 F. Supp. 3d 797, 845 (E.D. Va. 2025) ("*Google AdTech*") (rejecting argument that market should be defined

more broadly based on products' "shared high-level purpose"). Saying that companies compete for users' time and attention is like saying companies compete for consumers' dollars—a meaningless characterization devoid of the context needed for an antitrust inquiry. It does not show that the products are reasonably interchangeable for the same purposes. *See Microsoft*, 253 F.3d at 52.

Indeed, the court had recognized the infirmity of a "'time and attention' market" at summary judgment, explaining that such a market had "no obvious limiting principle." PJA.575 (SJ Op.). Under that proposed market, Meta competed not just with other apps but also with "watching a movie at a friend's house, reading a book at the library, and playing online poker." *Id.* "Antitrust law does not require" markets to be built around "such an 'infinite range of possible substitutes.'" *Id.* The court gave no explanation for its about-face at the merits stage, where the court identified no boundaries or limiting principle to its approach. *See* PJA.868.

**3.** Nothing in the district court's analysis overcomes these fundamental flaws. The court looked to temporary substitution between Facebook and Instagram on the one hand and TikTok and YouTube on

the other. But as explained above, this evidence does not suggest that the products are reasonable substitutes for friends-and-family sharing. A temporary internet outage may increase book-reading, but that does not mean Jane Austen's novels are in the same market as YouTuber Mr. Beast's videos. Transitory outage evidence is especially uninformative here, where strong network effects are at play: Users cannot accomplish friends-and-family sharing on another app unless they have an established network of friends there. *See* PJA.587-89 (SJA.047-49) (SJ Op.). Further, some substitution between consuming connected and unconnected content, PJA.851-52 (SJA.243-44), does not negate a PSN market. Rather, it is consistent with Meta also competing with others at a broader level to entertain users. *See supra* § II.B.1.

The court's heavy reliance on the "time spent" metric compounded the problems with its analysis. A key feature of PSN apps is that users create content and share it with family and friends (in addition to consuming friends-and-family content). TikTok and YouTube do not serve that function regardless of how much time people spend watching videos on them. The time-spent metric also is inherently biased toward video as against text and photos (and therefore skewed in favor of

unconnected content as against connected content). *See* PJA.1170. Indeed, the district court later acknowledged that time spent "overestimates the competitive importance of video apps." PJA.875. But it was too late: The court had already relied on this fundamentally flawed metric in misdefining the relevant market.

### C. The district court erred by treating existing conditions as competitive.

The district court committed two other market definition errors, both stemming from the same serious conceptual mistake: erroneously assuming that current market conditions are competitive—despite Meta's control of both Facebook and Instagram.

#### 1. The court used the wrong baseline for its hypothetical monopolist test.

The hypothetical monopolist test is a standard method courts use to determine a product market. Here, where the products are free, that test asks whether a firm controlling all PSN apps could profitably impose a small but significant and non-transitory reduction in quality on one PSN app, *compared to a scenario in which PSN apps compete independently with one another* (the baseline). *See* U.S. Dep't of Justice

& FTC, *Merger Guidelines* §§ 4.3.A, 4.3.B & n.83 (2023) ;[8] *see also Whole Foods*, 548 F.3d at 1038. The idea is to identify which other products compete enough with a given product such that those other products could constrain price increases or other anticompetitive conduct in the proposed market.

To conduct a hypothetical monopolist test, therefore, the court must consider the competitive baseline. Here, that would at a minimum reflect a world in which Instagram is independent of Meta. After all, the core allegation in this case is that Meta maintained its PSN monopoly by acquiring Instagram.

The district court purported to apply the hypothetical monopolist test; indeed, the court's market definition fundamentally turned on its application of that test. PJA.828-31, 847, 853. But the court never defined the competitive baseline or considered a scenario where Instagram was independent of Meta. The court thus ignored the elephant in the room: *Meta had control over both Facebook and Instagram* during the entire time period considered. As a result, the court never examined what competition would look like if Instagram

[8] Available at: https://tinyurl.com/msk4fce3.

and Facebook were independent, much less whether Meta could profitably make one app slightly worse compared to that scenario.

