No. 26-5028

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellant*,

v.

META PLATFORMS, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Columbia
No. 20-cv-3590
Hon. James E. Boasberg

# REPLY BRIEF OF THE FEDERAL TRADE COMMISSION


DANIEL GUARNERA
*Director*

TAYLOR C. HOOGENDOORN
KELSE MOEN
*Deputy Directors*

KRISHA CERILLI
NATHAN BRENNER
PATRICIA GALVAN
JUSTIN LORBER
JENNIFER TARR
*Attorneys*

BUREAU OF COMPETITION

LUCAS CROSLOW
*General Counsel*

H. THOMAS BYRON III
ALEX POTAPOV
*Deputy General Counsels*

BENJAMIN F. AIKEN
MARIEL GOETZ
*Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 569-7769
baiken@ftc.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iv

GLOSSARY ........ vii

INTRODUCTION ........ 1

ARGUMENT ........ 3

I. Section 13(b) Did Not Require the Commission to Show an Ongoing Violation at the Time of the District Court's Final Decision. ........ 3

A. The district court misinterpreted Section 13(b)(1). ........ 3

1. The district court's interpretation conflicts with text and precedent and has untenable implications. ........ 3

2. Meta's counterarguments fail. ........ 9

B. Section 13(b)(1) does not apply when the Commission seeks only a permanent injunction. ........ 13

C. Remand is necessary. ........ 15

II. The District Court Was Wrong that Meta Lacked Monopoly Power in 2025. ........ 17

A. The district court committed multiple legal errors in rejecting a PSN market. ........ 17

1. A product market may be defined around a product's distinct use, and can coexist alongside other markets. ........ 17

2. Market definition requires a competitive baseline. ........ 20

B. None of Meta's other arguments can save the district court's erroneous market analysis.................................24

1. The errors are legal in nature. ..........................................24

2. Substitution with unconnected content does not defeat a PSN market..........................................................25

3. Order of substitution evidence does not defeat a PSN market..................................................................26

4. The court's *Brown Shoe* analysis cannot support affirmance. ......................................................................29

C. The district court erred by rejecting the Commission's direct evidence of Meta's monopoly power.........................................................................................31

CONCLUSION ..........................................................................................34

# TABLE OF AUTHORITIES

## CASES

*AMG Capital Management, LLC v. FTC*, 593 U.S. 67 (2021) ........ 7, 10

*Att'y Gen. of U.S. v. Wynn*, 104 F.4th 348 (D.C. Cir. 2024) ........ 4, 9

*Bailey v. Allgas, Inc.*, 284 F.3d 1237 (11th Cir. 2002) ........ 32

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995) ........ 32

*Chappell-Johnson v. Powell*, 440 F.3d 484 (D.C. Cir. 2006) ........ 16

*Cook Inlet Tribal Council, Inc. v. Dotomain*, 10 F.4th 892 (D.C. Cir. 2021) ........ 3

*Deppenbrook v. Pension Benefit Guaranty Corp.*, 778 F.3d 166 (D.C. Cir. 2015) ........ 13

*Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451 (1991) ........ 18, 23

*ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547 (8th Cir. 1991) ........ 13

*Flannery v. Eckenwiler*, No. 24-7168, 2026 WL 2617583 (D.C. Cir. Sept. 4, 2026) ........ 17

*Frost v. Sioux City*, 920 F.3d 1158 (8th Cir. 2019) ........ 10

*FTC v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020) ........ 6

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) ........ 12

*FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) ........ 7

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 336 (3d Cir. 2016) ........ 22, 25, 31

*FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019) ........ 1, 4, 5, 6

*FTC v. Texaco, Inc.*, 555 F.2d 862 (D.C. Cir. 1977) ............................... 25

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) ..................................... 15

*Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709 (1986) ........................................................................................ 20

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109 (2018) ...................................................................................... 5, 9

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) ............................................................................. 12

*PhantomALERT Inc. v. Apple*, 183 F.4th 790 (D.C. Cir. 2026) ........................................................................... 21

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) ............................................................................... 12

*United States v. Conn. Nat'l Bank*, 418 U.S. 656 (1974) ........................................................................................ 20

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 392-93 (1956) ................................................................ 32

*United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024) ................................................................... 28, 29

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ........................................................................................ 20

*United States v. JS&A Grp., Inc.* 716 F.2d 451 (7th Cir. 1983) ............................................................................... 8

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ........................................................................... 25

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) .......................................................................... 28

*Wilk v. American Medical Association*, 895 F.2d 352, 357 (7th Cir. 1990) .......................................................... 12

*Yee v. City of Escondido*, 503 U.S. 519 (1992) ........................................ 15

**STATUTES**

15 U.S.C. § 53 ............................................................... 1, 3, 5, 12

**OTHER AUTHORITIES**

Dennis W. Carlton & Jeffrey M. Perloff,
*Modern Industrial Organization* (4th ed. 2015) .................................. 26

IIB Phillip E. Areeda et al.,
*Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2021) ........................... 23, 28

U.S. Dep't of Justice & FTC,
*Merger Guidelines* (2023) ..................................................................... 22

# GLOSSARY

| | |
|---|---|
| AAI.Br. | Brief of the American Antitrust Institute as Amicus Curiae in Support of Appellant and Vacatur |
| Chamber.Br. | Brief of the U.S. Chamber of Commerce as Amicus Curiae in Support of Meta and Affirmance |
| Econ.Br. | Brief for Amici Curiae Professors of Economics in Support of Reversal |
| FTC | Federal Trade Commission |
| FTC Act | Federal Trade Commission Act, 15 U.S.C. § 41, *et seq.* |
| FTC.Br. | FTC's Opening Brief |
| HMT | hypothetical monopolist test |
| ICLE.Br. | Brief of Amicus Curiae International Center for Law & Economics in Support of Meta and Affirmance |
| Meta.Br. | Meta's Response Brief |
| PJA | Public Joint Appendix |
| PSN | personal social networking |
| Section 2 | 15 U.S.C. § 2 |
| Section 13(b) | 15 U.S.C. § 53(b) |
| SJA | Sealed Joint Appendix |
| States.Br. | Brief for States as Amici Curiae in Support of Appellant |

## INTRODUCTION

The district court rejected the FTC's monopolization claim against Meta based on a two-step rationale. The court was wrong at both steps.

