**FINAL VERSION**

ORAL ARGUMENT NOT YET SCHEDULED

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 26-5028

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellant*,

v.

META PLATFORMS, INC.,
*Defendant-Appellee*,

Appeal from the United States District Court for the District of Columbia
No. 1:20-cv-03590-JEB (Hon. James E. Boasberg)

# RESPONSE BRIEF FOR DEFENDANT-APPELLEE META PLATFORMS, INC.

MARK C. HANSEN
AARON M. PANNER
ALEX A. PARKINSON
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Defendant-Appellee Meta Platforms, Inc.*

October 20, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Defendant-Appellee Meta Platforms, Inc. certifies as follows:

### A. Parties and Amici

Plaintiff in the district court and Appellant in this Court is the Federal Trade Commission.

Defendant in the district court and Appellee in this Court is Meta Platforms, Inc.

Intervenor in the district court and Appellee in this Court is New York Times Co.

Amici Curiae in this Court in support of Appellant are State of Alaska; State of Arkansas; State of Colorado; District of Columbia; State of Delaware; State of Florida; State of Idaho; State of Indiana; State of Iowa; State of Kansas; Commonwealth of Kentucky; State of Louisiana; State of Maryland; State of Montana; State of Missouri; State of Nebraska; State of Nevada; State of New Jersey; State of North Dakota; State of Ohio; State of Oklahoma; State of Oregon; Commonwealth of Pennsylvania; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; State of West Virginia; American Antitrust Institute; Professors of Economics.

Amici Curiae in this Court in support of Appellee are Antitrust Economists; The Chamber of Commerce of the United States of America; International Center for Law & Economics; and Washington Legal Foundation.

**B. Rulings Under Review**

The rulings under review in this appeal are the Order and Judgment entered on November 18, 2025 (ECF Nos. 694 and 699), and the accompanying Memorandum Opinion (ECF Nos. 695 (sealed), 705 (revised redacted)), 811 F. Supp. 3d 67 (D.D.C 2025), in favor of Defendant Meta Platforms, Inc.

**C. Related Cases**

Defendant-Appellee states that the present case is related to this Court's earlier decision in *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023), as the instant case was reassigned to Judge Boasberg on the ground that the two cases were related. *See FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 11 (D.D.C. 2021) ("[A] number of State Plaintiffs filed a very similar suit against Facebook just before this action was filed.").

## CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 26.1, Defendant-Appellee Meta Platforms, Inc. ("Meta") states as follows:

Meta certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock. Meta's general nature and purpose is to build technology that helps people to connect and share, find and build communities, discover and enjoy online entertainment, and grow businesses through mobile devices, personal computers, virtual reality and mixed reality headsets, augmented reality, and wearables. Meta generates substantially all its revenues from selling advertising placements.

**TABLE OF CONTENTS**

Page


CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... i

CORPORATE DISCLOSURE STATEMENT ..... iii

TABLE OF AUTHORITIES ..... vii

GLOSSARY ..... xi

INTRODUCTION ..... 1

JURISDICTIONAL STATEMENT ..... 3

STATEMENT OF THE ISSUES ..... 3

STATUTES AND REGULATIONS ..... 3

STATEMENT OF THE CASE ..... 3

- A. Initial Complaint and Dismissal with Leave To Amend ..... 3
- B. States' Complaint: Dismissal with Prejudice and Affirmance by This Court ..... 6
- C. Amended Complaint and Denial of Motion To Dismiss ..... 7
- D. Denial of Summary Judgment ..... 8
- E. Production of Post-Discovery Data ..... 9
- F. Trial ..... 11
- G. The District Court Judgment ..... 14

SUMMARY OF ARGUMENT ..... 17

STANDARD OF REVIEW ..... 19

ARGUMENT ..... 20

I. THE DISTRICT COURT'S DETERMINATION THAT THE FTC FAILED TO PROVE THAT META HAS MONOPOLY POWER IS LEGALLY SOUND AND FACTUALLY SUPPORTED ....20

A. The District Court Correctly Held That the FTC Failed To Prove a Distinct Market for "Personal Social Networking" Services ....22

1. Evidence of Consumer Substitution Belied the FTC's Proposed Market ....22

2. The Evidence Supported the District Court's Finding That Users Substitute Time Spent on TikTok and YouTube for "Friends and Family Sharing" Time on Facebook and Instagram ....27

3. The District Court's Application of the *Brown Shoe* Factors Further Disproved the FTC's Proposed Market Definition ....29

B. The FTC Identifies No Error in the District Court's Market-Definition Analysis ....32

1. The District Court Properly Considered Whether the FTC's Proposed "PSN" Market Was Consistent with the Evidence ....34

2. The District Court Properly Applied the "Hypothetical Monopolist Test" Analysis ....39

3. The District Court Was Mindful of the "*Cellophane* Fallacy" ....41

C. The District Court Properly Rejected the FTC's "Direct" Evidence ....42

II. THE DISTRICT COURT PROPERLY HELD THE FTC TO THE BURDEN OF ESTABLISHING AN ONGOING VIOLATION OF THE ANTITRUST LAWS ....46

A. Section 13(b) Required the FTC To Prove That Meta Was Violating the Antitrust Laws ....... 46

B. The FTC's Argument That Section 13(b) Grants the FTC Unlimited Authority To Seek a Permanent Injunction Is Waived and Frivolous ....... 55

CONCLUSION ....... 57

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

Page

**CASES**

*Alaska v. United States*, 545 U.S. 75 (2005)....................................................56

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13 (D.C. Cir. 2011)....................................................33

* *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021)................ 2, 46, 47, 49, 51, 52, 56, 57

*Bailey v. Allgas, Inc.*, 284 F.3d 1237 (11th Cir. 2002)....................................44

*Blue Cross & Blue Shield v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995) ....................................................................................44

* *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ................16, 17, 18, 22, 29, 32, 33

*City of Waukesha v. EPA*, 320 F.3d 228 (D.C. Cir. 2003) ....................................33

*Combat Veterans for Cong. v. FEC*, 795 F.3d 151 (D.C. Cir. 2015) ......................53

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ................................19

*ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547 (8th Cir. 1991)....................49, 50

*FTC v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020) ..................................................49

*FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019)...........46, 47, 48, 49

*FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) ................................48, 49

*FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019)................................48

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008)...........................38

---

Authorities principally relied upon are designated by an asterisk (*).

*Google Play Store Antitrust Litig.*, *In re*, 147 F.4th 917 (9th Cir. 2025) ....................36

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)....................53

*Husky Mktg. & Supply Co. v. FERC*, 105 F.4th 418 (D.C. Cir. 2024)....................39

*IGT v. All. Gaming Corp.*, 702 F.3d 1338 (Fed. Cir. 2012) ....................37

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) ....................44

*Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)....................5

*Moses v. Howard Univ. Hosp.*, 606 F.3d 789 (D.C. Cir. 2010) ....................55

*Multidistrict Vehicle Air Pollution*, *In re*, 538 F.2d 231 (9th Cir. 1976) ..........49, 50

*Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*, 158 F.3d 1335 (D.C. Cir. 1998)....................43

* *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023).............4, 6, 7, 15

*Overby v. Nat'l Ass'n of Letter Carriers*, 595 F.3d 1290 (D.C. Cir. 2010) ....................19

*Parsi v. Daioleslam*, 778 F.3d 116 (D.C. Cir. 2015)....................54

*PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, *aff'd*, 315 F.3d 101 (2d Cir. 2002)....................42

*PhantomALERT Inc. v. Apple Inc.*, 183 F.4th 790 (D.C. Cir. 2026) ....................55

*Republic of Iraq v. Beaty*, 556 U.S. 848 (2009)....................56

* *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) ....................19, 29, 34

*Salazar ex rel. Salazar v. District of Columbia*, 602 F.3d 431 (D.C. Cir. 2010) ....................40

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996)..........56

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017)..........25

*United States v. Conn. Nat'l Bank*, 418 U.S. 656 (1974)..........37

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964)..........37

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956)..........44

*United States v. Eastman Kodak Co.*, 63 F.3d 95 (2d Cir. 1995)..........27

*United States v. Engelhard Corp.*, 126 F.3d 1302 (11th Cir. 1997)..........35

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)..........44

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011)..........25

* *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)..........19, 20, 36, 38

*United States v. Mohammed*, 693 F.3d 192 (D.C. Cir. 2012)..........33

*United States v. U.S. Sugar Corp.*, 73 F.4th 197 (3d Cir. 2023)..........20

*Wilk v. AMA*, 895 F.2d 352 (7th Cir. 1990)..........49, 50

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*:

395 U.S. 100 (1969)..........49

401 U.S. 321 (1971)..........53

## STATUTES AND RULES

Clayton Act § 16, 15 U.S.C. § 26 ....................6, 49, 50

FTC Act:

§ 13(b), 15 U.S.C. § 53(b) .................... 2, 3, 4, 5, 13, 18, 19, 46, 48, 49, 50, 51

§ 13(b)(1), 15 U.S.C. § 53(b)(1)....................55, 56

§ 13(b)(2), 15 U.S.C. § 53(b)(2)....................56

Sherman Act § 2, 15 U.S.C. § 2.................... 3-4, 5, 7, 46

28 U.S.C. § 1331 ....................3

28 U.S.C. § 1337 ....................3

28 U.S.C. § 1345 ....................3

28 U.S.C. § 2111 ....................53

Fed. R. Civ. P. 37 ....................54

Fed. R. Civ. P. 52 ....................1, 17

Fed. R. Civ. P. 52(a)(6)....................33

## OTHER MATERIALS

Compl., *New York v. Facebook, Inc.*, No. 1:20-cv-03589, Dkt.4 (D.D.C. filed Dec. 9, 2020) ....................6

DOJ & FTC Merger Guidelines (2023)....................25

## GLOSSARY

| | |
|---|---|
| FTC or Commission | Federal Trade Commission |
| FTC Act | 15 U.S.C. § 41 *et seq.* |
| HMT | Hypothetical Monopolist Test |
| PSN | Personal Social Networking |
| Section 2 | 15 U.S.C. § 2 |
| Section 13(b) | 15 U.S.C. § 53(b) |

## INTRODUCTION

After a seven-week trial, the district court issued a meticulous opinion holding that the FTC failed to carry its burden of proving that alleged differences in the way consumers use social media apps insulate Meta's apps, Facebook and Instagram, from effective competition. Evidence from dozens of witnesses, extensive expert testimony, and hundreds of documents proved the contrary: that Facebook and Instagram face fierce competition from TikTok and YouTube (among other rivals). The FTC's monopolization claim failed because Meta has no monopoly.