The court's analysis was therefore conceptually incoherent: It effectively assumed that present conditions are competitive, when the point of the test is to determine whether they are. The court's version of the hypothetical monopolist test boiled down to asking whether Meta could make its apps slightly worse than they are *now*. That's the wrong question in a monopolization case, where Meta is alleged to have monopoly power *already*.[9] As a leading treatise explains:

> In contrast [to the typical merger case], in a monopolization [case] the given assumption is that a firm already has monopoly power … [In turn the] relevant question is not necessarily whether its actions will permit a price increase beyond current levels, but typically whether it already has the power to charge supracompetitive prices.

IIB Phillip E. Areeda et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 539a2, at 343; *see also id.* at ¶ 516h, at 153-54. The Supreme Court likewise has recognized that the

[9] The court's hypothetical monopolist test was further flawed because it relied on studies that were "transitory" and involved huge (rather than "small") quality reductions (sometimes not even imposed on PSN apps). *See* PJA.846 (relying on List study, temporary outages, and India's TikTok ban).

"existence of significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power"—here, monopoly power. *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 471 (1991) (cleaned up).

Needless to say, an independent Instagram would have competed quite differently than a Meta-controlled Instagram. While ignored by the district court, compelling evidence showed that after the acquisition, Meta deliberately positioned Instagram to avoid drawing users away from ("cannibalizing") Meta's flagship Facebook product. PJA.1010-12 (Zuckerberg) & PJA.908-10. For example, after acquiring Instagram, Meta tripled ad load on Facebook, and then increased the ad load on Instagram to match Facebook's—both to make even more money and so users wouldn't flee its cash cow (Facebook) to an app with fewer ads (Instagram).[10] PJA.1002-05 (Zuckerberg); PJA.952-53 (SJA.292-93), 954, 1160-62. Similar strategic decisions abounded, as Meta managed the two apps to maximize company-wide profit and minimize head-to-head competition. *See, e.g.*, PJA.1006-07, 1013-14 (Zuckerberg);

[10] In this context, fewer ads are akin to a cheaper product.

PJA.932-33, 956, 1044-46, 1048-51. An independent Instagram, by contrast, would have been free to compete with Facebook by offering fewer ads—or otherwise increasing quality. PJA.1041-43, 1046-47 & PJA.957; PJA.958-59.

#### 2. The district court committed the *Cellophane* fallacy.

The court's baseline mistake led it into another trap, well known in antitrust analysis: the *Cellophane* fallacy.

Where monopoly has already been achieved, as the FTC alleged here, current prices or measures of quality are already not at competitive levels (prices are higher, quality is lower).[11] In that scenario, consumer switching to more remote substitutes outside of the proposed market is *consistent with* monopoly power, not evidence that the product market should be rejected or broadened. In other words, substitution in monopolized markets can give the misleading appearance that products outside of the proposed market are adequate

[11] As discussed below (§ II.D), the FTC also showed this directly, including through evidence revealing Meta's persistent supracompetitive profits.

substitutes for in-market products (and sufficiently constrain the alleged monopolist). *See Kodak*, 504 U.S. at 471.

Failing to recognize this principle is known as the *Cellophane* fallacy.[12] *See, e.g.*, Areeda, *Antitrust Law* ¶ 516h, at 153-54; ¶ 539, at 339-43; *see also, e.g.*, *United States v. Eastman Kodak Co.*, 63 F.3d 95, 103 (2d Cir. 1995). Committing the *Cellophane* fallacy leads to a "false negative": "over-defining a market and finding no [monopoly] power where, in fact, it does exist." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 n.7 (9th Cir. 2023).