*First*, the district court misinterpreted Section 13(b), the statute that empowered the FTC to bring this case. The court held that the FTC was required to prove a monopoly as of the time of the final decision in 2025. But Section 13(b) says nothing about the time of decision. Instead, it provides that the Commission "may bring suit" if it "has reason to believe" that the defendant "is violating, or is about to violate" the law. 15 U.S.C. § 53(b). This language sets forth a "pleading requirement—which is applied right out of the gate." *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 158 (3d Cir. 2019). Remarkably, Meta offers *no* response to this textual argument; indeed, its brief never mentions the statutory phrase "may bring suit."

Nor does Meta seriously engage with our remaining arguments, including that the unprecedented holding in this case created an unworkable and anomalous scheme unlike those faced by any other antitrust plaintiff. And Meta's argument that Section 13(b) is limited to

prospective relief is a non-sequitur because the court's decision was about liability, not the remedy.

*Second*, the district court misunderstood the antitrust analysis required in a monopolization case. The court failed to appreciate that Meta operates in both the PSN market and the market for unconnected content, such as the short-form videos on TikTok and YouTube. That fundamental legal error requires reversal and is not insulated by any factual findings; indeed, the court never found either (1) that there is no robust demand for friends-and-family sharing or (2) that YouTube and TikTok can satisfy that demand. The court also failed to appreciate that market definition must be informed by a competitive baseline. Instead, the court anchored the analysis in *current* market conditions, which reflect the PSN monopoly secured when Meta acquired Instagram.

The district court fundamentally misapplied Section 13(b) and then conducted a market analysis that was irredeemably flawed even under that incorrect approach. This Court should reverse and remand.

# ARGUMENT

## I. Section 13(b) Did Not Require the Commission to Show an Ongoing Violation at the Time of the District Court's Final Decision.

### A. The district court misinterpreted Section 13(b)(1).

#### 1. The district court's interpretation conflicts with text and precedent and has untenable implications.

**a.** The decision below, by the district court's own admission, hinged on timing. *See* PJA.813-15. In the court's view, Section 13(b) required the Commission to "prove that Meta has monopoly power *now*," at the time of the court's decision, years after the complaint. PJA.815; *see also* PJA.876, FTC.Br. 23 n.2. This interpretation violates the plain text of Section 13(b)(1). *See* FTC.Br. 20-23; *cf. Cook Inlet Tribal Council, Inc. v. Dotomain*, 10 F.4th 892, 894 (D.C. Cir. 2021) ("[I]n all cases of statutory interpretation," courts "start with the controlling statute's text.").

The statute provides that when the Commission has "reason to believe" that a party "is violating, or is about to violate" any law the FTC enforces, "the Commission … may bring suit … to enjoin" that conduct. 15 U.S.C. § 53(b). Under the statute's plain text, "is violating, or is about to violate" governs when the Commission "may bring suit."

*See* FTC.Br. 21-23. The statute therefore creates a "pleading requirement—which is applied right out of the gate." *Shire*, 917 F.3d at 158; *see also Att'y Gen. of U.S. v. Wynn*, 104 F.4th 348, 354 (D.C. Cir. 2024) (construing similar provision in another statute as creating an "authorization to sue for an injunction"). The statutory text simply does not require the FTC to hit the moving target imagined by the district court.

Meta offers *no* response. Nowhere in its brief does it even attempt to grapple with the statutory text. If there is any way to understand "may bring suit" as creating anything beyond a pleading requirement, Meta never says. Remarkably, the statutory phrase "may bring suit" never appears in Meta's brief.

One of Meta's amici attempts to fill in this gap but badly misreads the statute. While it is true that the Commission must provide "proper proof" to support a permanent injunction, Chamber.Br. 5-8, that phrase is *not* accompanied by the "is violating, or is about to violate" language—underscoring that this requirement applies only at the pleading stage. Similarly, "is violating, or is about to violate" does not modify when a court may "enjoin any such act or practice," 15 U.S.C.

§ 53(b), so the present tense of the statute is irrelevant to "what [the Commission] may ask a federal court to enjoin," Chamber.Br. 6. Finally, the unremarkable observation that "Congress knows how to reach past conduct," *id.*, is beside the point because it begs the question of the relevant timeframe. As noted, the Commission's view is that the ongoing-or-anticipated violation requirement applies as of the time of the complaint, not the court's final decision.

Because the "the plain language" of Section 13(b) is "unambiguous," the "inquiry … ends" here. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018).

**b.** Meta also never disputes that "no other court has adopted the district court's novel, atextual construction" of Section 13(b). FTC.Br. 24. Meta cannot cite a single case that has interpreted Section 13(b) to require the Commission to show an ongoing or anticipated violation at the time of the court's final merits decision. And its efforts to downplay the Commission's cases are unpersuasive.