The district court found that the quantitative evidence of substitution — *all* of which pointed in the same direction — and qualitative marketplace evidence demonstrated that TikTok and YouTube impose far more significant competitive constraints on Meta than Snapchat, an app that the FTC insisted *was* in its purported "personal social networking" market. The court's rejection of the FTC's alleged relevant market is grounded in rigorous legal analysis and is supported by overwhelming factual findings that would hold up to any scrutiny, let alone the "clearly erroneous" standard Rule 52 mandates.

The FTC does not contest that if the district court answered this market-definition question correctly, Meta's market share is too low to support an inference of monopoly power. And its challenge to the district court's

determination that the FTC failed to show monopoly power through "direct" proof of high profits or reduced quality ignores the district court's persuasive reasons for rejecting its arguments — including the finding that, far from declining in quality, "Meta's apps have continuously improved." Op.27(JA818).

With no credible merits challenge, the FTC challenges the district court's holding that Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), required the FTC to prove that Meta had monopoly power at the time of trial rather than creating a mere pleading standard. But the FTC's reading of the statute is unprecedented and, indeed, contrary to recent Supreme Court precedent. *See AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 75-77 (2021). Section 13(b) creates a federal-court right of action solely to obtain *prospective* relief to address the threat of harm from ongoing or imminent conduct; evidence of a past violation (with a request for a retrospective remedy) is not a basis for suit. And the FTC's argument that the "is violating, or is about to violate," language of Section 13(b) does not apply to *permanent* injunction cases is forfeited because the agency argued the opposite below; it is, in any event, an untenable reading of the statute.

The evidence is exhaustive, the law is clear, and the district court's judgment is sound. This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331; it is unnecessary to decide whether it also had jurisdiction under 28 U.S.C. §§ 1337 and 1345. Meta otherwise agrees with the FTC's jurisdictional statement.

## STATEMENT OF THE ISSUES

1. Whether the district court's holding that the FTC failed to meet its burden of proving that Meta has monopoly power in a well-defined relevant market was legally sound and supported by fact-finding that was not clearly erroneous.

2. Whether the district court correctly held that the FTC could not establish a claim for injunctive relief under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), unless it proved that Meta was "violating, or [was] about to violate" Section 2 of the Sherman Act.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in the addendum to the FTC's Opening Brief and in an addendum to this brief.

## STATEMENT OF THE CASE

### A. Initial Complaint and Dismissal with Leave To Amend

**1.** The FTC sued in December 2020 under Section 13(b) of the FTC Act alleging that Meta (then known as Facebook, Inc.) violated Section 2 of the

Sherman Act by monopolizing an alleged market for "personal social networking ['PSN']." *See* Compl. ¶¶ 2, 174(JA90, 139). The FTC alleged that Meta, "[a]t least since 2011, . . . has had monopoly power," *id.* ¶ 170(JA138), and that Meta "willfully maintained its monopoly power through its course of anticompetitive conduct, including through anticompetitive acquisitions," *id.* ¶ 171(JA138) — specifically, of Instagram (in 2012) and WhatsApp (in 2014). The FTC also alleged that Meta had engaged in "anticompetitive conditioning of access to interconnections" — policies that had (prior to 2018) restricted certain entities' access to Facebook's Platform. *Id.*; *see also id.* ¶¶ 78-160(JA111-35) (detailing alleged conduct); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 293-94 (D.C. Cir. 2023) (describing parallel allegations in States' suit).

Meta moved to dismiss. *See generally* Dkt.56. Meta argued that the FTC lacked authority to sue because Section 13(b) of the FTC Act authorizes the FTC to seek injunctive relief in federal court only if a defendant "is violating, or is about to violate" a law enforced by the FTC. The FTC, however, alleged only *past* violations of Section 2, not any ongoing or imminent one. *Id.* at 39-43. Meta also challenged allegations regarding relevant market, monopoly power, and exclusionary conduct. *See id.* at 10-39.

In opposition, the FTC conceded that Section 13(b) allows the FTC to "seek a preliminary *or permanent* injunction in federal court" only when "the

Commission 'has reason to believe' that . . . a defendant '*is violating, or is about to violate*' any provision of law enforced by the FTC." Dkt.59, at 38 (emphasis added). The FTC argued that this requirement posed no barrier, however, because its "reason-to-believe" determination was unreviewable and because, in any event, it alleged that "Facebook's course of anticompetitive conduct is ongoing" since "continued possession of a firm or assets . . . acquired in violation of the antitrust laws represents a continuing violation . . . ." *Id.* at 41, 42-43. The FTC also defended its factual allegations.

**2.** The district court granted Meta's motion but gave the FTC leave to amend. The court found that, despite its "intuitive appeal," Meta's argument that the FTC could not challenge a consummated merger as a Section 2 violation under Section 13(b) "runs into contrary precedent." MTD Op.51(JA196).[1] The district court further held that, while the FTC had adequately alleged a relevant market, it had not plausibly alleged monopoly power. In particular, although the FTC alleged that Meta had a market share "in excess of 60%," it failed to allege "what the agency might be measuring." MTD Op.28-29(JA173-74). Since the FTC

---

[1] Although Meta believes that this determination was incorrect, it is not a matter of jurisdiction that this Court needs to resolve to reach the merits. *See Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014) (noting that "whether [the plaintiff] has a cause of action under the statute" "does not implicate subject-matter jurisdiction").

might "be able to cure these deficiencies," the court granted leave to amend. MTD Op.32(JA177) (cleaned up). The court also rejected the FTC's allegations related to Meta's now-abandoned Platform policies. *Id.* ("[Meta's] Platform-related conduct cannot be a basis for injunctive relief[.]").

### B. States' Complaint: Dismissal with Prejudice and Affirmance by This Court

On the day the FTC filed, a group of 46 states, the District of Columbia, and Guam (the "States") filed a similar complaint under Section 16 of the Clayton Act, 15 U.S.C. § 26. *See* Compl., *New York v. Facebook, Inc.*, No. 1:20-cv-03589, Dkt.4 (D.D.C. filed Dec. 9, 2020). Like the FTC, the States alleged that Meta had monopoly power in a relevant market for PSN services and based their claims on Meta's acquisitions of Instagram and WhatsApp and its former Platform policies.

Meta moved to dismiss, arguing (among other things) that the States' claims based on the acquisitions of Instagram and WhatsApp were barred by laches and that allegations regarding Meta's former Platform policies failed to state a claim. *See generally* Dkt.114-1. The district court granted Meta's motion with prejudice. *See generally* Dkt.137.

This Court affirmed. The Court began with a "preliminary observation" concerning the "odd[ity]" of the States' suit, which "concerns an industry that, even on the States' allegations, has had rapid growth and innovation with no end in sight." *New York v. Meta*, 66 F.4th at 295. The Court held that the States, when

suing for injunctive relief under Section 16 of the Clayton Act, are subject to laches, which Meta established with respect to the challenged acquisitions based on the facts alleged. *See id.* at 301. This Court then held that the States' allegations regarding Meta's Platform policies "did not set forth a violation of § 2." *Id.* at 302.

The latter holding effectively affirmed the district court's dismissal of the FTC's parallel allegations concerning Meta's Platform policies.[2] The FTC accordingly has not pursued any arguments regarding those Platform claims in this appeal, leaving the acquisitions of Instagram and WhatsApp as the exclusive basis for the exclusionary conduct element of its claimed Section 2 violation.

### C. Amended Complaint and Denial of Motion To Dismiss

The FTC filed an amended complaint in August 2021 (JA199-279); Meta again moved to dismiss, and, this time, the district court denied the motion. It noted that, while "the agency may well face a tall task down the road in *proving* its allegations," the complaint plausibly alleged (1) "that Facebook exercises monopoly power in the market for PSN services"; (2) "that the company's dominant market share is protected by barriers to entry"; and (3) that Facebook . . .

---

[2] The FTC included, in its amended complaint, allegations related to Meta's former Platform policies; the district court allowed no discovery regarding them, *see* MTD Op.40(JA374), and granted summary judgment on those aspects of the FTC's claims. *See* MSJ Op.52(JA592).

has willfully maintained [monopoly] power through . . . the acquisitions of Instagram and WhatsApp." MTD Op.2(JA336).

### D. Denial of Summary Judgment

**1.** After extensive fact and expert discovery, Meta filed for summary judgment, challenging every element of the FTC's proof. One focus was the FTC's failure to show a genuine issue of material fact with respect to monopoly power. In making these arguments, Meta relied on the most recent data available. For example, Meta cited data from October 2022 to argue that substitution evidence showed that TikTok, Twitter, and YouTube "offer features that are closer substitutes for Meta than Snapchat" and that including them in the relevant market "puts Meta's share of time spent" well below the monopoly power threshold. Dkt.325-1, at 23. Meta also argued that TikTok's rise belied barriers to entry, noting TikTok's strong growth. *Id.* (citing data from April 2023).

In opposing Meta's motion, the FTC never contested that it was required to show that Meta currently had monopoly power — not just that it exercised such power at some earlier time. For example, in arguing that "Meta's market share well exceeds . . . 60%," that FTC relied on data "through 2022" and argued that "Meta's more recent shares are higher" than earlier shares. Dkt.328-1, at 30. Nor did the FTC argue that TikTok's growth was too recent to matter; instead, it argued that TikTok was not a "PSN" app. *Id.* at 32.

**2.** In November 2024, the district court denied Meta's motion, while noting the challenge facing the FTC at trial: "In addition to the complexities of a platform market that offers its products to end users at no cost while charging for advertising, time and technological change pose serious challenges to the market analysis here." MSJ Op.51(JA591). "The Facebook and Instagram of 2024 . . . are different — in some cases dramatically so — from what they were when these acquisitions took place." *Id.* "The challenge for the Commission will be to show that the 'personal social networking' service that it highlights as Meta's core use case is distinct enough from the many other social-media products vying for consumers' online attention that it still constitutes its own relevant antitrust market." *Id.* The FTC made no pre-trial objection to the district court's framing of its burden.