At summary judgment, the district court recognized the *Cellophane* fallacy and the real risks it poses here, where Meta is alleged to "*already* exercise[] monopoly power over the relevant product market." PJA.579-80. But the court fell prey to that error following trial: It relied on substitution *during* the monopoly period—and after the core challenged conduct (Meta's acquisitions)—to conclude that more remote substitutes (TikTok and YouTube) belonged in the

[12] The term arises from the so-called *Cellophane* case, *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956).

market.[13] PJA.833-47, 851-52 (SJA.243-44), 863-64, 867. Recall that the alleged unlawful monopoly was in place since 2012, when Meta acquired Instagram. In determining the product market, the court relied exclusively on evidence of consumer switching between Meta's apps and TikTok or YouTube in recent years—all of it well after Meta controlled both Facebook and Instagram.[14] *See, e.g.*, PJA.833 (evidence from 2019-21); PJA.834-35 (Meta study panel from 2020-23); PJA.835-36 (List experiment from 2023). This is precisely the kind of evidence that gives rise to the *Cellophane* fallacy.

The error is especially egregious because the court candidly acknowledged that Meta may well have had a monopoly in the PSN market for at least portions of this period, such as in 2020. *See* PJA.792, 831-32, 880; *see also supra* 34-35. Moreover, the FTC's direct evidence should have sent a strong signal to the court that Meta indeed held monopoly power during the relevant period. *See infra* § II.D.

---

[13] This error is independent from the court's other market definition errors, discussed *supra* 42-57.

[14] The same error plagued the court's *Brown Shoe* analysis (PJA.852-67). *See, e.g.*, PJA.863-64 (citing documents from 2019-25).

Instead, the district court dismissed the FTC's *Cellophane* warnings as not "too worrying here." PJA.849. None of its justifications hold water. PJA.849-50.

The court suggested, first, that "*order* of substitution" evidence is immune from the fallacy. PJA.849. This is simply wrong, and the court cited no support for believing otherwise. By assessing current substitution order, the court effectively asked whether Meta—the alleged monopolist—can profitably raise prices (or degrade quality) *even more* than it already has. But the correct question is whether Meta is *already exercising* monopoly power. *See Kodak*, 504 U.S. at 471. The district court also pointed to data showing substitution *to* Meta's apps when TikTok or YouTube became unavailable, PJA.849, but this evidence reflects at most the unremarkable proposition that consumers may view TikTok, YouTube, and Meta's apps as interchangeable for video entertainment purposes. The muted effect Meta's increased ad load had on users, PJA.850, likewise is consistent with monopoly power, not a reason to think Meta lacks it. *See infra* 65-67.

The district court's final reason for dismissing *Cellophane* concerns reveals its fundamental confusion. The court claimed that

"[i]nvoking the *Cellophane* fallacy here … puts the cart before the horse," reasoning that "[t]he fallacy is a risk only if Meta is in fact a monopoly." PJA.850. But that conclusion puts the cart before the horse. As explained, the *Cellophane* fallacy is an error of reasoning that causes courts *to mistakenly overlook monopolies*. Dismissing the fallacy on the ground that there is no monopoly is circular.

* * *

The district court's incomplete and misdirected market definition analysis requires reversal and remand. In *Whole Foods*, for example, this Court reversed where the district court ignored compelling evidence that Whole Foods and Wild Oats competed in a distinct organic market—"even if they also compete" in a broader market. 548 F.3d at 1037 (Brown, J.). The Third and Seventh Circuits likewise reversed where the district courts' incorrect focus led them to adopt markets that were too broad—and thus to wrongly conclude there was no harm to competition. *See FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 341, 344-45 (3d Cir. 2016) (holding that "failing to properly formulate and apply the hypothetical monopolist test" constitutes legal error); *Advocate*, 841 F.3d at 475; *see also Cass Student Advert., Inc. v. Nat'l*

*Educ. Advert. Serv., Inc.*, 516 F.2d 1092, 1095 (7th Cir. 1975) (reversing where district court "erred in its perception of the service" at issue).