As explained, *Shire* expressly held that Section 13(b) creates a "pleading requirement." 917 F.3d at 158. Meta simply ignores that phrase and instead points to that court's use of the word "evidence."

Meta.Br. 48. But the rest of the sentence reveals that the court was discussing the requirements for the FTC "to bring a claim," not to prevail at trial. *Shire*, 917 F.3d at 156.[1] As for *FTC v. AbbVie Inc.*, Meta quotes a sentence fragment in a parenthetical (Meta.Br. 49), while omitting that the sentence begins by framing a pleading requirement—i.e., when "the FTC *cannot sue* under Section 13(b)." 976 F.3d 327, 376 (3d Cir. 2020) (emphasis added).

Indeed, *AbbVie* unambiguously rejects Meta's position. Defendants there argued that remand would be futile because the Commission could not show that they were "violating, or … about to violate" the law. 917 F.3d at 381. The court rejected that argument precisely because, under *Shire*, Section 13(b) "requires a plaintiff to plead" that a violation is occurring or is about to occur, while a different standard—the likelihood of recurrence—applies "when a court is considering whether to grant or deny injunctive relief." *Id.* (quotation omitted). In other words, the court held that it did not matter if the

---

[1] *Shire* was an appeal from a motion to dismiss, further proof that the court was not thinking of evidence at trial.

violation had ceased by the time the district court considered remedies—exactly the Commission's position here.

*AMG* offers no support for the district court's conclusion. *Contra* Meta.Br. 46-47. As explained below (at 10-11), *AMG* concerned the remedies available under Section 13(b) and said nothing about what the Commission must prove on the merits. FTC.Br. 24; *see AMG Capital Management, LLC v. FTC*, 593 U.S. 67, 76 (2021). And the sentence quoted by Meta states that Section 13(b) "set[s] forth when the Commission *may request* injunctive relief," Meta.Br. 47 (quoting *AMG*, 593 U.S. at 75-76 (emphasis added)), confirming the Commission's position that Section 13(b) sets forth a pleading requirement. *See also* FTC.Br. 24 (discussing similar decision in *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019)).

Meta's reliance on *FTC v. Evans Prods. Co.*, *see* Meta.Br. 48, is equally misplaced. *Evans* addressed only "violations that completely ceased *before the FTC brought suit*." 775 F.2d 1084, 1087 (9th Cir. 1985) (emphasis added).

**c**. Meta fares no better in responding to the Commission's arguments that the district court's ruling is unworkable. Meta.Br. 51-

53. Meta does not deny that the district court's approach all but demands reliance on post-discovery evidence, in violation of basic principles of civil procedure. FTC.Br. 23 n.2, 28-29. Nor does Meta deny that the court's interpretation invites defendants to manufacture favorable post-discovery evidence, or that there are indications that Meta did so here. FTC.Br. 28-29. Meta's attempts to minimize the role of that evidence in *this* case, Meta.Br. 54, are unresponsive to these broader implications.

Likewise, Meta does not dispute that the district court's interpretation forces the Commission to bring cases without knowing whether they can continue to judgment. FTC.Br. 28. Meta shrugs off this concern because the FTC could pursue administrative proceedings instead. Meta.Br. 51. But Congress enacted Section 13(b) to give the Commission a real choice. *See United States v. JS&A Grp., Inc.*, 716 F.2d 451, 456-57 (7th Cir. 1983). Meta offers no reason to think Congress intended for one of those options to be unworkable.

Finally, Meta does not deny that its approach to Section 13(b) would create a unique requirement that no other plaintiff, government or private, must satisfy. FTC.Br. 27. Instead, it faults the Commission

for not explaining "why the statute" creates a pleading requirement. Meta.Br. 52. Such explanations are unnecessary when the text dictates the outcome. *Nat'l Ass'n of Mfrs.*, 583 U.S. at 127. Regardless, there is nothing unusual about a statutory pleading requirement. *E.g.*, *Wynn*, 104 F.4th at 354 (considering similar provision). And of course, the Commission must still prove the elements of an underlying substantive violation, here under the Sherman Act. In other words, the Commission must make the same showing as any other plaintiff. *See* States.Br. 7-10.

**2. Meta's counterarguments fail.**

**a.** Meta's primary argument rests on the notion that Section 13(b) permits only "'prospective, not retrospective' relief." FTC.Br. 46. (quoting *AMG*, 593 U.S. at 76). To begin, this is irrelevant. Meta is repeating the district court's error of confusing the violation with the remedy. *See* FTC.Br. 25.

The district court did not issue judgment for Meta on the ground that no prospective relief was appropriate. It did so because it determined that Meta *was not violating the Sherman Act* at the time of the 2025 judgment. PJA.876-79. The availability of any remedy is irrelevant to that question. Indeed, the court had bifurcated proceedings

into liability and remedies phases, *see* PJA.384, and the parties had not even engaged in remedies discovery, much less litigated a remedies trial.

Regardless, the Commission *did* seek prospective relief. The complaint asked the court to enjoin various conduct; for example, the Commission requested that Meta be "permanently enjoined from engaging in similar or related conduct in the future." PJA.277.[2] Injunctions are "inherently prospective." *Frost v. Sioux City*, 920 F.3d 1158, 1161 (8th Cir. 2019). True, they "cannot redress past injuries," *id.*, but the Commission's requests were forward-looking, to stop ongoing or future injuries.