**E. Production of Post-Discovery Data**

**1.** On January 18-19, 2025, TikTok was unavailable to users during an overnight outage. *See* Dkt.417, at 24. Meta's primary economic experts — Dennis Carlton and John List — had relied on such "natural experiments" to study substitution. Meta accordingly produced to the FTC (in February 2025) data related to usage of Facebook and Instagram before, during, and after the TikTok outage. In addition, Meta served trial subpoenas on employees of TikTok, Alphabet (owner of YouTube), and Snap (owner of Snapchat), seeking, along with

trial testimony, documents related to usage around the TikTok outage as well as documents analyzing the outage's impact.

On March 6, 2025, Meta produced a declaration by Dr. Carlton with analyses of the effect of the TikTok outage on usage of Facebook and Instagram, based on Meta's earlier-produced data. Dr. Carlton's declaration also included two figures and two tables updating figures and tables in his 2023 Expert Report related to (1) time spent on particular Facebook features and (2) the share of content on Facebook and Instagram posted by users' connections on the app. These updates showed that trends evident when Dr. Carlton filed his original report — reflecting increasing consumption of "unconnected" content posted by persons or entities unknown to the user — had continued through early 2025.

**2.** On March 18, 2025, the FTC moved to exclude Dr. Carlton's declaration and the data Meta had produced. It argued (1) that the production violated the court's scheduling order and the Federal Rules of Civil Procedure and (2) that, although "[e]vidence relating to Meta's monopoly power may be relevant, . . . Meta's new evidence has little-to-no probative value." Dkt.428, at 1. In response, Meta argued that the data was highly relevant, since the FTC "must prove that Meta 'is violating' the antitrust laws to maintain an action under Section 13(b) . . . . That means *now*, not at some time in the past." Dkt.450, at 1. In its reply, the FTC did not contest that legal point. *See* Dkt.463.

The district court denied the FTC's motion. *See* Order(JA654). It held that "the FTC must prove that [Meta] is currently violating the antitrust laws; as a result, evidence regarding the January 2025 TikTok outage is certainly relevant and obviously could not have been produced during discovery." *Id.* The district court likewise refused to quash Meta's nonparty subpoenas related to the TikTok outage and declined to exclude Dr. Carlton's declaration. "Any prejudice to the FTC here is outweighed by the evidence's probative value." *Id.*; *see also* Order(JA663) (denying nonparties' motions to quash trial subpoenas).

**F. Trial**

Trial began April 14, 2025; the FTC called some of Meta's most senior current and former officers; all of those witnesses were also extensively examined by Meta's lawyers. The FTC also called third-party witnesses from TikTok, YouTube, X/Twitter, and other social media apps, and several experts.

The FTC rested May 15, 2025. Much of the evidence supporting Meta's defense had already been introduced during the FTC's case; Meta called a few additional current and former Meta employees and non-party witnesses, as well as three experts. The FTC called only its principal economic expert, Dr. Scott Hemphill, in rebuttal. The trial concluded May 27.

The FTC examined witnesses concerning *current* market conditions, including questioning on post-discovery documents. *See, e.g.*, 04/28 AM

Tr.31:15-33:2(JA1081-83) (Coleman, X/Twitter) (FTC questioning about Meta's app Threads, launched May 2023); 04/30 AM Tr.41:20-22(JA1095) (Presser, TikTok) (FTC: "Does TikTok currently, today, offer within the United States personal social networking services . . . ?"); *id.* 42:3-5(JA1096) (FTC asking same regarding YouTube); *id.* 50-52(JA1100-02) (FTC questioning regarding 2024 declaration); 05/19 AM Tr.33:24-34:1(Sealed.JA303-04) (Levenson, Snap) (FTC: "I would like to ask you about Snap's core use cases in competition today and the competitive landscape today.").

During the third week of trial, the FTC objected to a demonstrative exhibit Meta used during its examination of Meta's COO, which showed the growth in Instagram's users from 2018 to the present. The FTC objected to "testimony about data related to today, in part because it is late-produced discovery that was not received by the FTC and it's based on data that the FTC does not have any underlying data for." 04/29 PM Tr.189:14-17(JA1088). The district court allowed the testimony to proceed.

Two days later — after the FTC had questioned TikTok's Adam Presser about post-discovery data and documents — the FTC again raised objections to testimony concerning post-discovery metrics, which the court overruled. *See* 05/01 AM Tr.39:19-40:5(JA1118-19); 05/01 PM Tr.176:1-9(JA1124); *id.* 179:17-

20(JA1127). The FTC later asked to submit a bench brief, which the district court allowed.

After the trial's fourth week, the FTC filed a "Bench Brief Regarding Post-Discovery Evidence." *See generally* Dkt.589-01. The FTC argued that the court "should base its liability determination on the discovery record and give no weight to the testimony of Meta's executives or experts regarding data and information that has never been produced." *Id.* at 1. The FTC asserted that post-discovery evidence was "unreliable," inconsistent with the federal rules, and prejudicial. *See id.* at 5, 9. Finally, the FTC argued, for the first time, that Section 13(b) "does not change the time period relevant to a liability determination" and that "the appropriate time to update the Court about recent market conditions" is during any remedies phase. *See id.* at 11.

After trial, the district court overruled the FTC's objection. The court noted that the FTC had known "[s]ince 2021 . . . that its central burden in this case is to demonstrate that [Meta] 'is currently violating the antitrust laws.'" Order at 1(JA664). This burden stemmed both from Section 13(b) and from the obligation to show that "Meta *currently* possesses monopoly power" in order "to obtain injunctive relief for long-past acquisitions." *Id.* The court rejected the FTC's "conjecture" that "the testimony of Meta's witnesses on direct examination was unreliable" and held that such testimony was consistent with the Federal Rules of

Evidence. *Id.* at 3(JA666). The court noted, too, that "Meta has tried its case on the understanding that current market conditions would be central to determining liability" and that the FTC itself "questioned witnesses about post-discovery data and current market conditions, . . . arguably waiving any objection the FTC might raise." *Id.* at 3-4(JA666-67). The FTC also failed to seek any pre-trial order limiting the testimony at issue. *Id.* The court accordingly concluded that the FTC's objection was "neither legally justified nor fair to Defendant." *Id.*

### G. The District Court Judgment

After briefing and submissions of proposed findings, the district court issued its Memorandum Opinion and entered judgment against the FTC on November 18, 2025. The court began by rejecting the FTC's argument that "if Meta broke the law in the past," the agency could seek an injunction "to redress the lingering harm." Op.23(JA814). The court held that Section 13(b) has a "forward-facing role" and that the FTC "can therefore seek to enjoin only conduct that currently violates the law or imminently will." *Id.* (cleaned up).

The court devoted the rest of the opinion to explaining why the FTC had failed to prove that Meta exercises monopoly power.[3]

---

[3] The Court did not address the exclusionary conduct element of the FTC's claim. It accordingly did not reach Meta's arguments that the acquisitions of Instagram and WhatsApp had been "grand slam homerun[s]" for consumers,

The district court first rejected the FTC's "direct evidence," holding that the FTC (1) failed to assess whether Meta's profits — which it had not shown were greater than other successful tech firms' — were due to "an enticing appeal to . . . advertisers," reward on risky investment, or exceptional management, rather than power over users, Op.25-26(JA816-17); (2) failed to show that the quality of Meta's apps had decreased, *see* Op.26-35(JA817-26); and (3) failed to show that Meta's "price discrimination" in setting ad load reflected anything other than the degree of market power present in nearly every real-world market. Op.35-36(JA826-27).

The district court then rejected the FTC's "indirect evidence" that the FTC's set of PSN apps (Meta's apps plus Snapchat and a small app called MeWe) are in a separate market from social media apps such as TikTok and YouTube and that Meta has a dominant share of that alleged market. The district court evaluated quantitative evidence of substitution as well as qualitative evidence concerning competitive decision-making by Meta and its rivals. The court held that evidence from "natural and field experiments" left "no doubt that TikTok and YouTube compete with Meta's apps." Op.52(JA843). The court further concluded that

defeating the FTC's claim of anticompetitive effects. *See* Dkt.626-01, at 48-60; *see also New York v. Meta*, 66 F.4th at 295.

TikTok and YouTube "compete enough to prevent [Meta] from exercising monopoly power." Op.53(JA844).

The district court rejected the FTC's contrary arguments. It began by noting concerns about the FTC's expert, Dr. Hemphill. Before the FTC filed suit, Dr. Hemphill (who is a lawyer and an economist) had met with the FTC, Department of Justice, and state attorneys general to encourage them to sue. Op.56-57(JA847-48). Before being retained as an expert, he "even advised the FTC on specific next steps," such as "whom the agency should subpoena" and other litigation tactics. Op.57(JA848). In light of this advocacy, the district court "doubt[ed] that he weighed the evidence objectively"; instead, "it was almost as if the FTC had put one of its own lawyers on the stand." *Id.* The district court nevertheless did not "reject such opinions merely because of potential bias" but "explain[ed] why they do not persuade on the merits." Op.58(JA849).

The district court then applied the *Brown Shoe* factors to further test the FTC's claim that PSN apps compete in a separate market. Overall, the court found that the apps the FTC identified as PSN apps "mostly resemble" TikTok and YouTube, and that TikTok and YouTube have at least as much of a constraining effect on Meta's apps as Snapchat. Op.76(JA867).

Having determined that (at least) TikTok and YouTube compete in the same relevant antitrust market with Meta's apps, the district court held that Meta's

market share was too low to support an inference of monopoly power — a conclusion that held even if only TikTok, not YouTube, were in the market. *See* Op.82-88(JA873-79).

## SUMMARY OF ARGUMENT

**I.** The district court correctly determined that quantitative evidence of strong substitution and qualitative evidence of competitive rivalry contradicted the FTC's claim that Meta exercises monopoly power unconstrained by competition from (at least) TikTok and YouTube. The district court's legal framework for evaluating the "direct" and "indirect" evidence of Meta's alleged monopoly power was faithful to precedent, and the district court's evaluation of the extensive trial evidence easily passes Rule 52's "clearly erroneous" review.