So too here. Each of the court's errors caused it to wrongly include TikTok and YouTube in the market, which led directly to the court's conclusion that Meta lacked monopoly power—tainting the entire outcome. *See* PJA.873-79.

### D. court's final reason for dismissing *Cellophane*

### E. The district court erroneously rejected the FTC's direct evidence of Meta's monopoly power.

The district court should have been on high alert that Meta exercised monopoly power because the FTC introduced direct evidence showing as much. Where a plaintiff can show with direct proof that a firm has "profitably raise[d] prices substantially above the competitive level," as the FTC did here, "the existence of monopoly power is clear" and there is no need to "examine market structure in search of circumstantial evidence of monopoly power." *Microsoft*, 253 F.3d at 51. In rejecting the FTC's direct evidence, PJA.815-18, the district court misapplied antitrust law and economic principles.

*Economic profits*: Unlike "accounting profits," which deduct from revenue only explicit costs (like labor, raw materials, etc.), "economic

profits" also deduct implicit costs, including the opportunity cost of other uses of firm resources, known as the "cost of capital." *See* Investopedia, *Understanding Economic vs. Accounting Profit: Key Differences Explained* (Nov. 14, 2025), https://tinyurl.com/mryac7mj; *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1252 n.21 (11th Cir. 2002). Sustained accounting profits on their own are often unremarkable, but sustained economic profits are a strong indicator that a firm is exercising monopoly power—as the district court acknowledged, PJA.815, and Meta's own expert testified and wrote, PJA.1227. *See also* Areeda, *Antitrust Law* ¶ 504b, at 130.

At trial, the FTC demonstrated that Meta generated persistently high economic profits for nearly two decades. Unrebutted expert testimony showed that Meta collects economic profits nearly four times its cost of capital. PJA.1067-72. This strongly suggests that Meta exercised monopoly power (even before considering all the circumstantial evidence that pointed in the same direction).

The district court's analysis of Meta's economic profits is beset with legal error. PJA.815-17. *First*, the court improperly conflated the first step of *Grinnell* with the second step. The court speculated that

Meta may have earned sustained economic profits through appropriate means such as "impressive technology," "risky investments that paid off," or "shrewd management." PJA.815-16. This is conceptual confusion. The question at step one of *Grinnell*—the only step the court reached—is whether a monopoly exists, not how it came about. And it is entirely possible to achieve a monopoly through impressive technology, intelligent investments, or shrewd management. *See Grinnell*, 384 U.S. at 571. The court's speculations about the source of Meta's monopoly would be relevant, if at all, only at the second step of *Grinnell*. And the FTC's evidence suggested Meta indeed held monopoly power, relevant to the first step.

*Second*, the court relied on cases pertaining to *accounting* profits as opposed to economic profits. PJA.815-17 (citing *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995); *Bailey*, 284 F.3d at 1252; *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 926, 931 (N.D. Cal. 2009)). As explained, though, accounting profits are fundamentally different from economic profits. Similarly, the FTC did not need to demonstrate that Meta's *economic* profits were

"greater than other successful tech firms'." PJA.817. In competitive markets, there are no sustained economic profits. *Supra* 63.

Meta's persistently high economic profits—even as late as the trial, PJA.817—further demonstrate that TikTok, YouTube, and others outside the PSN market do not discipline Meta's exercise of monopoly power. In a competitive market, Meta could not sustain its substantial economic profits. *See supra* 63.