Meta confuses the issue by again misconstruing *AMG*. Meta.Br. 46-48. *AMG* held that Section 13(b) does not authorize equitable monetary relief because it permits only "prospective, not retrospective" relief. 593 U.S. at 76. While *AMG* limits the remedies the Commission may seek—and the Commission complied with it by seeking only forward-looking relief—it says nothing about the elements of the

[2] Contrary to Meta, then, the Commission *did* identify "relief it could seek." Meta.Br. 50. At any rate, again, these remedial issues are separate from the liability question the district court decided.

underlying substantive statute. *AMG* is thus beside the point here, given that the district court found no liability under the Sherman Act and never reached the separate remedies phase.

**b.** In a variation on the same theme, Meta contends the Commission "cannot obtain relief under section 13(b) by showing a past violation and seeking an injunction to address supposed 'lingering effects.'" Meta.Br. 49. This argument is irrelevant for two reasons. First, it again concerns the availability of any remedy the Commission may eventually seek, while the district court's judgment concerned Meta's liability. Second, Meta ignores that—quite apart from the question of lingering effects—the court could conclude there is a likelihood of recurrence warranting injunctive relief. FTC.Br. 25-26. That is a separate, independent basis for an injunction that would be considered during the remedies phase.[3]

Regardless, Meta is wrong that injunctions cannot address lingering effects. The Supreme Court has held that after finding "a violation of the Sherman Act," courts are "empowered to fashion

---

[3] Notably, Meta's position would allow a defendant to escape liability by ceasing its conduct even if that conduct is likely (or certain) to recur, as long as the recurrence is not imminent. *Cf.* Meta.Br. 51-52.

appropriate restraints … both to avoid a recurrence of the violation *and to eliminate its consequences*." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978) (emphasis added). Likewise, outside the antitrust context, injunctions may address "past exposure to illegal conduct" where there are "continuing, present adverse effects." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 109 (1998) (cleaned up). The "permanent injunction" authorized in Section 13(b), 15 U.S.C. § 53(b), is no different.[4]

Meta's attempt to distinguish the Commission's lower-court authorities fails. Meta.Br. 49-50. *Wilk v. American Medical Association* did affirm an injunction based on the threat of a recurring boycott, but Meta ignores that the court *also* affirmed the injunction—on a separate, independent ground—based on the "lingering effects" of that boycott, which had ended years earlier. 895 F.2d 352, 357, 369-70 (7th Cir. 1990). Meta also has no answer for the Eighth Circuit's holding that a "district court may consider … the continuing effects of past illegal

---

[4] Meta is also wrong that the court's decision equates to a finding of no lingering harm. Meta.Br. 50. Unlawful acquisitions can cause significant harm at market shares below monopoly levels. *See, e.g.*, *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 905-06 (7th Cir. 1989); Econ.Br. 21.

conduct" when issuing an injunction even though the antitrust conspiracy at issue had ended before the "scheduled hearing for permanent injunction." *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 552, 557 (8th Cir. 1991) (cleaned up).

**c.** Meta complains in passing that the Commission raised this argument too late in the litigation. Meta.Br. 52. By not affirmatively arguing forfeiture, Meta has itself forfeited the point. *See Deppenbrook v. Pension Benefit Guaranty Corp.*, 778 F.3d 166, 172 (D.C. Cir. 2015). Regardless, the Commission argued from the beginning that it was authorized to bring suit because it had alleged an ongoing Sherman Act violation at the time of the complaint. PJA.326-28 (opposition to motion to dismiss). The Commission also asserted the argument both during and after trial, *see* PJA.682-85, 699-701, which is why the district court passed upon the issue, setting it up for this Court's resolution.

### B. Section 13(b)(1) does not apply when the Commission seeks only a permanent injunction.

This Court can and should resolve this case by holding that Section 13(b) does not require the Commission to show an ongoing or anticipated violation at the time of the district court's final decision. But the decision below can also be vacated on the separate ground that

Section 13(b)(1) does not apply when the Commission seeks only a permanent injunction.

The Commission's authority to seek a permanent injunction under the second proviso of Section 13(b) is a standalone authority untethered to Section 13(b)(1). FTC.Br. 30-35. That proviso "'state[s] a general, independent rule'" unmodified by what precedes it. FTC.Br. 32 (quoting *Alaska v. United States*, 545 U.S. 75, 106 (2005)).

Meta responds with overheated rhetoric, dismissing the Commission's position as "[f]rivolous" and nonsensical. Meta.Br. 55-56. But Meta has little to offer on the substance. First, Meta returns to *AMG*. Meta.Br. 56. But the issue in *AMG* was whether Section 13(b) authorized the Commission to seek equitable monetary relief, and the Court's stray observations about Section 13(b)(1) were necessarily dicta. *See* FTC.Br. 34 n.6.

Second, Meta catastrophizes by claiming the Commission's asserted authority would be "free-standing" and "subject to no limitation whatsoever." Meta.Br. 56. Not so. As the Commission explained, it would have to "satisfy the well-known standard for a permanent injunction," including success on the merits of the claim.

FTC.Br. 35. For the same reason, the FTC's position here is not an "elephant[]," Meta.Br. 57—there is nothing extraordinary about the FTC seeking a permanent injunction under the same standard that all parties, including other federal agencies, must satisfy. At any rate, the plain language of Section 13(b) is not a "mousehole[]." *Id.*

Meta also insists the Commission forfeited this argument. Meta.Br. 55. As explained above, however, the Commission argued in multiple filings that Section 13(b) did not require the Commission to prove monopoly power as of the time of the court's final decision. *See supra* 13. And "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992).