The district court properly applied both the "hypothetical monopolist test" — here, a conceptual rather than quantitative framework — and the qualitative factors set forth in *Brown Shoe* in determining that the FTC failed to carry its burden of proving a distinct "personal social networking" market. The FTC's critique of the district court's market-definition analysis rests on the claim (at 46) that the district court failed to address whether Meta "competed in a narrower PSN market limited to apps used for connecting with friends and family." But the district court focused on that very question and found that demand for friend-sharing on Meta's apps did not insulate Facebook and Instagram from competition

from TikTok and YouTube. Furthermore, the FTC preserves no challenge to the district court's application of the *Brown Shoe* factors, which, by itself, is fatal to its appeal on the merits.

The FTC's claim that the district court misapplied the hypothetical monopolist test by failing to consider the correct competitive baseline was not made below and is incorrect, as the district court asked and answered what the FTC concedes is the right question — whether Meta could profitably raise prices above (in this case, degrade quality below) the competitive level. The district court also explained why the FTC's reliance on the "*Cellophone* fallacy" did not undermine evidence that TikTok and YouTube are constraining substitutes, an analysis supported by evidence.

The FTC's cursory challenge to the district court's rejection of its supposed "direct" evidence of monopoly power fails for the reasons articulated by the district court following careful analysis of the trial evidence, an analysis the FTC largely ignores.

**II.** Section 13(b) of the FTC Act provides no support for the FTC's request for remand. Section 13(b) requires the FTC, to obtain injunctive relief, to prove — not merely to allege — that the defendant "is violating, or is about to violate" the antitrust laws. The FTC's argument that Section 13(b) is a mere pleading standard placing no limit on the FTC's authority to seek relief to address

lingering effects of past violations contradicts Supreme Court and court of appeals precedent holding that Section 13(b) authorizes the FTC to seek prospective relief to enjoin ongoing (or threatened) harm-causing conduct; it does not authorize retrospective relief. Nor does the FTC explain how the district court would (hypothetically) enjoin a no-longer-existing monopoly. The FTC's additional argument that the relevant language of Section 13(b) does not even apply when the FTC seeks a *permanent* injunction is forfeited and frivolous.

## STANDARD OF REVIEW

"[A] trial court's findings of fact in a bench trial . . . must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." *Overby v. Nat'l Ass'n of Letter Carriers*, 595 F.3d 1290, 1293-94 (D.C. Cir. 2010) (quoting Fed. R. Civ. P. 52(a)(6)) (cleaned up). "[T]his standard applies to the inferences drawn from findings of fact as well as to the findings themselves." *Id.* at 1294 (cleaned up). Legal questions are reviewed *de novo*.

Because "the definition of the 'relevant market' rests on a determination of available substitutes," *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986), the court of appeals "review[s] relevant market definitions as fact findings" for "clear error." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977-78 (9th Cir. 2023) (cleaned up); *see also United States v. Microsoft*

*Corp.*, 253 F.3d 34, 52 (D.C. Cir. 2001) (en banc) (rejecting challenge as "fall[ing] far short of what is required to challenge findings [supporting market-definition determination] as clearly erroneous"). Although a "district court's formulation of the [relevant] market tests may be freely reviewed on appeal as a matter of law," where a market-definition determination is based on "facts, . . . expert witness testimony, [and] . . . credibility determinations," the district court's conclusion "is not 'a matter of law,' . . . but a matter of fact." *United States v. U.S. Sugar Corp.*, 73 F.4th 197, 203, 207 (3d Cir. 2023).

## ARGUMENT

### I. THE DISTRICT COURT'S DETERMINATION THAT THE FTC FAILED TO PROVE THAT META HAS MONOPOLY POWER IS LEGALLY SOUND AND FACTUALLY SUPPORTED

Much of the evidence at the seven-week trial was focused on the extent to which TikTok and YouTube (and other apps, like X/Twitter, Reddit, and Pinterest) act as competitive constraints on Meta's market behavior. This Court's precedents make clear that this market-definition inquiry turns on substitution: "Because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level, the relevant market must include all products reasonably interchangeable by consumers *for the same purposes*." *Microsoft*, 253 F.3d at 51-52 (cleaned up; emphasis added; citation omitted).

The FTC staked its case on those four emphasized words, "for the same purposes." As the FTC concedes (at 38-39), its theory was that Facebook and Instagram — like Snapchat but unlike any other significant social media app — are used by consumers for "friends-and-family sharing." The FTC asserts (at 38) that "distinct consumer demand" gives Meta monopoly power, which manifests not in higher prices (the apps are free), but in lower quality and hence higher *quality-adjusted* prices.

But, as the district court noted, the test for whether a product market is correctly defined "does not focus on whether items have abstract qualitative differences but instead on the reality of what consumers would do." Op.39(JA830). "After all, whether a hypothetical monopolist could profitably raise prices — and therefore where the product market's borders lie — depends on which alternatives consumers would turn to and how readily they would do so, not on how different the products seem to a judge." *Id.* The FTC does not and cannot challenge the district court's framing of this central question.

The district court's opinion is a text-book illustration of how a court *should* answer that market-definition question, giving due weight to quantitative and qualitative evidence — including empirical evidence, *all* of which was on Meta's side. The FTC's merits arguments present factual disputes that ignore the district court's analysis, which forcefully rejected the arguments the FTC recycles here.

Moreover, the FTC does not properly challenge the district court's application of the *Brown Shoe* factors, which provides a sufficient basis to affirm.

### A. The District Court Correctly Held That the FTC Failed To Prove a Distinct Market for "Personal Social Networking" Services

#### 1. *Evidence of Consumer Substitution Belied the FTC's Proposed Market*

**a.** Empirical evidence demonstrated that "people treat TikTok and YouTube as substitutes for Facebook and Instagram, and the amount of competitive overlap is economically important." Op.56(JA847). In evaluating competitive constraints on social media apps, "the relevant question is not whether [a significant increase in quality-adjusted price] would cause people to stop checking [the app] at all, but whether it would cause them to use these apps *less* — and whether that shift in usage would make the [price increase] unprofitable." Op.40(JA831). Social media apps "compete over marginal time": "[W]hen people have a free moment, which app will they open, and how long will they spend on it?" *Id.* The trial evidence was overwhelming that TikTok and YouTube are the most important competitors (those that *constrain* Meta) for this "marginal time" — far more important than Snapchat, which the FTC *concedes* (at 38) is in the relevant market. *See* Op.47(JA838) (noting that the FTC "insists [Snapchat] is Meta's closest competitor").

The district court reviewed this evidence in detail. *See* Op.41-56(JA832-47). When TikTok launched in the United States, "Americans reallocated massive amounts of time from Facebook and Instagram to this new app." Op.42(JA833). "Meta observed widespread substitution from Facebook and Instagram to TikTok, and the rate of substitution was high enough to constrain Meta's growth." Op.43(JA834). Meta's expert, Dr. List, found (based on a study of 50,000 users), that when consumers reduce their usage of Facebook or Instagram, they are most likely to switch to YouTube, with TikTok second; similarly, when users spent *more* time on Meta's apps, that was most likely to come at the expense of YouTube and TikTok. *See* Op.43-44(JA834-35).

The district court further noted that all the experimental evidence of consumer substitution — Dr. List's path-breaking field experiment and four natural experiments from when certain apps became unavailable — "confirmed the observational evidence." Op.44(JA835).

Dr. List's field experiment involved paying users to reduce time spent on Facebook or on Instagram; those (small) payments led users to reduce time spent on the relevant app significantly, allowing Dr. List to observe where they spent time instead. The diversion of time from Facebook was greatest to YouTube, followed by Instagram and TikTok (all before Snapchat); the diversion of time from Instagram was greatest to YouTube, Facebook, and TikTok (also all before

Snapchat). *See* Op.45-46(JA836-37). Moreover, when those diversion numbers were adjusted to account for the amount of time users spent on the apps during the pre-payment period, "List's results grow even more striking": comparing "Indexed Diversion" — the ratio of diversion to pre-treatment time spent — showed diversion to TikTok and YouTube exceeding diversion to Snapchat, with "[n]o other app ha[ving] a ratio much above 1." Op.46(JA837). The court determined that Dr. List's field experiment "offers the single best evidence of what consumers consider alternatives to Meta's apps." *Id.*

The "natural experiments" involved (1) an outage of Meta's apps in 2021; (2) a ban on TikTok in India; (3) a half-day shutdown of TikTok in the United States in early 2025; and (4) a 2018 YouTube outage. The evidence from all those events told "a consistent and unmistakable story." Op.52(JA843). "When consumers cannot use Facebook and Instagram, they turn first to TikTok and YouTube. When they cannot use TikTok or YouTube, they turn to Facebook and Instagram." *Id*. "Against that unmistakable pattern, the FTC offers no empirical evidence of substitution whatsoever." Op.56(JA847).

The district court further concluded that substitution to TikTok and YouTube prevented Meta "from exercising monopoly power" — and therefore belied the FTC's proposed market definition. It relied first on the "magnitude of substitution"; TikTok and YouTube "compete fiercely over a meaningful share of

Meta's business." Op.53-54(JA844-45); *see also* Op.51(JA842) (noting, based on evidence from the 2025 TikTok outage, that "the amount of time that TikTok seems to be taking from Meta's apps is stunning"). Second, Meta "has made billions of dollars of investment decisions because it views TikTok and YouTube as serious competitive threats." Op.54(JA845). "[S]ubstitution from Meta to TikTok was so high that it forced Meta to fundamentally transform its apps." Op.55(JA846). This evidence of competitive constraint undermined the FTC's proposed market definition. *See*, *e.g.*, *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 26 (D.D.C. 2017) (merging parties "focus most of their competitive efforts within the [alleged] market"); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 52-53 (D.D.C. 2011) (internal documents tracking rivals' "marketing, product offerings, and pricing," and evidence that defendant "determined its own pricing and business strategy in relation to those companies' . . . products" supported conclusion that they were in the same market); DOJ & FTC Merger Guidelines § 4.2.A (2023) (evidence that firms "react by taking steps to preserve or enhance the competitiveness or profitability of their own products or services" in response to rivals is evidence that firms strongly compete).