*Quality-adjusted price*: The court also erred when rejecting the FTC's direct evidence that Meta had profitably raised the quality-adjusted price of its apps. PJA.817-20, 822. As with "the power to raise price when it is desired to do so," a firm's "ability to degrade product quality … without concern of losing consumers" is "proof of monopoly power." *Google Search*, 747 F. Supp. 3d at 118 (cleaned up); *see also Microsoft*, 253 F.3d at 58 (explaining that "a firm without a monopoly would have been unable" to "set the price" of its product "without considering rivals' prices"); *Google AdTech*, 778 F. Supp. 3d at 834 (ability to "degrad[e] product quality without seeing significant diminution of [firm's] customer base" was indicative of monopoly power and additional confirmation of relevant market).

The FTC demonstrated that Meta had raised the quality-adjusted price of its apps in at least two ways. First, and most basically, Meta indisputably increased the ad loads of both Facebook and Instagram so that users saw more ads, PJA.818, especially as they used the apps' friends-and-family features, *see supra* 38. Second, Meta degraded the quality of its apps, including through poor privacy practices—famously exemplified by the Cambridge Analytica breach. *See* PJA.822. Meta's users repeatedly expressed dissatisfaction with the apps' privacy protections and data collection practices, PJA.1106-1110, PJA.912-13, SJA.277-78, yet those poor practices have not caused Meta to lose customers.

The district court rejected this evidence, but its rationale was legally infirm. The court's central concern was that it did not find "credible that users would prefer the Facebook and Instagram apps that existed ten years ago to the versions that exist today." PJA.818. As explained above, that is the wrong inquiry. What matters is how those apps compare to a world where Facebook and Instagram had been competing with each other for the past decade-plus. *See supra* § II.C. In that competitive market, Facebook and Instagram may have increased

the quality of the ads—a point on which the court placed great emphasis, PJA.819-20—*without* spiking their ad load (because users dislike ads). PJA.1054. The court's failure to apply the correct test led it to improperly reject this evidence.

The court also shrugged off Meta's poor privacy practices because it believed that "users have several alternatives that they have been turning to in droves." PJA.822. That conclusion reflects the same fundamental legal errors identified in § II.B.2 & II.C: Evidence of this substitution does not refute a separate market. In other words, the court concluded that this evidence did not demonstrate a narrow PSN market because the court assumed there is no narrow PSN market. That circular reasoning was also error.

This direct evidence of Meta's monopoly power was alone sufficient to satisfy the first prong of *Grinnell*, thus requiring remand. *See Microsoft*, 253 F.3d at 51 (explaining that "direct proof" of supracompetitive prices insulated from competition means "the existence of monopoly power is clear"). At the very least, this evidence should have put the court on high alert that Meta was behaving like a monopolist would. This backdrop renders the court's approach to the

hypothetical monopolist test and its lack of concern about the *Cellophane* fallacy even more indefensible.

**CONCLUSION**

The judgment should be reversed, and this case should be remanded.

Respectfully submitted,

LUCAS CROSLOW
*General Counsel*

H. THOMAS BYRON III
ALEX POTAPOV
*Deputy General Counsels*

/s/ Benjamin F. Aiken
BENJAMIN F. AIKEN
MARIEL GOETZ
*Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580

October 19, 2026

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 12,710 words.

2. This document complies with the requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Century Schoolbook.

October 19, 2026

/s/ Benjamin F. Aiken
Attorney for the Federal Trade Commission

STATUTORY ADDENDUM

**Section 13(b) of the FTC Act, 15 U.S.C. § 53(b)**:

**(b) Temporary restraining orders; preliminary injunctions**

Whenever the Commission has reason to believe—

> **(1)** that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
>
> **(2)** that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however*, That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: *Provided further*, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction. Any suit may be brought where such person, partnership, or corporation resides or transacts business, or wherever venue is proper under section 1391 of title 28. In addition, the court may, if the court determines that the interests of justice require that any other person, partnership, or corporation should be a party in such suit, cause such other person, partnership, or corporation to be added as a party without regard to whether venue is otherwise proper in the district in which the suit is brought. In any suit under this section, process may be served on any person, partnership, or corporation wherever it may be found.