**C. Remand is necessary.**

Finally, Meta makes the outlandish suggestion (Meta.Br. 53-55) that the court's misinterpretation of Section 13(b) was harmless. As Meta concedes, the standard for showing harm from a legal error is "not onerous." Meta.Br. 53. The question is merely whether the error "may well have influenced [the court's] ultimate conclusion." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The Commission easily clears

that low bar here. After all, the district court itself repeatedly acknowledged that there may have been a monopoly in 2020, and therefore that its bottom-line conclusion entirely depended on the proposition that the FTC had to show a monopoly as of 2025. *See* PJA.831-32, 876; *see also* FTC.Br. 22, 29, 35-36.

Lacking any response to this inescapable conclusion, Meta instead spends several pages discussing post-discovery evidence. Meta.Br. 53-55. But as explained above (and in the opening brief), the prejudice to the Commission arises from the district court's reliance on its misunderstanding of Section 13(b), not merely its erroneous admission of evidence.[5]

Here, the court expressly acknowledged that the Commission's proposed market "may have been a market … when the FTC filed this case in 2020." PJA.831-32. Because this is a "court of review, not of first view," its "general practice is to remand issues unaddressed below." *Flannery v. Eckenwiler*, No. 24-7168, 2026 WL 2617583, at *7 (D.C. Cir.

---

[5] The correct interpretation of Section 13(b) is a legal issue subject to de novo review, but nothing "turns" on the standard of review because "a district court by definition abuses its discretion when it makes an error of law." *Chappell-Johnson v. Powell*, 440 F.3d 484, 487 (D.C. Cir. 2006) (cleaned up).

Sept. 4, 2026) (cleaned up). Remand is necessary here to address whether such a market existed.

## II. THE DISTRICT COURT WAS WRONG THAT META LACKED MONOPOLY POWER IN 2025.

### A. The district court committed multiple legal errors in rejecting a PSN market.

#### 1. A product market may be defined around a product's distinct use, and can coexist alongside other markets.

**a.** As Meta acknowledges (at 34), multiple product markets can coexist. *See* FTC.Br. 44-47; Econ.Br. 9. And while the district court recognized this at summary judgment, Meta.Br. 34, it abandoned that key principle at trial. *See* FTC.Br. 46. The court repeatedly said it was looking for *the* market. FTC.Br. 43-44; PJA.812, 813, 827. Meta does not defend those obviously erroneous statements.

Meta also does not dispute that markets can be defined around a product's distinct purpose, even as "fierce" competition exists for other uses. *See* FTC.Br. 44, 47-50; Meta.Br. 37-38; Econ.Br. 13-14. But the district court relied on precisely such competition for other uses (with TikTok and YouTube, for video content) to rule out a PSN market—without properly analyzing whether a distinct market for apps used for friends-and-family sharing *also* exists. *See* PJA.845-47.

The court's disregard of these core legal principles distorted its entire market analysis. *See* FTC.Br. 43-54.

**b.** Meta offers several unpersuasive responses. It insists that user demand for friends-and-family sharing "did not insulate Facebook and Instagram from competition from TikTok and YouTube." Meta.Br. 35; *see also* Meta.Br. 1, 17. But because Meta can operate in multiple markets, it need not be "insulate[d]" from competition with other apps (used for different purposes, like viewing unconnected video) to be a PSN monopolist. *See* FTC.Br. 43-47; Econ.Br. 3, 6-9, 13-14, 18; AAI.Br. 17; *see also Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 471 (1991) (recognizing that competition in one market can "coexist with market power" in other markets).

Meta's misguided efforts (at 37-38) to distinguish the Commission's cases on the facts ignore the fundamental *legal* errors that pervade the court's analysis. And several key precedents, including *Grinnell*, *Connecticut National Bank*, and *Whole Foods,* illustrate as much by underscoring that a PSN market could exist even though Meta competes with TikTok and YouTube. FTC.Br. 47-50; PJA.728-29, 760-63; *see* Econ.Br. 17-18, 20.

Finally, Meta suggests in passing that the Commission had to show price discrimination against friends-and-family users to prove its PSN market. Meta.Br. 35-36. The court itself previously rejected that position, PJA.577-78 (SJA.037-38); such price discrimination is unnecessary, particularly if many people use the apps for friend-sharing (which they do). *See* PJA.1229-35; PJA.770.

**c.** Meta does not seriously contend that the court made either finding needed to reject a PSN market under controlling case law: (1) that there is no meaningful demand for PSN services or (2) that TikTok and YouTube meet that demand. FTC.Br. 50-52.

As to (1): Meta does not dispute that connecting with friends and family remains an important purpose for which people use Facebook and Instagram. *See* FTC.Br. 38-42, 47, 50. The number of friends-and-family posts remains enormous; Meta trumpets this as the key reason to sign up; and Meta's apps have virtually no Reels-only users. FTC.Br. 11, 38-39. Meta also generates more than 80% of its revenue from friend-focused areas of Facebook and Instagram. FTC.Br. 38.

As to (2): Meta suggests in passing that TikTok and YouTube do "satisfy demand for friend-sharing" because users share app content via

private messages or texts. Meta.Br. 37. But piecemeal offerings are not a substitute for a package or one-stop-shop option. *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 571-73 (1966) (central station security); *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 662-66 (1974) (cluster of commercial bank services). There is indisputable consumer demand to connect with friends and family all in one place—which Meta's apps offer but TikTok and YouTube do not (as their executives acknowledged). *See* PJA.1093-96 & PJA.945-46 (SJA.290-91); PJA.1036-38 & PJA.940-43.

The court thus failed to make findings "essential to a proper resolution of the legal question." *E.g., Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714-15 (1986). Instead, the court relied on a "time and attention" market that (as Meta does not contest) has no limiting principle and that the court itself previously rejected. FTC.Br. 51-52; AAI.Br. 14.