**b.** The FTC argues (at 53) that evidence of substitution during short-term outages is not informative. But not all substitution evidence was from short-term outages — the Facebook Study data covered several months, as did the data from

the India TikTok ban. *See* Op.50(JA841) (evidence from India ban "measures long-term effects, confirming that substitution between Meta's apps and TikTok is not a passing phenomenon").

Furthermore, the FTC's criticism assumes that what matters is competition for *users* when, in fact, the district court found that what matters is competition for *usage*, "the best proxy for what drives these apps' revenue: ads." Op.82(JA873); *see* Op.83(JA874) (companies "understand themselves to be competing for users' time, not competing to get people to use their app at all"). Users "typically have multiple free apps, so the choice they face — when they are bored in line, sitting on their couch, or early to a date — is which app they will pop open and how long they will use it before switching to another." Op.83(JA874). Apps' ability to attract marginal usage in the short term provides constraining competition.

In any event, the district court acknowledged the FTC's critiques, *see* Op.55(JA846), but reasonably concluded that, "[w]hile each of Meta's empirical showings can be quibbled with, they all tell a consistent story": TikTok and YouTube are economically significant substitutes for, and competitive constraints on, Meta's apps. Op.56(JA847). The FTC does not argue that this conclusion was clear error. And it offers no support for any argument that the district court was legally compelled to disregard expert testimony (the admissibility of which the FTC never challenged) confirming that this evidence was informative of

competition-constraining substitution. *See*, *e.g.*, 05/21 AM Tr.67:17-21(JA1199) (Carlton). Its arguments merely reprise failed post-trial advocacy, posing no proper appellate challenge.

#### 2. *The Evidence Supported the District Court's Finding That Users Substitute Time Spent on TikTok and YouTube for "Friends and Family Sharing" Time on Facebook and Instagram*

The district court further found that users substitute time spent on TikTok and YouTube specifically for time spent on connected content — that is, "friends and family sharing" — on Facebook and Instagram. This evidence undermined the FTC's claim that supposedly distinct demand for friends-and-family content insulated Meta from competition by TikTok and YouTube. *See* Op.60(JA851) ("[C]onsumers treat connected and unconnected content as substitutes."); *cf.* *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104-05 (2d Cir. 1995) ("[W]hile many consumers state a preference for the familiar Kodak brand name, the empirical evidence of what consumers actually do indicates that consumers find non-Kodak film to be an acceptable substitute.").

The district court specifically called out at least five categories of such evidence:

*First*, when TikTok gained users and usage — taking time away from Facebook and Instagram — this substitution occurred *before* Meta added its Reels short-form video feature, indicating that users were substituting time spent viewing

unconnected content on TikTok for "friends and family" time spent on Meta's apps. *See* Op.43(JA834); *see also* Op.61(JA852) ("[W]hen TikTok first gained a foothold[,] it crimped the growth of time spent on every part of Facebook and Instagram, not just videos.").

*Second*, substitution to TikTok and YouTube during the 2021 Meta outage happened at a time when Reels "was still in its infancy." Op.47(JA838). Again, this showed that users "were . . . not trying to replace unconnected videos but instead content from their friends," indicating that "connected and unconnected content might compete with one another." *Id.*

*Third*, the court pointed to evidence of shifts in usage of Meta's apps' own features. When Meta introduced Reels for some users but not others, users with Reels spent less time on Feed and Stories (which the FTC has argued are used for friends-and-family sharing), thus "treat[ing] unconnected Reels as a substitute for the parts of the app where they would see posts from their friends." *See* Op.60-61(JA851-52).

*Fourth*, Snapchat found similar substitution patterns in its ordinary-course business analyses. Op.61(JA852). "Another source of evidence, another confirmation that people use TikTok as a substitute for content from friends." *Id.*

*Fifth*, empirical results from the 2025 TikTok outage undermined the FTC's proposed market definition. *See* Op.51(JA842). "[A]ccording to the FTC's theory,

TikTok and YouTube are video-entertainment apps, while Facebook and Instagram are used for personal social networking." *Id.* (citation omitted). But consumers did not treat YouTube as the closest substitute for TikTok; "people evidently thought that the closest platforms to TikTok were Facebook and Instagram." *Id.* The court continued:

> It is unclear whether that was because Meta's apps are really entertainment apps, because TikTok is really a social-networking app, or because those artificial categories do not make sense. What is clear is that the FTC's hypothesis about how people use these apps is consistently disproven by the data.

*Id.*

### 3. *The District Court's Application of the* **Brown Shoe** *Factors Further Disproved the FTC's Proposed Market Definition*

The district court's application of the *Brown Shoe* factors provided independent confirmation that "personal social networking is not a separate product market." Op.76(JA867); *see Rothery Storage*, 792 F.2d at 218 & n.4 (explaining *Brown Shoe* "practical indicia").

Under the rubric of "[p]eculiar [c]haracteristics and [u]ses," the district court considered "how Meta's apps differ from TikTok and YouTube" and "how important those differences are in the context of the overall apps." Op.63(JA854). The FTC had made much of the supposed difference between PSN apps' "social graph" — connections among people and entities using a social network — and the "content graph," i.e., "a map of the topics that a user is interested in" that the FTC

said characterized TikTok and YouTube. Op.64(JA855); *cf.* FTC Br. 40. But the evidence showed that TikTok "has a social graph, too," and is "committed to building [it] out"; while "[c]ontent from friends that is delivered through a social graph is a tiny minority of what users see on Meta's apps." Op.64-65(JA855-56). Instead, as do TikTok and YouTube, Meta mostly shows users "unconnected content recommended by AI algorithms." Op.65(JA856); Op.16(JA807) (testimony of the head of Instagram: "we have met in the middle, so to speak").

Furthermore, the apps "deliberately copy each other" and "compete to attract the same content creators." Op.66(JA857). "When apps inside and outside the FTC's alleged market are deliberately offering the same features and competing to get the same people to post the same videos, that is strong evidence that they are competing for the same users who are after the same things." *Id.* While it is "natural to post a vacation photo to Instagram or a life update to Facebook" — something users are less likely to do on TikTok or YouTube — this "difference . . . is a minor one," given that "[p]eople seldom post on Facebook or Instagram these days." Op.67(JA858).

Rather than posting content for all connections to view, the "dominant way that people use Meta's apps to connect with friends is by sharing content in private messages or texts." Op.67-68(JA858-59). This is "the same way they share content from TikTok or YouTube." Op.68(JA859). "Meta's apps are primarily

recommendation systems hooked onto messaging tools. Their characteristics and uses are hardly peculiar." Op.70(JA861).

The "industry recognition" factor also "weigh[ed] against the FTC's proposed market." Op.74(JA865). The district court acknowledged evidence that, "in internal and external discussions, industry experts typically agreed that Facebook and Instagram let users keep up with friends, that TikTok and YouTube are less effective at this, and that this makes them different options." Op.71(JA862). But "many industry executives make no such distinction and consider our four apps, and others, part of a single category." *Id.* More important, "the evidence overwhelmingly shows that industry insiders think that TikTok and YouTube compete with PSN apps." Op.72(JA863). "TikTok and YouTube tracked Meta's products as competitive threats," and Meta's "business documents created outside litigation reflect a consistent and urgent focus on TikTok's competitive threat." Op.72-73(JA863-64). This recognition "that the apps compete" is "more probative of whether there is industry recognition of the [alleged PSN market] as a separate economic entity." Op.74(JA865) (cleaned up).

Reviewing the evidence concerning the remaining *Brown Shoe* factors, the district court found that they too "cut[] against the agency." Op.75(JA866). "Apps inside and outside the FTC's proposed market . . . share similar raw ingredients and similar technology to build them into similar experiences";

customers of the apps "are not distinct"; "price . . . is identical"; and "if Meta tried to raise its sticker price, users would flee." Op.75-76(JA866-67).

Considering all the *Brown Shoe* factors, the district court concluded that apps both inside and outside the FTC's proposed PSN market have "identical" features; "people mostly use all four to watch unconnected content that they can send in direct messages, industry participants agree that the apps belong in the same competitive market, they use similar resources and technologies, and they charge the same price." Op.76(JA867). Accordingly, "[e]ven when considering only qualitative evidence, . . . Meta's apps are reasonably interchangeable with TikTok and YouTube." *Id.*

### B. The FTC Identifies No Error in the District Court's Market-Definition Analysis

The FTC's merits arguments offer no serious appellate challenge to the district court's articulation of governing market-definition principles or the application of those principles to the evidence.

To begin with, the FTC does not develop *any* challenge to the district court's application of *Brown Shoe*. The FTC concedes (at 37) that "evaluation of 'practical indicia' such as the factors outlined in *Brown Shoe*" is an "established method[] for defining a product market." The district court evaluated those factors in light of the evidence and reached the factual determination that those factors —

even without considering quantitative evidence of substitution — defeated the FTC's proposed market definition. Op.76(JA867).

The FTC does not articulate *any* argument — much less one that respects Rule 52(a)(6)'s clear-error standard — that the district court's evaluation can be reversed. The FTC's recitation of its favorite evidence (at 38-42) gets the FTC nowhere, particularly absent an argument (which it does not make) that the district court erroneously disregarded any of it. *See United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012) (a showing "that the record can support alternate interpretations . . . is far from proof that the district court's reading of [the evidence] is clearly erroneous"); *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 22 (D.C. Cir. 2011).

The FTC asserts (at 43 & 60 n.14) that supposed errors of economic reasoning it purports to find in the district court's opinion — directed to the court's analysis of substitution evidence — undermine the *Brown Shoe* analysis as well. But such a passing assertion cannot preserve an argument, *see City of Waukesha v. EPA*, 320 F.3d 228, 254 (D.C. Cir. 2003) (per curiam), which is unexplained (and inexplicable, given the nature of the FTC's claimed errors). The FTC's failure to preserve any challenge to the district court's *Brown Shoe* analysis, by itself, defeats its market-definition challenge.

Even setting this forfeiture aside, the FTC's arguments have no force because they ignore the substance of the district court's opinion and the reasons it gave for rejecting the very arguments the FTC recycles here.