**2. Market definition requires a competitive baseline.**

Meta concedes that market definition requires asking what choices consumers would make in a *competitive* market. *See* Meta.Br. 39-40. Amici on both sides agree. *See* Econ.Br. 17; AAI.Br. 7-9; ICLE.Br.

6, 22. As this Court recently explained, market definition must be assessed relative to a world without "the conduct challenged as monopolistic." *PhantomALERT Inc. v. Apple*, 183 F.4th 790, 800 (D.C. Cir. 2026); AAI.Br. 7-9. Here, that means a world in which Instagram and Facebook are not jointly owned by Meta. The district court's failure to consider such a world caused it to commit two fundamental errors. FTC.Br. 54-62.

*HMT error*. The court's hypothetical monopolist test (HMT) analysis considered only current conditions—more than a decade after Meta acquired Instagram. FTC.Br. 55-56. Meta admits that the court's market definition "did not depend on—or even refer to—any particular 'competitive baseline.'" Meta.Br. 40. Yet that is precisely what the HMT and market-definition law require.[6] *See* FTC.Br. 54-55; *PhantomALERT*, 183 F.4th at 800; Econ.Br. 6, 17. The court's failure to ask the correct HMT question requires reversal. *See FTC v. Penn State*

[6] Contrary to Meta's suggestion (at 39-40), the FTC repeatedly made this argument below. *See, e.g.*, PJA.718 (HMT question is "compared to a competitive market"); PJA.483 (HMT "baseline" is "competitive prices—not the defendant's existing prices"); *see also* PJA.1154-55 (comparison is to "world in which Facebook and Instagram were under separate ownership").

*Hershey Med. Ctr.*, 838 F.3d 327, 336, 344-45 (3d Cir. 2016); FTC.Br. 62-63.

The error was especially egregious because, as the court acknowledged, Facebook and Instagram were close alternatives to one another—indeed, the two most prominent friends-and-family sharing apps. *See* PJA.796-97, 800, 837; Econ.Br. 17. Common ownership of two close competitors gives the owner particular leverage to raise prices or reduce quality, which independent competition would otherwise constrain. *See, e.g.*, U.S. Dep't of Justice & FTC, *Merger Guidelines*, §§ 2.2, 4.3 (2023);[7] *Hershey*, 838 F.3d at 345-46; Econ.Br. 14. It is unsurprising, then, that once Meta acquired Instagram it effectively raised prices by increasing ad load and degrading privacy. FTC.Br. 57-58, 67.

Meta claims the court's HMT conclusion was "fully supported" because "competition from TikTok and YouTube" prevents Meta from profitably "degrad[ing] its apps' quality." Meta.Br. 40; *see also* Meta.Br. 35. That neatly encapsulates the error: as explained, that is exactly the

[7] Available at: https://tinyurl.com/msk4fce3.

outcome expected from a profit-maximizing monopolist like Meta. *See* FTC.Br. 56-58; Econ.Br. 11, 15-17; *Kodak*, 504 U.S. at 470-71.[8]

*Cellophane fallacy*. The Commission explained that the court pervasively committed the *Cellophane* fallacy. FTC.Br. 58-62. In response, Meta repeats the court's error of dismissing the fallacy because the FTC purportedly failed to show supracompetitive prices (here, reduced quality). Meta.Br. 42; PJA.850. That objection is circular. FTC.Br. 61-62. The court conducts a market analysis *to find out* whether a firm has the power to charge supracompetitive prices. *See* IIB Phillip E. Areeda et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2021) ¶ 539a2, at 343; Econ.Br. 6. It makes no sense to treat supracompetitive prices as a threshold showing.

In any event, the FTC *did* show that Meta's quality-adjusted prices were supracompetitive. *See* FTC.Br. 66-68. Meta tries to minimize this by suggesting that eliminating ads altogether led to only a modest increase in Facebook use. Meta.Br. 41-42. But this shows that

---

[8] As amici explain, the court's HMT also was improper because it did not start with the narrowest grouping of products (*see* PJA.853-54) but rather "defined the market from the outside in," AAI.Br. 3-4.

Meta was able to decrease product quality without losing many customers, which indicates monopoly power. *See* FTC.Br. 66; Econ.Br. 4, 15-16.

Moreover, Meta does not even attempt to defend the court's reliance on substitution evidence from the period during which the court recognized Meta may well have had monopoly power. FTC.Br. 60; Econ.Br. 17; *see, e.g.*, PJA.851-52 (SJA.243-44). And that recognition should have prompted skepticism about whether *current* quality-adjusted prices were at competitive levels—particularly given Meta's continued economic profits and ability to degrade quality, *see infra* 31-34.

### B. None of Meta's other arguments can save the district court's erroneous market analysis.

#### 1. The errors are legal in nature.

Meta repeatedly characterizes these errors as factual. *E.g.*, Meta.Br. 3, 17, 19. In reality, they pertain to the "formulation of the [relevant] market tests," which, as Meta acknowledges, "may be freely reviewed on appeal as a matter of law." Meta.Br. 20 (cleaned up).

Precedent confirms that misapplying the governing principles of market definition (including the HMT) is legal error and requires

reversal. FTC.Br. 62-63; *Hershey*, 838 F.3d at 344-45. Similarly, fact findings must be rejected when they "result from the District Court's misapplication of governing law." *United States v. Microsoft Corp.*, 253 F.3d 34, 118 (D.C. Cir. 2001); *see also FTC v. Texaco, Inc.*, 555 F.2d 862, 876 n.29 (D.C. Cir. 1977).