### 1. *The District Court Properly Considered Whether the FTC's Proposed "PSN" Market Was Consistent with the Evidence*

The FTC claims (at 43-44) that the district court failed to consider whether — notwithstanding competition "to show users AI-recommended videos" — there was a separate market for PSN apps, but that is *exactly* the question the district court answered. As the FTC concedes (at 46), the district court was aware that "companies can operate in multiple and concentric relevant markets," and it articulated the "fundamental point" the FTC argues (at 3) it supposedly "failed to grasp." *Compare* FTC Br. 3 (analogy to a grocery store adding "a pet food section") *with* Op.60(JA851) (same analogy). Contrary to the FTC's bluster, the district court rejected the FTC's argument because the *evidence* belied it — the claimed error is not one of law at all.

**a.** The market-definition inquiry helps answer whether a defendant can exploit consumers with a demand for its product or whether available substitutes will prevent such exploitation (typically, price increases) because consumers will go elsewhere. *See Rothery Storage*, 792 F.2d at 218; *see also* Economists' Br. 6 (recognizing the point). As the district court understood, *see* Op.60(JA851), *cf.* FTC Br. 49-50, the FTC's theory was that users who want to share content with

friends and families lack close substitutes for Facebook and Instagram, even if they have alternatives for other uses of those apps. But the district court found that user demand for friend-sharing did not insulate Facebook and Instagram from competition from TikTok and YouTube.

*First*, by any accounting, content posted by friends has become a small fraction of the content that users see on Facebook and Instagram — less than 15% of posts in Facebook's News Feed and 5% on Instagram's Feed. *See* Op.9(JA800). Almost none of the content on Reels — the most popular feature of both Facebook and Instagram — is from friends. *See id.* Because the FTC does not question that users *can* substitute to other apps (including TikTok and YouTube) at least for short-form video, that competition will protect *all* users of Meta's apps unless Meta has the ability to discriminate against those users with a preference for a particular feature that is (hypothetically) unavailable elsewhere. *See United States v. Engelhard Corp.*, 126 F.3d 1302, 1306 (11th Cir. 1997) ("[I]t is possible for only a few customers who switch to alternatives to make the price increase unprofitable, thereby protecting a larger number of customers who would have acquiesced in higher . . . prices."). The district court concluded that Meta cannot discriminate that way. "[Q]uality mostly does not vary across users: apps have the same features, layout, speed, reliability, and privacy practices for everyone." Op.78(JA869). And the FTC's claim that Meta could discriminate by showing

users with a preference for friends-sharing more ads was not only implausible (since "it is hard to see how . . . small[ ] variations in ad load could possibly constitute a significant difference in price") but also "contradicted by the evidence." *Id.*

*Second*, as explained above, the evidence showed that users "treat connected and unconnected content as substitutes." Op.60(JA851); *see supra* pp. 27-29. This means, contrary to the FTC, that apps need not duplicate the friends-and-family sharing features of Facebook and Instagram to act as competitive constraints, because enough users will turn to unconnected content as an alternative in response to any deterioration in relative quality.[4] *See* Op.82-83(JA873-74) (explaining that apps compete to attract additional *usage* not *users*, which is how "users themselves experience the relevant choice"); Op.40(JA831) (explaining competition for "marginal time"); *see also Microsoft*, 253 F.3d at 51-52 ("same purposes" inquiry turns on "the ability of consumers to turn to other suppliers," thus "restrain[ing] a firm from raising prices above the competitive level"). There was extensive

[4] To use the FTC's analogy (at 45), if enough consumers like hamburgers and chicken sandwiches equally and choose between them based on price and quality, competition from Chik-fil-A could constrain McDonald's market power as effectively as competition from Burger King — even if some number of consumers strongly prefer hamburgers. *Cf. In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 936 (9th Cir. 2025); *see* 05/21 PM Tr.136-52(JA1208-24) (Carlton) (explaining absence of evidence of price discrimination based on friend-sharing).

*qualitative* and *quantitative* evidence of this precise substitution pattern. The FTC does not begin to explain why crediting that evidence constitutes error — let alone clear error.

*Third*, the FTC's premise — that Meta's apps satisfy demand for friend-sharing that other apps cannot meet — was likewise undermined by the evidence, which showed that only a small proportion of users post content, and that, instead, the "dominant way that people use Meta's apps to connect with friends is by sharing content in private messages or texts," which (as noted above) is "the same way they share content from TikTok or YouTube." Op.67-68(JA858-59). Those apps thus satisfy demand for friend-sharing just as Meta's apps do — even if there are, of course, distinguishing features of every app. *IGT v. All. Gaming Corp.*, 702 F.3d 1338, 1347 (Fed. Cir. 2012) (differentiated products compete).

**b.** The FTC cites cases, but none helps it. The district court relied on *United States v. Cont'l Can Co.*, 378 U.S. 441 (1964), for the proposition that products with qualitative differences may still be reasonably interchangeable — as is the case with Meta's apps, TikTok, and YouTube. The FTC failed to carry its burden of proving the contrary, so it lost. In *United States v. Connecticut National Bank*, 418 U.S. 656, 662-66 (1974), the government proved that competition with savings banks for some banking services did not constrain commercial banks in the provision of others, justifying recognition of a distinct market for commercial

banks. The FTC failed to carry its burden of proving that was true for "friends-and-family sharing" on PSN apps, so it lost.

In *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008), two judges decided (for different reasons) that the FTC made a sufficient showing, for purposes of granting a preliminary injunction, that competition from conventional grocery stores might not constrain the exercise of monopoly power by a hypothetical monopolist of premium-and-natural food stores. The FTC failed to carry its burden of showing that TikTok and YouTube similarly fail to constrain Meta, so it lost. And so on. The FTC does not articulate a *legal* principle that the district court disregarded.

Whether consumers treat non-PSN alternatives as close-enough substitutes for PSN apps to constrain the exercise of monopoly power — the central question in the case — is an issue of fact, and the district court resolved it against the FTC. *Cf. Microsoft*, 253 F.3d at 52 (rejecting challenge to market-definition holding where defendant "does not argue that the District Court's findings do not support its conclusion"). The FTC's assertion that the district court did not understand its theory, when the district court articulated and rejected that theory because the evidence belied it, is nothing but pretense.

### 2. *The District Court Properly Applied the "Hypothetical Monopolist Test" Analysis*

The FTC's argument that the district court applied the wrong "competitive baseline" when it performed its "hypothetical monopolist" analysis was not preserved before the district court and is baseless.

The hypothetical monopolist test (or "HMT") tests the boundaries of a proposed antitrust market by asking whether a single firm would be able to impose a significant price increase without losing too many sales for such an increase to be profitable; if not, the candidate market is too narrow. *See Husky Mktg. & Supply Co. v. FERC*, 105 F.4th 418, 421 n.* (D.C. Cir. 2024); *see also* Op.38(JA829). The test sometimes involves quantitative econometrics, but no one performed a quantitative HMT in this case (or even proposed a method for doing so, given the apps' zero price); accordingly, the district court "ma[d]e a qualitative, holistic appraisal," asking "could Meta maximize its profit by making its apps significantly worse than they would be in a competitive world, or is it constrained by competition from TikTok and YouTube?" Op.56(JA847). The FTC does not dispute that this is the right question; the district court determined (based on evidence) that TikTok and YouTube *do* impose such constraints.

The FTC argues (at 55) that the district court failed to "consider [a] competitive baseline" of "a world in which Instagram is independent of Meta." But the FTC made no argument in the district court that construction of a

"competitive baseline" in which Instagram was independent from Meta needed to be factored into the HMT, much less explained how doing so would change the analysis. It therefore cannot raise that argument on appeal. *See Salazar ex rel. Salazar v. District of Columbia*, 602 F.3d 431, 434 (D.C. Cir. 2010).

In any event, the FTC offers nothing to support its claim of error, much less clear and prejudicial error. The FTC cites *nothing* to indicate that the court "assumed that present conditions are competitive" or that it asked "whether Meta could make its apps slightly [sic — the test is significantly] worse than they are *now*." FTC Br. 56. On the contrary, the district court expressly framed the issue as whether Meta could "maximize its profit by making its apps significantly worse than they would be *in a competitive world*." Op.56(JA847) (emphasis added). That is exactly what the FTC says is the right test.

Aggressive rhetoric about the district court's supposed "conceptual[] incoheren[ce]" aside, the FTC does not begin to show how this supposed error affected *any* factual finding. The district court's conclusion was fully supported: because of competition from TikTok and YouTube, Meta cannot degrade its apps' quality without losing enough users and usage to rivals to make such a move unprofitable. That conclusion did not depend on — or even refer to — any particular "competitive baseline."

### 3. *The District Court Was Mindful of the* "Cellophane *Fallacy*"

The FTC's resort to the so-called "*Cellophane* fallacy" ignores the district court's careful explanation for rejecting its arguments. The *Cellophane* fallacy involves the failure to recognize that an alternative product, which might appear to be an adequate substitute when the product of interest is sold at a monopoly price, might *not* be a substitute at a competitive price — in other words, apparent substitution might not be constraining the monopolist to set prices at competitive levels. *See* Op.58(JA849) ("This principle warns that consumers are more likely to turn to alternatives if a product is already priced above competitive levels[.]").[5]

The district court properly framed the concern, and it explained why "the fallacy" was not "too worrying here." *Id.* *First*, the possibility that Meta's apps are below a competitive level of quality "would not affect the *order* of substitution." *Id.* The FTC (at 61), citing nothing, disagrees, but the district court's statement is supported by evidence, *see* 05/19 AM Tr.107(JA1179) (List); 05/21 AM Tr.92-93(JA1202-03) (Carlton); there is no clear error. *Second*, the

[5] As the FTC acknowledges (at 58), its arguments regarding the *Cellophane* fallacy and the district court's supposed "competitive baseline" error are two sides of the same coin: both involve over-crediting substitution evidence because real-world prices are (supposedly) above the competitive level. The district court's reasons for rejecting the FTC's arguments regarding the *Cellophane* fallacy thus further undermine the FTC's arguments regarding the court's application of the HMT.