Meta therefore cannot hide behind clear error review.

#### 2. Substitution with unconnected content does not defeat a PSN market.

Meta relies heavily (at 36-37) on evidence of some substitution of time between connected and unconnected content. But this evidence suffers from the same *Cellophane* problem: it reflects post-monopoly conditions and thus cannot reliably capture genuine consumer choices in *competitive* conditions. *See* FTC.Br. 58-62; *see also* FTC.Br. 54-58; AAI.Br. 10 (explaining that "purported diversion" today "could be flight toward poor substitutes and away from a monopolist"). The court thus "walked headfirst into the *Cellophane* fallacy." Econ.Br. 15.

The evidence also fails for three more reasons, none rebutted by Meta. First, contrary to Meta's suggestion (at 36), the court never found that there was *enough* substitution between connected and unconnected content to constrain a PSN monopolist from anticompetitive conduct.

*See* Econ.Br. 17-18. Second, measuring time spent consuming content overweights unconnected content (predominantly video) while underweighting friends-and-family content (where Meta makes most of its revenue). FTC.Br. 38, 53-54; PJA.875. Third, it fails to account for content *creation*. *See* FTC.Br. 53-54.

#### 3. Order of substitution evidence does not defeat a PSN market.

Meta suggests (at 41) that the court overcame the *Cellophane* fallacy by relying on "order of substitution" evidence—that is, evidence that in certain circumstances more minutes were diverted from Meta's apps to TikTok or YouTube than to Snapchat. But the court was simply wrong to declare, with no support, that the *Cellophane* fallacy would not affect order of substitution. PJA.849. Order of substitution is not a reliable metric for market definition in a Section 2 case because, as just discussed, any substitution is at prevailing (monopoly) prices or quality. *See* Econ.Br. 15-16. Current substitution order does not necessarily reflect the choices consumers would make when the product is offered at a different price or quality—e.g., non-monopoly levels. *See* Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* (4th ed.

2015), at 670; Econ.Br. 17. In other words, far from overcoming the *Cellophane* fallacy, the district court doubled down on it.[9]

The key source of the substitution evidence—the List study—is especially flawed. It measured only *temporary* diversion (four weeks) and did not examine the purpose for which people used an app. *See* PJA.1183; AAI.Br. 13; Econ.Br. 19-20; PJA.581-82. Recall that a central benefit of Facebook, Instagram, and Snapchat is the social graph, an established network of family and friends. FTC.Br. 53. It is unsurprising that people who were paid not to use Facebook or Instagram for less than month did not undertake the effort necessary to rebuild their entire network on Snapchat and instead turned in greater numbers to TikTok and YouTube (whose unconnected video content does not require a social network).

The order of substitution evidence is especially inapt because the fact that a market is monopolized means there are only small and fringe providers of the product remaining (beyond the monopolist defendant).

[9] Contrary to Meta's suggestion (at 41), even its own experts were at best equivocal on the point. PJA.1176-79 ("I just don't know … there are forces in both directions"); PJA.1184-90; PJA.1201-03 ("doesn't sound likely at all").

*See, e.g.*, Areeda, *Antitrust Law* ¶ 701(c) (describing monopolized market with small fringe player). These small providers would rank lower in an order-of-substitution analysis than larger players from adjacent markets simply because they are not particularly strong providers of the relevant product. But that does not mean the market should be expanded to include the larger players that do not compete in the same market.

To the contrary, markets in monopolization cases routinely include small players that provide the relevant product, while excluding larger players that do not (despite their overall commercial significance in other markets). In *Microsoft*, for example, fringe operating systems BeOS and Linux were included in the "Intel-compatible PC operating system" market while Apple's Mac OS was excluded. *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 13, 15-16, 22-23 (D.D.C. 1999), *aff'd in relevant part*, 253 F.3d 34, 52-54 (D.C. Cir. 2001). In *Google Search*, the "general search services" market included minor general search engines like DDG and Neeva, even though they "have not posed any meaningful threat to [Google's] 'market power.'" *United States v. Google LLC*, 747 F. Supp. 3d 1, 37, 122 (D.D.C. 2024). The court excluded

larger firms that do not provide general search engines, such as Amazon and social media companies, even though Google characterized Amazon and similar firms as "intense" competitors for commercial searches and viewed social media companies as "competitive threats." *Id.* at 58-62.

The district court's reasoning boils down to pulling TikTok and YouTube into the market simply because a smaller player (Snapchat) happened to survive in the monopolized PSN market. That approach flouts settled law and economic principles. *See* FTC.Br. 59-62; AAI.Br. 18.

#### 4. The court's *Brown Shoe* analysis cannot support affirmance.

Finally, Meta argues that the Commission forfeited a challenge to the court's *Brown Shoe* analysis and that the decision can be upheld on this basis. Meta.Br. 32-33. This is wrong three times over.

First, our opening brief *did* challenge the court's *Brown Shoe* analysis, explaining that the identified "errors affected the court's analysis under both the hypothetical monopolist test and *Brown Shoe*." FTC.Br. 43; *see also* FTC.Br. 17 (errors "infected [the court's] analysis under both methods"). The brief also repeatedly cited the *Brown Shoe*

analysis in identifying errors. *See, e.g.*, FTC.Br. 43, 47, 50-51, 59-60, 60 n.14.