FTC primarily argued that the supposedly supracompetitive price of Meta's apps was reflected in higher ad load, but "ads have such marginal effects on users' behavior that [it] is hard to imagine that they are yanking substitution rates around" — any difference between competitive and supracompetitive ad loads is unlikely to affect substitution significantly. Op.59(JA850). *Third*, because the FTC failed to present evidence that Meta's apps are priced above a competitive level, its assertion that they *might* be gave the district court no reason to disregard the "substitution evidence." *Id.*; *see also PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 258 (S.D.N.Y. 2000) (rejecting *Cellophane* theory where "PepsiCo has not submitted any evidence to show that Coca-Cola's prices are supracompetitive"), *aff'd*, 315 F.3d 101 (2d Cir. 2002).

The FTC criticizes the district court's reasoning, but leaving aside the vacuousness of those criticisms, they fail because the FTC cites nothing to establish clear error. The district court heard and considered evidence including testimony of both sides' experts, even putting aside the FTC's expert's bias and lack of credibility. *See* Op.58(JA849). Nothing the FTC argues undermines the district court's weighing of the evidence.

### C. The District Court Properly Rejected the FTC's "Direct" Evidence

The FTC does not question that, if this Court upholds the district court's determination that the FTC failed to show that TikTok and YouTube — or even

just TikTok — are outside the relevant market, Meta's market share is too low to support an inference of monopoly power.[6] All that remains is the FTC's argument that the district court erred by rejecting the FTC's "direct" evidence of monopoly power. But the district court explained its reasons for rejecting the FTC's evidence; the FTC's challenge ignores the district court's explanations and the "clear error" standard.

**1.** With respect to profits, the district court rejected the FTC's evidence, not because of confusion between economic and accounting profits, *see* Op.24(JA815), but because the FTC failed to establish that Meta's profits reflected lack of competition for user engagement rather than "several other factors . . . , none of which the FTC has foreclosed," Op.25(JA816). Those include its "appeal to . . . advertisers"; "appropriate reward for risky investments"; and exceptional management. *Id.* Moreover, the agency "did not even show that Meta's profits are greater than other successful tech firms'." Op.26(JA817). Furthermore, Meta's "alleged monopoly profits are rising" even though the FTC conceded that Meta's apps are increasingly subject to competition from TikTok and YouTube (even if

[6] Because the FTC does not challenge this aspect of the district court's judgment, the argument of American Antitrust Institute cannot preserve the issue for review. *See Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*, 158 F.3d 1335, 1338 (D.C. Cir. 1998).

not in "friend sharing"), making it "unlikely that the [alleged monopoly] is driving [Meta's profits]." *Id.*

The FTC argues (at 64-66), citing *United States v. Grinnell Corp.*, 384 U.S. 563 (1966), that the existence of profits, by itself, proves monopoly power, and that the considerations cited by the district court were relevant to the source of the monopoly, not the profits. That is wrong. While economic profits indicate that a firm has *some* degree of market power — profits are inconsistent with perfect competition — they do not imply that a firm has "monopoly power" in the legal sense. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 392-93 (1956); *cf.* Op.36(JA827) (rejecting FTC's argument that price discrimination implies monopoly power) (citing *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 44-45 (2006)). A "competitive firm" that has made risky but successful investments or that has exhibited superior efficiency "may be highly profitable" though not a monopolist. *Blue Cross & Blue Shield v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) (Posner, J.) (discussing economic, not accounting, profits); *see also Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1252 (11th Cir. 2002) (discussing non-monopoly sources of economic profits distinct from "differences in accounting"). The FTC cites nothing in *Grinnell* to support any contrary argument. *Cf. Grinnell*, 384 U.S. at 571 ("The existence of [monopoly] power ordinarily may be inferred from the predominant share of the market."). Moreover,

the FTC ignores the district court's observation that Meta's alleged profits reflect the success of its *advertising* business and imply nothing about power over *users*. Nor does the FTC address the court's point that, according to the FTC, power over users is declining while profits are rising.

**2.** The FTC's arguments regarding allegedly declining quality of Meta's apps identify no legal error; the FTC highlights isolated pieces of evidence without attempting to show that the court's conclusions, based on the full record, were clearly erroneous. The burden was on the FTC to demonstrate an overall decline in quality, but it failed. *See* Op.27(JA818) ("The Court simply does not find it credible that users would prefer the Facebook and Instagram apps that existed ten years ago to the versions that exist today."). And the FTC's assertion (at 67) that the district court failed to consider whether quality would have been even better in a but-for world is unsupported: the FTC points to *no* overall quality metric and cannot show that quality is worse relative to *any* benchmark.

The FTC points to increased ad load, but the district court explained that ad load (like other individual quality metrics) implies nothing about overall quality. *See* Op.28(JA819) ("When Meta has stuffed its apps with more ads *and* upgraded them with new features, it is not clear that the company has reduced quality overall."). Moreover, an increase in ad load does not even imply that *any* aspect of quality has declined since "the effect of ads on users' experience depends on not

only their number but also on their quality and relevance"; and "[a]ll the evidence . . . shows that [ad] quality has increased." *Id.* As for "privacy," the FTC points to survey results as the sole evidence that Meta's apps privacy practices are "poor," but the district court explained that such survey evidence measures "response to external events" and does not measure quality — of privacy practices or anything else. Op.31(JA822). The FTC ignores the explanation.

## II. THE DISTRICT COURT PROPERLY HELD THE FTC TO THE BURDEN OF ESTABLISHING AN ONGOING VIOLATION OF THE ANTITRUST LAWS

### A. Section 13(b) Required the FTC To Prove That Meta Was Violating the Antitrust Laws

**1.** Section 13(b) does not support the FTC's effort to avoid the merits because the district court correctly held the FTC to its burden of proving an ongoing violation of Section 2. The Supreme Court and the courts of appeals have construed Section 13(b) to authorize "prospective, not retrospective" relief. *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 76 (2021); *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 772 (7th Cir. 2019) (Section 13(b) requires that "the defendant must be 'violating' or 'about to violate' the law"). The district court accordingly was correct to hold that "[t]he FTC can . . . seek to enjoin only conduct that currently violates the law or imminently will." Op.23(JA814).

That conclusion is fairly compelled by *AMG Capital*. In that case, as the FTC notes, the Supreme Court held that Section 13(b)'s grant of authority to seek a

"permanent injunction" in "proper cases" did not authorize the FTC to seek restitution. *See* 593 U.S. at 75. Writing for a unanimous Court, Justice Breyer acknowledged that the statute's use of the word "injunction," standing alone, did not rule out authority to seek equitable monetary relief. *Id.* But additional considerations confirmed that the FTC's authority did not extend so far. First, the "'is violating' and 'is about to violate' (not 'has violated')" language in Section 13(b) "set[s] forth when the Commission may request injunctive relief." *Id.* at 75-76; *see also Credit Bureau*, 937 F.3d at 772. Section 13(b) gives the FTC the ability to stop (or prevent) a harmful practice, it does not provide a retrospective remedy. In addition, the Supreme Court noted that "the provision addresses a specific problem, namely, that of stopping seemingly unfair practices from taking place while the Commission determines their lawfulness" in an administrative proceeding. *AMG Cap.*, 593 U.S. at 76.

The Court's reasoning fully supports the district court's interpretation of the statute. Because Section 13(b) authorizes the FTC only to seek to enjoin ongoing (or imminently threatened) violations, the FTC was required to establish, as a prerequisite for relief, that Meta was violating Section 2 of the Sherman Act — which required the FTC to demonstrate that Meta has monopoly power.

*AMG Capital* also forecloses the FTC's argument that Section 13(b) imposes a mere pleading requirement. *AMG Capital* precluded the FTC from seeking

monetary relief because the statute is designed solely to allow the FTC to seek prospective relief; that is, to put a stop to a practice that threatens continuing harm. *See also Credit Bureau*, 937 F.3d at 773 ("The public interest in stopping or preventing a violation is distinct from the public interest in remedying a past harm."). By the same token, Section 13(b) does not allow the FTC to obtain relief based on proof of a *past* violation; it must indeed "demonstrate an ongoing antitrust violation." FTC Br. 25; *see FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985) (holding that Section 13(b) "cannot be used to remedy past violations").

*FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019), does not support the FTC. That case *rejected* the FTC's argument that it could pursue an injunction "under Section 13(b) . . . when it shows a reasonable likelihood that past violations will recur"; instead, Section 13(b) "prohibits existing or impending conduct" and "does not permit the FTC to bring a claim based on long-past conduct without some *evidence* that the defendant 'is' committing or 'is about to' commit another violation." 917 F.3d at 156 (emphasis added). The Third Circuit's reference to "evidence" shows that the court understood that Section 13(b) is not merely about pleading; moreover, it did not address (much less endorse) the FTC's position here. *Id.*

Contrary to the FTC's argument (at 26), it cannot obtain relief under Section 13(b) by showing a past violation and seeking an injunction to address supposed "lingering effects." Such relief is not "prospective," *AMG Cap.*, 593 U.S. at 76, in the sense of addressing any "ongoing [or] imminent future *violation[],*" *Credit Bureau*, 937 F.3d at 774 (emphasis added). An injunction that does not enjoin any current or future violation is retrospective — by its terms, it addresses the effects of past conduct. *See Evans Prods.*, 775 F.2d at 1085. Such relief is thus not available under Section 13(b). *See FTC v. AbbVie Inc.*, 976 F.3d 327, 376 (3d Cir. 2020) ("if a violator's conduct is neither imminent nor ongoing, there is nothing to enjoin").

The FTC cites *no* authority under the FTC Act to support its position. *Wilk v. AMA*, 895 F.2d 352 (7th Cir. 1990), *ES Development, Inc. v. RWM Enterprises, Inc.*, 939 F.2d 547 (8th Cir. 1991), and *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231 (9th Cir. 1976), are cases addressing the appropriate scope of relief under Section 16 of the Clayton Act, which does not impose the limitations imposed by Section 13(b).[7] Moreover, none of the cases upheld an injunction

[7] In drawing a comparison between the two provisions, *see* States' Br. 5-7, the States ignore the many differences in language, structure, and purpose between them. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969) (noting that "§ 16 of the Clayton Act . . . was enacted by the Congress to make available equitable remedies previously denied private parties, invok[ing] traditional principles of equity and authoriz[ing] injunctive relief upon the

based simply on the interest in addressing "lingering effects" of past conduct: *Wilk* was directed at the threat of a recurring boycott, *see* 895 F.2d at 368; *ES Development* barred conspirators from perpetuating conspiratorial conduct on an individual basis, *see* 939 F.2d at 557-58; and the court in *Air Pollution* held that the equitable remedies that plaintiffs sought were unavailable, *see* 538 F.2d at 237. In any event, dicta from those cases says nothing about the scope of Section 13(b).