And indeed, that analysis reflected the same fundamental misconceptions about market definition discussed above. For example, the court brushed aside compelling qualitative evidence that Meta's apps serve a different purpose than TikTok and YouTube, reasoning that "industry insiders think that TikTok and YouTube compete with PSN apps." PJA.862-63 (SJA.254-55). But as explained, the question is not whether Meta competes with TikTok and YouTube *in any market*; it's whether Meta competes with them *in the PSN market*. *See* FTC.Br. 43-44, 46-47, 51-52; *see also* Econ.Br. 3, 7, 12-13, 18-19. The analysis also suffered from the *Cellophane* fallacy. *See* FTC.Br. 58-62; Econ.Br. 15-16; PJA.857, 861, 863, 867 (relying on conditions during the alleged monopoly to infer interchangeability). Cleansed of these errors, the *Brown Shoe* assessment might well have come out differently.

Second, the court did not rely on *Brown Shoe* as an alternative ground independent from its HMT analysis. *See* PJA.853 (the *Brown Shoe* "factors do not set out a separate inquiry"). Indeed, the court emphasized that "the touchstone of market definition remains how

consumers would respond to a price increase," i.e., the HMT. PJA.830. And the court specified that the *Brown Shoe* evidence "must be considered in light of the widespread substitution between these apps," referring back to its HMT discussion. PJA.867. Only after "[t]aking all the evidence together" did the court conclude that "personal social networking is not a separate product market." PJA.867.

Third, the court's erroneous HMT alone requires reversal. The Commission was entitled to prove a product market using either the HMT or *Brown Shoe*, and offered evidence satisfying both. *See, e.g.*, PJA.707-24. Because the court could have adopted a PSN market using either approach, the HMT error by itself requires reversal. *See Hershey*, 838 F.3d at 344-45.

### C. The district court erred by rejecting the Commission's direct evidence of Meta's monopoly power.

Meta's defense of the district court's treatment of the Commission's direct evidence simply repeats the court's mistakes.

*Economic profits*. Meta does not dispute that the Commission introduced unrebutted expert testimony showing that Meta has earned sustained high economic profits for years. *See* FTC.Br. 64-66. Instead, it echoes the district court's conflation of accounting and economic profits.

Even if non-monopolist tech firms had similar *accounting* profits to Meta (Meta.Br. 43), there was no evidence that they had similar *economic* profits (and in competitive markets, they could not). The district court, Meta's own expert, the leading antitrust treatise, and appellate courts all agree that while persistent *accounting* profits are not always evidence of monopoly power, persistent *economic* profits are. FTC.Br. 64. Meta cites no authority supporting its contrary assertion. Meta.Br. 44.[10]

Similarly, Meta fails to understand that its rising profits—despite competition from TikTok and YouTube—*support* the FTC's argument. *See* Meta.Br. 43-44. Because Meta faces competition for unconnected content, its economic profits must flow from elsewhere—specifically, Meta's friends-and-family offerings. *See* FTC.Br. 38 (80% of Meta's revenue comes from friend-focused app features). Nor can Meta rely on

[10] *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 392-93 (1956), says nothing about economic profits. The other cases Meta cites confirm the distinction between accounting profits and economic profits. *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) (distinguishing "accounting conventions" from "real profits (or losses), as an economist would understand these terms"); *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1252 (11th Cir. 2002) (criticizing reliance on return on assets as "more a reflection of various accounting conventions than true economic profit").

market power over advertisers as the source of its economic profits. Meta.Br. 45. Meta's expert disavowed that Meta had such market power, *see* PJA.1193-95, and Meta indisputably earned more by "crank[ing] up the ad load" on users after controlling Instagram. PJA.871.

Meta also repeats the court's speculation, unsupported by any factual findings, about *how* Meta may have attained its monopoly power. PJA.813, 815-16; Meta.Br. 43. This speculation conflates the two *Grinnell* factors. The question at the first step of *Grinnell*—the only step the district court reached, PJA.813—is *whether* Meta is a monopolist, not *how* it became one. FTC.Br. 64-65.

*Quality-adjusted price*. Meta was able to degrade its product, including by massively increasing ad load and engaging in poor privacy practices, without losing customers—a telltale sign of monopoly power. FTC.Br. 67; PJA.808, 822. The district court used the wrong baseline by comparing the "Facebook and Instagram … that existed ten years ago to the versions that exist today," failing to consider how a competitive market over the past 10 years would have improved both products. FTC.Br. 67-68; *see* PJA.820 (discussing ad quality improvements and

assuming "the quality-adjusted price of Meta's apps several years ago," long after Meta's acquisitions, "represented the competitive price"). Meta makes the same mistake when it asserts that the FTC had to demonstrate "an overall decline in quality," Meta.Br. 45, ignoring that competition would have led to greater improvements.

Meta also degraded its apps through poor privacy practices (like those revealed in the Cambridge Analytica scandal, PJA.822). The court dismissed these "genuine [privacy] problems," PJA.822, based on substitution evidence—which, as explained, is consistent with Meta having monopoly power in the PSN market. FTC.Br. 68; *cf.* States.Br. 13-14 (discussing flaws in court's analysis of Meta's privacy practices). Accordingly, the court's conclusions once again stemmed from the legally mistaken presumption that the market was already competitive. FTC.Br. 68.

## CONCLUSION

The judgment should be reversed, and this case should be remanded.

Respectfully submitted,

October 19, 2026

LUCAS CROSLOW
*General Counsel*

H. THOMAS BYRON III
ALEX POTAPOV
*Deputy General Counsels*

/s/ Benjamin F. Aiken
BENJAMIN F. AIKEN
MARIEL GOETZ
*Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,431 words.

2. This document complies with the requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Century Schoolbook.

October 19, 2026

/s/ Benjamin F. Aiken
Attorney for the Federal Trade Commission