Furthermore, the FTC offers no explanation as to what "lingering effects" means or what relief it could seek. The FTC claims that, by acquiring Instagram and WhatsApp, Meta gained a monopoly; but the district court found that Meta has no monopoly today, irrespective of whether there is "ongoing . . . competition between Facebook and Instagram." FTC Br. 26. Even on the unproven assumption that competition was ever impaired, the court found that competition has been restored. The district court found that, in the absence of proof of a monopoly today, there was nothing to justify relief; the FTC offers nothing of substance to contradict that conclusion.

**2.** The FTC's argument (at 28-29) — supported by the State amici — that limiting Section 13(b) to its terms would undermine the FTC's enforcement

---

demonstration of 'threatened' injury"). For its part, *the FTC* makes no argument that Section 13(b) must be read *in pari materia* with Section 16 of the Clayton Act, a provision the FTC does not even cite.

authority cannot overcome the statutory text or Supreme Court precedent; the FTC's arguments have no force in any event.[8] "Ever since the Commission's creation in 1914, it has been authorized to enforce the [FTC] Act through its own administrative proceedings." *AMG Cap.*, 593 U.S. at 72. By contrast, the authority to seek a federal-court injunction under Section 13(b) has "a limited purpose" as an adjunct to the FTC's administrative enforcement scheme, allowing for prospective relief against ongoing or imminent violations. *Id.* at 75.

Even if that authority extends to seeking a permanent injunction to stop ongoing (or imminent) conduct when no administrative proceeding is pending or contemplated,[9] there is no need to extend such authority to cases of purely past violations. In such cases, "[n]othing . . . prohibits the Commission from using its authority under § 5 and § 19." *Id.* at 82. Nor would limiting Section 13(b) to its terms invite strategic evasion: if a defendant temporarily ceased unlawful conduct while remaining poised to resume it, Section 13(b)'s "about to violate" language would be available. And it is *not* "likely that Congress, without mentioning the

---

[8] The FTC's suggestion that defendants will have an incentive to delay is unintentionally ironic: the FTC took advantage of the non-applicability of laches to pursue a challenge to transactions that had closed nearly a decade earlier — making its case "not only odd, but old." *New York v. Meta*, 66 F.4th at 295; *see* MTD Op.53(JA198).

[9] In *AMG Capital*, the Supreme Court assumed this authority exists without deciding the question. *See* 593 U.S. at 78. The question is not jurisdictional, and this Court need not address it. *See supra* note 1.

matter, would have granted the [FTC] authority so readily to circumvent its traditional § 5 administrative proceedings." *Id.* at 78.

Furthermore, the FTC's position — not the district court's holding — is (in the FTC's words, at 28) "illogical and anomalous." The FTC never explains *why* the statute requires the FTC merely to *plead* an ongoing violation and not to *prove* one, nor does it point to any other statute that creates a comparable disconnect. Moreover, the FTC asserts that, once it pleads an ongoing violation, it does not matter whether it can prove that there was one even at the time of the complaint: instead, the FTC suggests (at 22), the question is whether Meta had a monopoly "at the time of the allegedly anticompetitive conduct" — in this case, 2012 and 2014, when Instagram and WhatsApp were acquired. But if the violation was in the past when the FTC sued, the case should have been dismissed for that reason. *See supra* pp. 4-5 & note 1.

Although the district court addressed the FTC's statutory argument on the merits, it noted that it was "arguably waiv[ed]," Order at 4(JA667), and that observation was amply supported. It was not until mid-trial that the FTC first argued that it was not required to prove an ongoing violation, even though the district court had made its burden clear repeatedly, the FTC itself relied on the most recent available data, and the FTC persistently examined witnesses about current market conditions. *See supra* pp. 8-9, 11-12. Under such circumstances,

the FTC's last-minute objection reflects less a principled reading of the statute and more a last-ditch effort to change the rules of a contest it was losing. *Cf. Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 331-32 (1971) ("[W]e cannot say that the judge abused his discretion or stressed too much the value of avoiding reopening a trial to litigate matters that [a party] had had an opportunity, but neglected, to litigate.").

**3.** The FTC does not explain what it should have had to prove or what evidence it offered to prove it; that is reason enough to reject its argument. Under 28 U.S.C. § 2111, the FTC must show that the district court's supposed error "affect[ed] the [FTC's] substantial rights." *Combat Veterans for Cong. v. FEC*, 795 F.3d 151, 157 (D.C. Cir. 2015). When a court applies an incorrect legal standard, the burden to show prejudicial error is not onerous; the appellant must show that the error of law "may well have influenced [the court's] ultimate conclusion." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). But without explaining what it should have been required to show, what evidence it introduced to show it, and how evidence that the district court improperly considered was decisive, the FTC does not meet that threshold burden.

The FTC's only specific complaint seems to be that the district court should not have admitted post-discovery evidence. But the FTC concedes (at 25) that such evidence was relevant to remedy; and, in the absence of evidence of

continuing monopoly power, no injunction could issue. Op.24(JA815). There could be no reason for the district court to blind itself to the facts.

Moreover, the FTC does not argue and could not begin to show that post-discovery evidence changed the outcome. Almost all the documentary evidence relied on was produced prior to the close of fact discovery; almost all the empirical analyses conducted by Meta's experts were based on data produced during fact discovery and were disclosed in their expert reports. Data related to the 2025 TikTok outage was consistent with the rest of the substitution data the district court considered — further confirmation, not a late-breaking change. *See* Op.56(JA847) (all the empirical evidence "tell[s] a consistent story," while "the FTC offers no empirical evidence of substitution whatsoever"). The FTC cannot support any assertion that the district court reached a different conclusion because it considered "post-discovery developments." FTC Br. 28.

Nor does Rule 37 support the FTC's argument: the FTC does not and cannot argue that the district court abused its discretion by admitting evidence of post-discovery developments, nor does it question the district court's holding that the FTC suffered no prejudice. *See Parsi v. Daioleslam*, 778 F.3d 116, 125 (D.C. Cir. 2015) ("[W]e review discovery-related orders for abuse of discretion, a narrowly circumscribed scope of review.") (cleaned up). Again, that evidence confirmed market developments already evident years earlier, including the rise of

TikTok, the declining importance of connected content, the rise of messaging for sharing with friends, the centrality of algorithmic recommendations, the strong substitution of user time among Meta's apps, TikTok, and YouTube. *See also* Op.10-14(JA801-05) (explaining transformation in "scrolling and sharing" on Meta's apps over the last decade). Nothing in the district court's opinion suggests that this was a close case, much less that admission of post-discovery evidence tipped the scales.

### B. The FTC's Argument That Section 13(b) Grants the FTC Unlimited Authority To Seek a Permanent Injunction Is Waived and Frivolous

The FTC's claim (at 30) the Section 13(b)(1) "does not apply" when the FTC seeks a permanent injunction is not properly before this Court. The FTC never made this argument below, and it affirmatively argued to the contrary in successfully opposing Meta's motion to dismiss the complaint as unauthorized under Section 13(b). *See* Dkt.59, at 38 (arguing that, under Section 13(b), the FTC may "seek a preliminary *or permanent* injunction in federal court" only when "the Commission 'has reason to believe' that . . . a defendant 'is violating, or is about to violate' any provision of law enforced by the FTC") (emphasis added). The FTC has thus forfeited this argument. *See PhantomALERT Inc. v. Apple Inc.*, 183 F.4th 790, 803 (D.C. Cir. 2026); *see also Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 792 (D.C. Cir. 2010) (explaining elements of judicial estoppel).

In any event, *AMG Capital* forecloses the FTC's argument. As explained above, in construing the scope of the FTC's permanent injunction authority, the Court made clear that the proviso granting that authority must be read in light of Section 13(b)(1), including its "is violating, or is about to violate" language. *See AMG Cap.*, 593 U.S. at 76 ("Consider the words 'is violating' and 'is about to violate' . . . setting forth when the Commission may request injunctive relief."). The FTC (at 34 n.6) dismisses this as "dicta," but the Court's reasoning is based on the understanding that Section 13(b)(1) applies to the FTC's permanent injunction authority — and is therefore binding. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66-67 (1996).

Furthermore, the FTC's argument makes no sense. On the FTC's reading, its authority "in proper cases" to "seek . . . a permanent injunction" is free-standing and is subject to no limitation whatsoever. *See* FTC Br. 32 ("not contingent on anything preceding it"). The FTC has never asserted such sweeping authority before. As the FTC's own cases note, it is "customary to use a proviso to refer only to things covered by a preceding clause," *Alaska v. United States*, 545 U.S. 75, 106 (2005), even if that is not invariably so. *See also Republic of Iraq v. Beaty*, 556 U.S. 848, 858 (2009) (similar). That is how the Supreme Court (dispositively) read the proviso in Section 13(b)(2) in *AMG Capital*, a case that cabined the FTC's authority. And the FTC offers no reason that Congress would have invested the

FTC with sweeping authority in a sentence buried within a provision addressing injunctions pending administrative proceedings. As the Court noted in *AMG Capital*, "Congress does not hide elephants in mouseholes." 593 U.S. at 78 (cleaned up).

**CONCLUSION**

This Court should affirm.

Respectfully submitted,

/s/ *Aaron M. Panner*

MARK C. HANSEN
AARON M. PANNER
ALEX A. PARKINSON
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mhansen@kellogghansen.com
apanner@kellogghansen.com
aparkinson@kellogghansen.com

*Counsel for Defendant-Appellee Meta Platforms, Inc.*

October 20, 2026

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), the brief contains 12,976 words.

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word in a proportionally spaced typeface (Times New Roman, 14 point).

/s/ *Aaron M. Panner*
Aaron M. Panner

October 20, 2026

# ADDENDUM

**15 U.S.C. § 2**

**15 U.S.C. § 2 – Monopolizing trade a felony; penalty**

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 20, 2026, I caused to be filed electronically the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Aaron M. Panner*
Aaron M. Panner